**14 CV 3745**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD R. LANIER, on behalf of himself, individually, and on behalf of all others similarly situated, | CIVIL ACTION NO. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | JURY TRIAL DEMANDED |
| BATS EXCHANGE, INC., BATS Y-EXCHANGE, INC., CHICAGO BOARD OPTIONS EXCHANGE, INC., CHICAGO STOCK EXCHANGE, INC., EDGA EXCHANGE, INC., EDGX EXCHANGE, INC., INTERNATIONAL SECURITIES EXCHANGE, LLC, , NASDAQ OMX BX, INC., NASDAQ OMX, PHLX, LLC, NASDAQ STOCK MARKET, LLC, NATIONAL STOCK EXCHANGE, LLC, NEW YORK STOCK EXCHANGE, LLC, NYSE ARCA, INC., NYSE MKT, LLC | |
| Defendants. | |



RECEIVED
MAY 23 2014
U.S.D.C. S.D.N.Y.
CASHIERS

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................. 5

II.  NATURE OF THE ACTION ................................................................. 5

III.  BACKGROUND ................................................................................... 6

    A.  Overview of the Significance of the Market Data to Subscribers and the Process by Which It Is Disseminated .................................... 6

    B.  The Significance of the Exchange Defendants' Side Deals With the Preferred Data Customers ..................................................................... 7

    C.  The Significance of Time in the Financial World ............................... 7

IV.  JURISDICTION AND VENUE ............................................................. 9

V.  PARTIES ............................................................................................. 10

    A.  Plaintiff ............................................................................................ 10

    B.  Defendants ....................................................................................... 10

VI.  FACTUAL ALLEGATIONS ............................................................... 12

    A.  The Exchange Defendants Become For-Profit Businesses While Shedding Their Self-Regulatory Role .............................................. 12

    B.  The Exchange Defendants' Dissemination of Market Data to Subscribers ....................................................................................... 14

        1.  The Consolidated Quotation System & the Consolidated Tape System ................................................................................ 14

        2.  The Plan Requirements ........................................................... 16

        3.  The Subscriber Contracts ........................................................ 17

    C.  The Exchange Defendants Sell Faster Access to Market Data to the Preferred Data Customers .......................................................... 19

        1.  The Exchange Defendants Sell Advance Access Through Private Feeds ........................................................................... 20

        2.  The Exchange Defendants Sell Advance Access Through Co-Location Services ............................................................... 21

D. The Exchange Defendants' Breach of the Subscriber Contracts and Unjust Enrichment at the Expense of Subscribers ............................................. 22

VII. CLASS ACTION ALLEGATIONS ......................................................... 25

A. The Injunctive Relief and Monetary Relief Classes ......................................... 26

B. The Issue Class ......................................................... 27

C. The Subscriber Class Meets the Requirements of Rule 23(a) ........................... 28

1. Numerosity ......................................................... 28

2. Commonality ......................................................... 28

3. Typicality ......................................................... 29

4. Adequacy ......................................................... 30

D. The Subscriber Class Meets the Requirements of Rule 23(b) ........................... 30

CLAIMS FOR RELIEF ......................................................... 31

VIII. FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT ..................................... 31

IX. SECOND CLAIM FOR RELIEF – IMPOSITION OF A CONSTRUCTIVE TRUST ......................................................... 34

X. THIRD CLAIM FOR RELIEF – UNJUST ENRICHMENT (RECEIPT OF SUBSCRIPTION FEES) ......................................................... 35

XI. FOURTH CLAIM FOR RELIEF – UNJUST ENRICHMENT (RECEIPT OF FEES FROM PREFERRED DATA CUSTOMERS) ........................................... 36

XII. PRAYER FOR RELIEF ......................................................... 37

XIII. REQUEST FOR JURY TRIAL ......................................................... 38

Plaintiff, through his undersigned counsel, submits this Class Action Complaint ("Complaint") against the defendants named herein and alleges the following:

1.     This case is about broken promises. Plaintiff Harold Lanier, and other Subscribers, (collectively "Subscribers") entered into Contracts[1] with the defendants, all of which are securities exchanges ("Exchange Defendants"), to receive electronic market data[2] services offered by the Exchange Defendants. The Exchange Defendants promised to be fair by: (1) providing the market data service in a non-discriminatory manner; and (2) providing the Subscribers with "valid" data (i.e., the actual data that is accurate and not stale). The Exchange Defendants did not live up to either promise.

2.     First, the Exchange Defendants failed to live up to their promise to provide Subscribers with the market data in a non-discriminatory manner.  In an effort to increase their profits, the Exchange Defendants entered into lucrative side deals with certain customers to whom the Exchange Defendants sold advance access to the market data that Subscribers had contracted for through (1) direct feeds ("Private Feeds") and (2) co-location services ("Preferred Data Customers").[3] As detailed in Section IV.C. of this Complaint, for a price, the Exchange Defendants provided access to the data to Preferred Data Customers through arrangements that guaranteed they would receive the data substantially in advance of the Subscribers.

---

[1] The terms "Contracts" or "Subscriber Contracts" herein refer to the contracts for the receipt of market data between the Defendants, or agents acting on their behalf, and Subscribers. References to "Subscribers," "Contracts," or "Subscriber Contracts" specifically exclude the Preferred Data Customers discussed herein and their relationships, contractual or otherwise, with the Defendants.

[2] The electronic market data ("data" or "market data") includes the bid and offer and trade data described in footnote 4.

[3] For purposes of this Complaint the term "Preferred Data Customers" includes any entity or individual who entered into arrangements with the Exchange Defendants to obtain direct market data through Private Feeds and/or co-location services.

Unbeknownst to Subscribers, these side deals resulted in Subscribers receiving data that was obsolete because the Preferred Data Customers had advance access to the data.

3.      Second, the Exchange Defendants failed to live up to their promise to provide Subscribers with valid data.  The validity of the data is what made the electronic data services offered by the Exchange Defendants valuable to the Subscribers. But by entering into the side deals with the Preferred Data Customers, the Exchange Defendants effectively provided to Preferred Data Customers the data that Subscribers had paid for, while giving Subscribers data that was stale. In other words, as a result of the side deals, the Exchange Defendants deprived the Subscribers of the fundamental benefit of their Contracts, i.e., fair access to valid data. Plaintiff and the other Subscribers thereby suffered injury and damage as a result of the Exchange Defendants' conduct.

## I.      PRELIMINARY STATEMENT

4.      This Complaint alleges ordinary state law claims, the crux of which revolve around the sale of stale data to Plaintiff. In other words, the gravamen of Plaintiff's Complaint is that the services he purchased from the Exchange Defendants (specifically, the data provided through the exchanges) were not delivered as promised. This Complaint does not involve any claims regarding the purchase or sale of securities or investors' losses, nor does Plaintiff seek any relief related to the purchase or sale of any security.

## II.     NATURE OF THE ACTION

5.      Plaintiff brings this Complaint individually and on behalf of other Subscribers who entered into Contracts with the Exchange Defendants. The Contracts are similar—in all

respects material to this Complaint—to Plaintiff's Contracts with the Exchange Defendants, in that they obligate the Exchange Defendants to provide valid market data. [4]

6.      Pursuant to those Contracts, Subscribers paid hundreds of millions of dollars in subscription fees to the Exchange Defendants for the provision of that data in a nondiscriminatory manner.

7.      The gravamen of this Complaint is that the Exchange Defendants breached the Contracts, including the duty of good faith and fair dealing, by depriving Subscribers of the value for which they contracted. Through evasion of the spirit of the bargain, Exchange Defendants enriched themselves by offering and providing the valid data to the Preferred Data Customers well before it was provided to Subscribers—in essence, willful rendering of imperfect performance.

### III.      BACKGROUND

**A.      Overview of the Significance of the Market Data to Subscribers and the Process by Which It Is Disseminated**

8.      The market data disseminated by the Exchange Defendants to Subscribers is the best bid and offer and trade data for the securities traded on each Defendant's exchange. The bid and offer data is only valid if it reflects the current market, and is not stale.

9.      The Exchange Defendants distribute data to Subscribers by submitting their market data to a processor ("Processor"). The Processor, acting as agent for and on behalf of the Exchange Defendants, determines the overall, or consolidated, best bid and offer and then distributes that data to Subscribers (the "SIP" or "Subscriber Feed"). The consolidated or

---

[4] The phrase "market data" is intended to reflect all electronic data disseminated pursuant to the written plans at issue in this case, and as set forth *infra*, at Section VI.B.

aggregated data is intended to be a single source of information across all markets, rather than requiring the public to obtain data from many different exchanges and other markets.

10.     The Subscriber Contracts obligated the Exchange Defendants to provide to Subscribers valid market data on a non-discriminatory basis. Instead, the Exchange Defendants sold the access to the valid market data to Preferred Data Customers while providing stale market data to Subscribers.

**B.     The Significance of the Exchange Defendants' Side Deals With the Preferred Data Customers**

11.     The Exchange Defendants' side deals with the Preferred Data Customers to provide faster, advance access to market data breached Subscribers' Contracts and were designed to enable the Exchange Defendants to use their data monopoly to generate profits for themselves.

12.     The Exchange Defendants charge a substantial premium to the Preferred Data Customers in exchange for their receiving the data *earlier* than it is received by Subscribers. It is the very fact that Subscribers receive stale data that makes the earlier receipt of that data by the Preferred Data Customers so valuable to them. The Preferred Data Customers are incentivized to pay the Exchange Defendants' premium fees—hundreds of millions of dollars each year—for this head start because it guarantees profits for the Preferred Data Customers.

**C.     The Significance of Time in the Financial World**

13.     Market data is purportedly made available to the Processor and Preferred Data Customers at the same time. However, the Exchange Defendants actually transmit the data to Preferred Data Customers before they send the same data to the Processor, such that the data arrives at the Processor well over a thousand microseconds later than the same data distributed over faster channels reaches the Preferred Data Customers. This does not even account for the additional time required to subsequently transmit the data from the Processor to the Subscribers.

In human perception, those microseconds might appear unimportant, far less time than the blink of an eye. But in today's financial markets, one thousand microseconds is a virtual eon. And given that it only takes the Preferred Data Customers a handful of microseconds to cancel orders and execute trades, it is more than enough time for them to generate tremendous profits from the advance receipt of the market data.

14.     The illustration below shows the flow of market data from the exchanges to both Subscribers (through the Processor) and to Preferred Data Customers. Through the use of high speed Private Feeds and co-location services, the Preferred Data Customers can receive the data in as little as one microsecond and can begin acting on the data immediately. Meanwhile, due to the (1) size of the connection of the feed between the Exchanges and the Processor, (2) the procedure involved in transmitting data between the Exchanges and the Processor, and (3) the co-location of Preferred Data Customers' computer servers with the Exchanges' servers, the data for Subscribers is still *en route* from the Exchanges to the Processor long after the Preferred Data Customers have received, and acted on, the information to their advantage. On average, the data is received by the Processor approximately 1,499 microseconds after the Preferred Data Customers receive it. The Processor then aggregates the data and only then is it disseminated to the Subscribers.



15.     The result of the time discrepancy in the illustration above is that Subscribers do not actually know the valid market data at any given time because their data is stale in comparison with the data received by the Preferred Data Customers. The materiality of the receipt of valid, as opposed to stale, market data is demonstrated in part by the fact that Preferred Data Customers pay substantial premiums to obtain earlier access to the data.

16.     This Complaint explains: how and why the Exchange Defendants provide faster access to market data to the Preferred Data Customers; why the Exchange Defendants' side deals with the Preferred Data Customers deprived Subscribers of the benefit of their Contracts and constitute a breach of those Contracts; and why the Exchange Defendants ought to be required to return the fees paid by Subscribers and to turn over to Subscribers the fees they received from the Preferred Data Customers.

## IV.     JURISDICTION AND VENUE

17.     This Court has original jurisdiction over the subject matter of this dispute under 28 U.S.C. § 1332(d)(2), which provides for federal jurisdiction in class actions with minimal diversity when damages exceed five million dollars, exclusive of interest and costs. The aggregate amount at issue in this dispute exceeds five million dollars. In addition, "minimal diversity" is satisfied because at least one member of the proposed classes is a citizen of a State different from any defendant.

18.     Venue is appropriate in this district pursuant to:

    A.     28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York; and

    B.     28 U.S.C. § 1391(b)(1) because certain Defendants reside in the Southern District of New York and all other Defendants are deemed to reside in the Southern District of

New York pursuant to 28 U.S.C. § 1391(c)(2) because such Defendants are subject to personal jurisdiction in Southern District of New York with respect to this civil action.

## V.      PARTIES

### A.      Plaintiff

19.      Harold Lanier resides in Fairhope, Alabama. Plaintiff entered into Subscriber Contracts for receipt of valid market data from each of the Exchange Defendants.

### B.      Defendants

20.      The Exchange Defendants are national securities exchanges that disseminate electronic market data to a Processor for distribution to Subscribers through the SIP/Subscriber Feed. The Exchange Defendants also enter into arrangements to provide advance access to this same data to the Preferred Data Customers. The primary market for both the Subscriber Feeds and Private Feeds is New York, New York.

21.      BATS Exchange, Inc. is a Delaware Corporation with its main office at 8050 Marshall Drive, Lenexa, Kansas 66214. It maintains a New York office at 17 State Street 32nd Floor, New York, New York 10004.

22.      BATS Y-Exchange, Inc. is a Delaware Corporation with its main office at 8050 Marshall Drive, Lenexa, Kansas 66214. It maintains a New York office at 17 State Street 32nd Floor, New York, New York 10004.

23.      Chicago Board Options Exchange, Inc. is a Delaware Corporation with its main office at 400 South LaSalle Street, 26th Floor, Chicago, Illinois 60605. It maintains a New York office at 61 Broadway, Suite 1301, New York, New York 10006.

24.      Chicago Stock Exchange, Inc. is a Delaware Corporation with its main office at 440 South LaSalle Street, Chicago, Illinois 60605.

25.     EDGA Exchange, Inc. is a Delaware Corporation with its main office at 545 Washington Boulevard, Sixth Floor, Jersey City, New Jersey 07310.

26.     EDGX Exchange, Inc. is a Delaware Corporation with its main office at 545 Washington Boulevard, Sixth Floor, Jersey City, New Jersey 07310.

27.     International Securities Exchange, LLC is a Delaware LLC with its main office at 60 Broad Street, New York, New York 10004.

28.     NASDAQ OMX BX, Inc. is a Delaware Corporation with its main office at One Liberty Plaza, New York, New York 10006.

29.     NASDAQ OMX PHLX, LLC is a Delaware Corporation with its main office at 1900 Market Street, Philadelphia, Pennsylvania 19103.

30.     The NASDAQ Stock Market, LLC is a Delaware LLC with its main office at 1 Liberty Plaza, 165 Broadway, New York, New York 10006.

31.     National Stock Exchange, Inc. is a Delaware Corporation with its main office at 101 Hudson, Suite 1200, Jersey City, New Jersey 07302.

32.     New York Stock Exchange, LLC is a New York LLC with its main office at 11 Wall Street, New York, New York 10005.

33.     NYSE ARCA, Inc. is a Delaware Corporation with its main office at 100 South Wacker Drive, Suite 1800, Chicago, Illinois  60606.

34.     NYSE MKT, LLC is a Delaware LLC with its main office at 11 Wall Street, New York, New York 10005.

35.     At all relevant times herein, each of the Exchange Defendants was and is doing business in and/or directing activities to New York, and specifically this judicial district, and derived substantial revenue from such business. Upon information and belief, the Exchange

Defendants contracted with, disseminated, and provided the market data at issue in this

Complaint to Subscribers in New York and throughout the United States.

## VI.     FACTUAL ALLEGATIONS

**A.     The Exchange Defendants Become For-Profit Businesses While Shedding Their Self-Regulatory Role**

36.     National securities exchanges historically operated as not-for-profit mutual

organizations charged with enforcing market rules to protect investors. This structure was

intended to minimize conflicts of interests between the exchanges and the investing public and to

enable the exchanges to fulfill their roles as self-regulatory organizations. However it was

intended, the reality is that their control over the market data has enabled exchange members to

exercise undue influence over the exchanges and circumvent exchange rules to serve their own

economic interests at the expense of the investing public and other interested parties.

37.     Since the mid-1990s, the exchanges have demutualized, abandoning their not-for-

profit structure for a for-profit model and shedding their responsibilities as self-regulatory

organizations. All of the Exchange Defendants recently converted to or, in the case of the newer

Exchange Defendants, have always been for-profit entities.

38.     With this shift in status to for-profit companies who answer to their shareholders'

desire for profits, the Exchange Defendants developed a business model to capitalize on their

control over market data. "The traditional model of self-regulation for the exchanges found its

justification in the alignment of interests between the investing public and member firms," but

that model has given way to the Exchange Defendants "now [being] oriented toward maximizing

profits for their shareholders."[5] This shift in focus resulted in quarterly earnings targets and

---

[5] Stavros Gadinis & Howell Jackson, *Markets as Regulators: A Survey*, 80 So. Cal. L. Rev. 1239, 1258 (Sept. 2007).

revenues being earned from Preferred Data Customers taking priority over any obligations to Subscribers or the investing public.

39.     The Exchange Defendants traditionally marketed and sold access to their data to Subscribers, who contracted to receive valid market data on a non-discriminatory basis. In more recent years, however, the Exchange Defendants sold advance access to their data to an elite group of sophisticated Preferred Data Customers, who pay the Exchange Defendants handsomely for this advance look at the data. The Exchange Defendants' sale of advance access to market data has nothing to do with their former roles as market regulators and everything to do with recently acquired, exclusively profit-based motives.

40.     Commentators have noted the exchanges' fundamental shift from a regulatory to a profit-making role. As the lobbying arm of the broker-dealer industry has recognized:

> The interests, incentives and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today. Since the wave of demutualizations, exchanges have rightly focused their efforts on the part of their business that earns profits to maximize the return for their shareholders, and, in some cases, ***minimized their actual performance of regulatory functions***.[6]

41.     A federal district court has summarized this transformation most succinctly: "As exchanges have evolved into for-profit enterprises, an irreconcilable conflict has arisen, rendering independence unattainable in the context of an exchange regulating its own, for-profit business conduct."[7]

---

[6] Letter from the Securities Industry and Financial Markets Association to SEC Chair Mary Jo White, July 31, 2013, *available at* www.sifma.org/issues/item.aspx?id=8589944673 (emphasis added).

[7] *Facebook, Inc., IPO Secs. and Derivative Litig.*, MDL No. 12-2389, 2013 WL 6621024 at *16 (S.D.N.Y. Dec. 12, 2013).

**B.      The Exchange Defendants' Dissemination of Market Data to Subscribers**

42.      The Exchange Defendants distribute the market data pursuant to the national

market system that was created at the direction of Congress.

43.      Market data is disseminated to Subscribers through four consolidated information

collection and dissemination systems: the Consolidated Quotation System, the Consolidated

Tape System, the NASDAQ System, and the OPRA System. Each System operates pursuant to a

reporting Plan (in which the Exchange Defendants are participants) that, in turn, is operated by

an administrator ("Administrator"). The Processor (also known as the Securities Information

Processor or "SIP") collects, processes and disseminates the market data collected for the

applicable Plan from the Exchange Defendants that are participants in that Plan ("Eligible

Securities"). On behalf of the Exchange Defendants, the Processors disseminate the market data

to Subscribers pursuant to the Subscriber Feed.[8]  This Complaint relates to the dissemination of

market data under the Consolidated Quotation System and the Consolidated Tape System.

**1.      The Consolidated Quotation System & the Consolidated Tape System**

44.      The Consolidated Quotation System ("CQS") and the Consolidated Tape System

("CTS") disseminate quotation information and last sale market data for Eligible Securities. The

Consolidated Tape Association ("CTA") is the operating authority for both the CQS and the

CTS.

45.      The CQS and CTS market data are processed and disseminated through two

separate networks: Network A comprises data from the New York Stock Exchange LLC and

Network B comprises data from BATS Exchange, Inc., BATS Y Exchange, Inc., Chicago Board

---

[8] Pursuant to Regulation National Market System ("Reg NMS"), the exchanges must file a transaction reporting
plan ("Plan"), with which the exchanges must comply. *See* Rules 601(a), 608, 17 C.F.R. §§242.601(a),
242.608(2005).

Options Exchange, Inc., Chicago Stock Exchange, Inc., EDGA Exchange, Inc., EDGX

Exchange, Inc., International Securities Exchange, NASDAQOMX, BX, Inc., NASDAQOMX

PHLX, Inc., NASDAQ OMX PSX, Inc., the NASDAQ Stock Market LLC, National Stock

Exchange, Inc., NYSE ARCA, Inc., and NYSE MKT, LLC.

46.     CQS and CTS market data are distributed pursuant to the CQ Plan and the CTA

Plan, respectively, which are joint agreements among the exchanges.

47.     The participants in the CQ Plan and the CTA Plan , which are the exchanges that

report market data under the Plans, are:

- BATS Exchange, Inc.
- BATS Y-Exchange, Inc.
- Chicago Board Options Exchange, Incorporated
- Chicago Stock Exchange, Inc.
- EDGA Exchange, Inc.
- EDGX Exchange, Inc.
- Financial Industry Regulatory Authority, Inc.
- International Securities Exchange, LLC
- NASDAQ OMX BX, Inc.
- NASDAQ OMX PHLX, Inc.
- Nasdaq Stock Market LLC
- National Stock Exchange, Inc.
- New York Stock Exchange LLC
- NYSE Arca, Inc.
- NYSE MKT, LLC

48.     The Securities Industry Automation Corporation ("SIAC") acts as the Processor

for the CQ and CTA Plans. SIAC, on behalf of and as agent for the Exchange Defendants that

are participants in the CQ and CTA Plans, receives the market data from the Exchange

Defendants and aggregates the market data from those Exchange Defendants into the

consolidated data that is sent to all Subscribers. Two NYSE entities, New York Stock Exchange

LLC for Network A and NYSE MKT LLC[9] for Network B, are the Administrators for the Networks.

49.     Plaintiff uses the term "the Plans" to refer to the CQ and CTA Plans.

**2.      The Plan Requirements**

50.     The CQ and CTA Plans set forth terms under which valid market data covered by each Plan must be disseminated to Subscribers. The terms governing the dissemination of the data are the same in all respects material to this Complaint in each Plan.

51.     The CQ and CTA Plans require that the Exchange Defendants disseminate valid market data to the Processor for Eligible Securities covered by the Plans on "fair" and "non-discriminatory" basis.

52.     Under the express terms of the CQ and CTA Plans, the Exchange Defendants must furnish market data to the Processor "as promptly as possible" for dissemination to Subscribers.  Thus, the CQ and CTA Plans prohibit the Exchange Defendants from disseminating market data to their Preferred Data Customers more promptly than they disseminate that same data to the Processor.

53.     The CQ Plan further obligates the Exchange Defendants to "have as an objective the reduction of the time period for furnishing quotation information to the Processor." Therefore, if the Exchange Defendants reduce the amount of time for furnishing data to the Preferred Data Customers (through technological advancement or otherwise), the CQ Plan requires that they similarly reduce the amount of time for furnishing the same data to the Processor.

---

[9] NYSE MKT LLC is the successor entity to NYSE Amex.

54.     The Exchange Defendants violated their obligations under the CQ and CTA Plans to provide the valid market data for Eligible Securities covered by the Plans by: (1) providing market data to Subscribers that was not the valid market data, but rather stale market data; and (2) providing the valid market data to the Preferred Data Customers through Private Feeds and co-location services. Specifically, the Exchange Defendants did not disseminate the market data to Subscribers in a non-discriminatory manner as required by the Plans.  Rather, in violation of the Plans, the Exchange Defendants disseminated the data to the Preferred Data Customers more promptly than they disseminated that same data to the Processor.

**3.     The Subscriber Contracts**

55.     Pursuant to the CQ and CTA Plans, market data is disseminated through Subscriber Contracts between the Exchange Defendants (or agents acting on their behalf) and Subscribers, such as Plaintiff Harold Lanier.

56.     Subscribers are supposed to receive access to the valid market data under the Subscriber Contracts pursuant to the Subscriber Feed dissemination mechanism described in Section VI.C, *infra*—i.e., the Exchange Defendants disseminate the valid market data to the applicable Processors which, in turn, disseminate that data on behalf of the Exchange Defendants to Subscribers.

57.     The CQ and CTA Plans include "Forms of Subscriber Contracts" for the dissemination of Network A and Network B market data under those Plans. Plaintiff Harold Lanier entered into a Network A Subscriber Contract and a Network B Subscriber Contract governing the receipt of Network A and Network B market data that are substantively the same in all respects material to this Complaint to the Form Agreements attached to the CQ and CTA Plans. Upon information and belief, members of the Subscriber Class entered into Subscriber

Contracts governing the receipt of Network A market data and Network B market data that were similar to Plaintiff's NASDAQ Subscriber Contract in all respects material to this Complaint.

58.     Subscriber Contracts for the receipt of market data pursuant to the CQ and CTA Plans are similar to each other in all respects material to this Complaint in terms of the Exchange Defendants' obligation to provide valid market data on a non-discriminatory basis.

59.     The Subscriber Contracts are vehicles for the Exchange Defendants' fulfilling their obligations under the CQ and CTA Plans. The requirements under the CQ and CTA Plans are incorporated into the Subscriber Contracts. The Contracts are subject to, and may not deviate from or be inconsistent with, the Plans.

60.     The Exchange Defendants promised to deliver to Subscribers—through the Processor acting on the Exchange Defendants' behalf—valid market data as required by the Plans, which are expressly incorporated into the Subscriber Contracts.

61.     The fundamental benefit Subscribers contracted for in the Subscriber Contracts is the receipt of valid market data on a fair, nondiscriminatory basis. The validity of the market data is what makes it valuable to Subscribers.

62.     Pursuant to the Contracts, Plaintiff Lanier and the Subscribers paid periodic fees in exchange for the receipt of valid market data on a non-discriminatory basis.

63.     What Plaintiff and the Subscribers received in exchange for those fees was not the nondiscriminatory access to valid market data for which they had contracted but, rather, stale market data. The data was stale because the Exchange Defendants gave another elite class of recipients (the Preferred Data Customers) advance access to the valid data before they provided the data to the Processor.   As a result, the Exchange Defendants violated their obligations under the CQ and CTA Plans to deliver market data to the Processor "as promptly as possible."

64.     Subscribers had no choice but to continue paying fees to maintain their Contracts in order to continue receiving the electronic data services, as the Exchange Defendants were the only available source for that information. And because the terms of the Contracts are non-negotiable and dictated by the Exchange Defendants, Subscribers had no choice but to "take it or leave it."

**C.    The Exchange Defendants Sell Faster Access to Market Data to the Preferred Data Customers**

65.     Unlike the manner in which market data is disseminated to Subscribers, the Exchange Defendants sold faster access to market data to Preferred Data Customers by eliminating the transmission of data to the Processor and enabling the Preferred Data Customers to have Private Feeds to the Exchange Defendants' data and/or by allowing the Preferred Data Customers to place their servers in close physical proximity to the Exchange Defendants' servers.

66.     The Exchange Defendants sell Private Feed connection lines that transmit data faster for a higher premium charge; the greater the connection capacity size, the higher the fee. Meanwhile, the capacity of the Exchange Defendants' connection lines to the Processor is substantially lower, and the procedure for transmission is different, resulting in far slower transmission of data to the Processor, and the Subscribers in turn.

67.     The Exchange Defendants also sell co-location services for these Private Feeds whereby the Exchange Defendants lease server space to Preferred Data Customers in close physical proximity to the Exchange Defendants' servers, which, due to the laws of physics, allows the Preferred Data Customers to receive the data sooner.

68.     By offering and selling this advance access to the market data to the Preferred Data Customers through Private Feeds and "co-location services," the Exchange Defendants

contravene the spirit and letter of their bargain with Subscribers with the sole purpose of generating profits for the Exchange Defendants and their shareholders.

69.     The Preferred Data Customers pay a premium for this advance access, which is "advance" by virtue of the fact that it allows them to receive the data both before it is received by the Processor and before it is delivered to Subscribers—allowing the Preferred Data Customers to exploit the Subscribers' lack of valid market data and generate profits for themselves.

70.     Until recently, the significance of the side deals providing advance access to market data between the Exchange Defendants and the Preferred Data Customers were not known to the investing community and the Subscribers. Even the most sophisticated investors, including hedge fund managers, were unaware of the advance access the Preferred Data Customers had been given to market data. The Preferred Data Customers could use that advance information to their benefit and the Subscribers' detriment before the information had even reached the Subscribers in the first instance.

**1.     The Exchange Defendants Sell Advance Access Through Private Feeds**

71.     The Exchange Defendants sell advance access to market data to the Preferred Data Customers that is transmitted using Private Feeds faster than the data is transmitted to the Processor. The Exchange Defendants use transmission lines for the Private Feeds that carry the data to the Preferred Data Customers in a fraction of the time it takes for the slower transmission lines to deliver the same market data to the Processor.

72.     While it may take less than *two thousand microseconds* for the market data to initially arrive at the Processor through which the Subscribers receive the data, the Preferred Data Customers receive the data directly in as fast as *one microsecond*.

73.     Preferred Data Customers have publicly stated that Private Feeds are the only way to know where the market really is because the SIPs/Subscriber Feeds are slow and not useful

and that, with the Private Feeds, a Preferred Data Customer knows that a transaction has occurred even if the Processor does not yet reflect the transaction.

74. The Exchange Defendants offer and sell Private Feeds through which they transmit market data to the Preferred Data Customers via connections of up to 40 GB. These Private Feeds are described as, among other things, providing "real time data," "microsecond latency," and the "lowest latency possible." "Microsecond latency" refers to the smaller time lag between the time the Exchange Defendants transmit market data and the time that the Preferred Data Customers receive it relative to the time they would receive the same market data from the Processor. The Private Feeds offered by the Exchange Defendants include:

| Exchange Defendant | Private Feeds |
|---|---|
| BATS Exchange | Multicast PITCH |
| BATS Y-Exchange | Multicast PITCH |
| Chicago Stock Exchange | CHX Book Feed |
| Chicago Board Options Exchange | CBOE Streaming Markets Feed |
| EDGA Exchange | EdgeBook Depth |
| EDGX Exchange | EdgeBook Depth |
| International Securities Exchange | ISE Depth of Market Feed |
| NASDAQ OMX BX | BX TotalView-ITCH |
| NASDAQ OMX PHLX | PHLX Depth of Market |
| NASDAQ Stock Market | NASDAQ TotalView-ITCH |
| National Stock Exchange | NSX Depth of Book Multicast Feed |
| NYSE ARCA | NYSE ARCA Integrated Feed |
| NYSE MKT | NYSE MKT OpenBook |
| NYSE | NYSE OpenBook Ultra |

### 2. The Exchange Defendants Sell Advance Access Through Co-Location Services

75. The Exchange Defendants also market and sell advance access to market data to the Preferred Data Customers by permitting them to "co-locate" their servers in close physical proximity to the servers that transmit market data. The Preferred Data Customers thereby gain

valuable additional microseconds because the data travels a shorter distance than the data travels from the exchanges to the Processors.

76. The time advantage that the Exchange Defendants offer through co-location services is the result of simple physics. Data necessarily arrives at close destinations sooner than it arrives at more distant destinations. The timing advantage of co-location is corroborated by the manner in which the Exchange Defendants tout the length of each transmission cable within their co-location warehouses as being identical, to ensure that no Preferred Data Customer has an advantage over any other Preferred Data Customer.

77. The Exchange Defendants describe their co-location services as offering, among other things, "extremely low latency," "microsecond latency advantage," and "equidistant cabling" to ensure that Preferred Data Customers have "the same latency away from the match engine." While the Exchange Defendants go to great lengths to ensure fair and equal treatment of the collective group of Preferred Data Customers by offering the co-location services, they deprive Subscribers of the right to receive the benefits they contracted for—access to valid market data on a fair, non-discriminatory basis, or exactly what the Preferred Data Customers received (i.e., receipt of the market data on a nondiscriminatory basis vis a vis other Preferred Data Customers). All of the Exchange Defendants offer co-location services.

**D.    The Exchange Defendants' Breach of the Subscriber Contracts and Unjust Enrichment at the Expense of Subscribers**

78. Under the Subscriber Contracts, the Exchange Defendants were obligated to provide Plaintiff and Subscribers with valid market data on a fair and non-discriminatory basis.

79. The validity of that market data is what makes it valuable to all recipients, including Subscribers. Indeed, the validity of this market data is the fundamental consideration that Subscribers are to receive in return for subscription fees paid to the Exchange Defendants.

80.     Under the terms of the Subscriber Contracts, which incorporate the CQ and CTA Plans, *all* recipients of market data should receive the data either over the same distribution system, or in the same fashion, such that Subscribers would have non-discriminatory access to receipt of the valid market data, as illustrated below.



81.     Instead, the Exchange Defendants breached the Contracts by depriving Subscribers of the principal benefit of the Contracts—fair and non-discriminatory access to valid market data—because they provided that data to the Preferred Data Customers in advance of when it was provided to the Processor, as illustrated below, and *supra,* at Section VI.C.



82.     As a result of their side deals with the Preferred Data Customers, Defendants did not provide Subscribers with fair and non-discriminatory access to valid market data as required by the Subscriber Contracts because the Preferred Data Customers received that data on preferential terms—i.e., earlier, so that they could use data before even the Processor, much less the Subscribers, had received it.

83.     In the illustration at paragraph 81, the Preferred Data Customers received the market data 1,499 microseconds *before* even the Processor received that data for dissemination to Subscribers. The value for which Subscribers are paying is thus being transferred to the Preferred Data Customers, who receive the *valid market data*. In other words, the Preferred Data Customers received the benefit that Plaintiff and Subscribers contracted for, while Plaintiff and Subscribers did not because they received stale market data. In essence, the Exchange Defendants are selling the same set of market data twice, just at different speeds, such that it is only valid for one group of data customers—the Preferred Data Customers.

84.     The Exchange Defendants also breached the Contracts and the duty of good faith and fair dealing by placing, or causing to be placed by the Processor acting on their behalf, inaccurate times on the market data that did not accurately reflect the time that data was entered at the exchange.

85.     The value of advance access to the market data *exceeds* what would otherwise be the value of the market data because the Exchange Defendants have created for the Preferred Data Customers a class of other customers, the Subscribers, that receive the market data late and whom the Preferred Data Customers can exploit. The market data is far less valuable to Subscribers if it is not the valid market data. What Subscribers contracted for was valid data. What Subscribers got was stale data.

86.     Without the existence of someone (here, the Subscribers) who receives the data later, there could be no earlier receipt of the data by the Preferred Data Customers, and their speedy receipt of the data would not be of value. Without the Subscribers, the Exchange Defendants would not be able to sell advance access to the Preferred Data Customers. By

providing the Preferred Data Customers with earlier access to the data, the Exchange Defendants thus subverted the Subscriber Contracts for their own financial gain.

87.     The Exchange Defendants' actions harmed Mr. Lanier by providing him, without his knowledge, stale data instead of the valid market data for which he had contracted.

## VII.    CLASS ACTION ALLEGATIONS

88.     This action is brought by Plaintiff on behalf of himself and those Subscribers similarly situated[10] who have entered into Subscriber Contracts[11] with any of the Exchange Defendants (directly or through their agents). Plaintiff brings his claims on behalf of all Subscribers.

89.     To resolve the common core issue in the litigation—the Exchange Defendants' breach of the Subscriber Contracts—Plaintiff seeks certification of: an injunctive relief class pursuant to Federal Rule of Civil Procedure 23(b)(2) ("Injunctive Relief Class") and a monetary relief class pursuant to Rule 23 (b)(1)(B) and Rule 23 (b)(3) ("Monetary Relief Class"). The objective of this relief is to halt the unfair and discriminatory practices of the Exchange Defendants, and to return the Plaintiff and members of the Injunctive Relief Class and Monetary Relief Class to their position prior to entering into the Subscriber Contracts. Given that the common core issue of the litigation is whether the Exchange Defendants' breached the Subscriber Contracts, Plaintiff also requests certification pursuant to Rule 23(c)(4), which allows "particular issues" to be "brought or maintained as a class action" ("Issue Class"). Collectively

---

[10] Preferred Data Customers are not "similarly situated" to Plaintiff or Subscribers and therefore are not included the class Plaintiff Harold Lanier seeks to represent.

[11] As noted above, the term "Subscriber Contract" does not encompass the side deals or arrangements, contractual or otherwise, that exist between the Exchange Defendants and Preferred Data Customers.

the Injunctive Relief Class, Monetary Relief Class, and Issue Class, and will be referred to as the "Subscriber Class."

## A.      The Injunctive Relief and Monetary Relief Classes

90.      Rule 23(b)(1) provides that a class may be certified where the prosecution of separate actions by individual class members would create a risk of inconsistent adjudications with respect to individual class members, or adjudications of individual class members would be dispositive of the interests of the other class members not parties to the individual actions and would impede their ability to protect their interests.

91.      Rule 23(b)(2) provides that an injunctive class may be certified where the parties opposing the class have acted or refused to act on grounds that apply generally to the class.

92.      Rule 23(b)(3) provides that a class may be certified where questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other methods for adjudicating the controversy.

93.      Pursuant to Rule 23(b)(1), (2), and (3), Plaintiff brings this action on behalf of himself and all others similarly situated in the United States, defined as follows:

> All persons within the United States of America who were Subscribers and received market data pursuant to Subscriber Contracts at any time during the period from May 19, 2008 to the present ("Injunctive Relief Class" or "Monetary Relief Class").

94.      Excluded from the Injunctive Relief Class and the Monetary Relief Class are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, and the Preferred Data Customers.

**B.      The Issue Class**

95.      In the alternative, Plaintiff seeks certification under Rule 23(c)(4), which provides

that an action may be brought or maintained as a class action with respect to particular issues.

96.      Pursuant to Federal Rule of Civil Procedure 23(c)(4), the Issue Class is defined as

follows:

> All persons within the United States of America who were Subscribers and
> received market data pursuant to Subscriber Contracts at any time during the
> period from May 19, 2008 to the present ("Issue Class").

97.      Excluded from the Issue Class are Defendants, the officers and directors of the

Defendants at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which defendants have or had a

controlling interest, and the Preferred Data Customers.

98.      An Issue Class is appropriate under Rule 23(c)(4) because, as discussed above, at

the heart of this Complaint is whether the Exchange Defendants breached the Subscriber

Contracts by providing market data in the same unfair, inaccurate, and discriminatory fashion to

all Subscribers. Because the Exchange Defendants' conduct was uniform throughout the United

States—breaching the Subscriber Contracts by making side deals with Preferred Data Customers

to provide faster data to the Preferred Data Customers, and co-locating servers to the

disadvantage of all Subscribers—this issue is suited for class wide issue resolution. Specifically,

the liability issues applicable to the Issue Class arise from the following question: whether the

Exchange Defendants breached the Subscriber Contracts by failing to provide valid market data

and/or by providing market data in the same unfair, inaccurate and/or discriminatory fashion to

all Subscribers.

99.      Under Rule 23(c)(4), certification is appropriate when a Plaintiff establishes a

class under Rule 23(a), and when a common issue threads through the case.

**C.    The Subscriber Class Meets the Requirements of Rule 23(a)**

100.    The Injunctive Relief Class, Monetary Relief Class, and Issue Class are properly brought and should be maintained as a class action under Rule 23(a), as they satisfy the class action prerequisites of numerosity, commonality, typicality, and adequacy.

**1.    Numerosity**

101.    The members of the Subscriber Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are millions of members in the proposed Subscriber Class. The exact number of Class members is in the control of and may be identified from records maintained by the Exchange Defendants.

**2.    Commonality**

102.    Questions of law and fact, which are common to the Subscriber Class, are numerous and predominate over questions affecting only individual members of the class, including, *inter alia*, the following:

A.    Whether the Exchange Defendants provided valid market data to Subscribers in an unfair, inaccurate and/or discriminatory fashion;

B.    Whether the Exchange Defendants breached the terms of the Subscriber Contracts and the Plans;

C.    Whether claims of the Class arise from the same conduct constituting the Exchange Defendants' breach of the Subscriber Contracts and the Plans;

D.    Whether the Exchange Defendants breached the covenant of good faith and fair dealing in the Contracts when they entered into side deals with the Preferred Data Customers pursuant to which the Preferred Data Customers received faster access to market data;

28

E.      Whether the Exchange Defendants breached the covenant of good faith fair dealing in the Contracts by depriving the Subscriber Class of access to valid market data; and

F.      Whether the Exchange Defendants have been unjustly enriched.

103.    Questions of law and fact, which are common to the Injunctive Relief Class and/or the Monetary Relief Class, are numerous and predominate over questions affecting only individual members of the class, including, *inter alia*, the following:

A.      Whether Plaintiff and the Classes have been damaged by the Exchange Defendants' breach of the Subscriber Contracts and the Plans;

B.      Whether Plaintiff and the Classes are entitled to a return of fees paid pursuant to the Contracts; and/or fees the Exchange Defendants received from the Preferred Data Customers for access to Private Feeds and co-location services;

C.       Whether a constructive trust should be imposed on all monies unjustly obtained by the Exchange Defendants; and

D.      Whether the Exchange Defendants' practices complained of herein should be enjoined.

**3.    Typicality**

104.    Plaintiff's claims are typical of the claims of the Subscriber Class because his claims have the same essential characteristics as the claims of the class members and his claims arise from the same course of conduct by the Exchange Defendants, i.e., the Exchange Defendants breached the Subscriber Contracts and the Plans by failing to provide valid market data and/or by providing market data in the same unfair, inaccurate and discriminatory fashion to all members of the Subscriber Class.

4.      **Adequacy**

105.    Plaintiff will fairly and adequately represent and protect the interests of the Subscriber Class. His claims are common to all members of the Class and he has strong interests in vindicating their rights. In addition, Plaintiff and the Class are represented by counsel who are competent and experienced in class action litigation.

**D.      The Subscriber Class Meets the Requirements of Rule 23(b)**

106.    Certification of the Monetary Relief Class under Rule 23(b)(1) is appropriate because prosecuting separate actions by or against individual class members (Subscribers) would create a substantial risk that adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications and would substantially impair or impede their ability to protect their interests.

107.    Certification of the Monetary Relief Class and Issue Class under Rule 23(b)(3) is also appropriate because common questions of law and fact that exist as to all members of the Class are central to the adjudication of this action and predominate over any questions solely affecting individual members of the Class.

108.    Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy in that, among other elements:

A.      The interests of the Plaintiff and members of the Classes in individually controlling the prosecution of separate actions are outweighed by the advantages of adjudicating the common issues of fact and law by means of a class action;

B.      Resolution of the liability issues for the Issue Class would materially advance the litigation of the case;

C.      The expense of prosecuting Plaintiff's and Class members' claims individually would significantly exceed any economic benefit Plaintiff or class members could

realize individually, and individual litigation would overload court dockets and magnify the delay and expense to all parties making individual litigation of liability and damages claims economically impractical and infeasible;

        D.     It is desirable that litigation of the claims occur for the all Classes in this forum to preserve the resources of both the Courts and the litigants, and to reduce the risk of varying and inconsistent adjudications that could occur in individual adjudications; and

        E.     Little, if any, difficulty is likely to be encountered in management of this class action because applicable law will uniformly apply to each of the claims on behalf of each of the Classes.

      109.    Certification of the Injunctive Relief Class under Rule 23(b)(2) is appropriate because the Exchange Defendants acted or refused to act on grounds that apply generally to the Injunctive Class. Specifically, the Exchange Defendants breached the Subscriber Contracts and the Plans by failing to provide valid market data and/or providing market data in the same unfair, inaccurate and discriminatory fashion to all members of the Injunctive Class. Any final injunctive or declaratory relief would apply to the entire Injunctive Class as the Exchange Defendants would be ordered to cease their unfair, inaccurate, and discriminatory distribution of market data.

## CLAIMS FOR RELIEF

## VIII.   FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT

      110.    All of the preceding allegations in paragraphs 1 – 109 are incorporated by reference under this claim.

      111.    Plaintiff and members of the Subscriber Class entered into Subscriber Contracts with the Exchange Defendants.

112.    Pursuant to the Contracts, the Exchange Defendants charged fees to Plaintiff and the Subscriber Class in exchange for the delivery of valid market data on a non-discriminatory basis.

113.    Plaintiff and members of the Subscriber Class performed all contractual conditions required of them under the Contracts by paying the applicable fees and complying with the reporting requirements of the Contracts and all other terms of the Contracts.

114.    As described herein, the Exchange Defendants breached the terms of the Subscriber Contracts and the Plans and/or the implied covenant of good faith and fair dealing incorporated therein by, *inter alia*:

A.    Failing to provide the valid market data to Plaintiff and members of the Subscriber Class;

B.    Failing to provide valid market data on a fair and non-discriminatory basis to Plaintiff and the Subscriber Class;

C.    Failing to disseminate market data to Plaintiff and the Subscriber Class in a non-discriminatory manner;

D.    Failing to furnish market data to the Processor "as promptly as possible" for dissemination to Subscribers;

E.    Placing, or causing to be placed, inaccurate times on the market data delivered to Plaintiff and the Subscriber Class;

F.    Depriving Plaintiff and the Subscriber Class of the fundamental benefit they contracted for—i.e., the receipt of valid market data on a non-discriminatory basis—by providing advance access to market data to the Preferred Data Customers;

G.      Withholding the benefits of the Subscriber Contracts from Plaintiff and the Class;

H.      Preventing specific performance of the Subscriber Contracts;

I.      Providing faster and/or advance access to valid market data to the Preferred Data Customers; and

J.      Intentionally breaching contracts in order to enable Preferred Data Customers to exploit the time advantage gained by their advance access to the valid market data.

115.    The Exchange Defendants' breaches were material in that they deprived Plaintiff and members of the Subscriber Class of the fundamental right they contracted for and defeated entirely the object of the Contracts.

116.    The Exchange Defendants' breach of the Contracts was willful and intentional in order to generate profits for themselves by through sales of the valid market data to the Preferred Data Customers.

117.    The Exchange Defendants were grossly negligent and/or acted with deliberate or callous indifference to the rights of Subscribers and the spirit of the law and the Plan when they intentionally disregarded their promise to provide 'valid' market data on a non-discriminatory basis.

118.    Plaintiff and members of the Subscriber Class suffered damages as a direct and proximate result of the Exchange Defendants' breach of the Contracts and/or the implied covenant of good faith and fair dealing incorporated therein.

119.    Monetary relief is not adequate to remedy the harm caused by Defendants' ongoing and/or future breaches of the Contracts, such that specific performance and/or an order

enjoining Defendants' ongoing and/or future nonperformance is necessary to prevent irreparable harm to Plaintiff and members of the Subscriber Class.

120.    Plaintiff and members of the Subscriber Class are entitled to damages, restitution in an amount equal to the fees paid under the Subscriber Contracts, rescission of the Subscriber Contracts and/or specific performance.

## IX.    SECOND CLAIM FOR RELIEF – IMPOSITION OF A CONSTRUCTIVE TRUST

121.    All of the preceding allegations in paragraphs 1 – 120 are incorporated by reference under this claim.

122.    This Claim is pled in the alternative to the First Claim (Breach of Contract), *supra*.

123.    A confidential relationship exists between Plaintiff and the members of the Subscriber Class and the Exchange Defendants in that, among other things, the Exchange Defendants had superior access to confidential information in the form of valid market data and Plaintiff and the members of the Subscriber Class do not deal on equal terms with the Exchange Defendants with respect to market data.

124.    The Exchange Defendants promised, expressly or impliedly, to provide to Plaintiff and members of the Subscriber Class valid market data and to do so in a fair and nondiscriminatory fashion.

125.    In reliance on that promise, Plaintiff and members of the Subscriber Class paid the Exchange Defendants fees to receive market data.

126.    For the reasons discussed herein, the Exchange Defendants did not provide Plaintiff and members of the Subscriber Class with non-discriminatory access to valid market data. Rather, driven by their desire to maximize profits for themselves, the Exchange Defendants

sold advance access to market data to the Preferred Data Customers, such that the data received by Plaintiff and the Subscriber Class was not valid, but stale.

127.     The Exchange Defendants thus have been unjustly enriched by, and to the extent of, their receipt of fees from Plaintiff and members of the Subscriber Class at the expense and detriment of Plaintiff and the Subscriber Class.

128.     The Exchange Defendants' retention of the fees paid by Plaintiff and the Subscriber Class would be unjust.

129.     Equity requires that the Exchange Defendants be deemed to hold those fees in trust for Plaintiff and the Subscriber Class.

130.     Plaintiff and the Subscriber Class are entitled to imposition of a constructive trust upon all benefits, however derived, realized by Defendants as a result of the acts complained of herein.

## X.       THIRD CLAIM FOR RELIEF – UNJUST ENRICHMENT (RECEIPT OF SUBSCRIPTION FEES)

131.     All of the preceding allegations in paragraphs 1 – 130 are incorporated by reference under this claim.

132.     This Claim is pled in the alternative to the First Claim (Breach of Contract), *supra*.

133.     Plaintiff and the Subscriber Class conferred benefits on the Exchange Defendants in the form of subscription fees paid to the Exchange Defendants in order for Plaintiff to receive access to valid market data in a non-discriminatory manner.

134.     For the reasons discussed herein, the data Plaintiff and the Subscriber Class received was not valid market data, and was provided to them in a discriminatory manner.

135.    The Exchange Defendants have been enriched at the expense and to the detriment of Plaintiff and the Subscriber Class in the form of the subscription fees they collected.

136.    Under the circumstances alleged herein, it is against equity and good conscience for the Exchange Defendants to retain these fees.

137.    Plaintiff and the Subscriber Class are entitled to restitution of the subscription fees paid to the Exchange Defendants.

## XI.     FOURTH CLAIM FOR RELIEF – UNJUST ENRICHMENT
## (RECEIPT OF FEES FROM PREFERRED DATA CUSTOMERS)

138.    All of the preceding allegations in paragraphs 1 – 137 are incorporated by reference under this claim.

139.    Plaintiff and the Subscriber Class conferred benefits on the Exchange Defendants in the form of the opportunity to sell advance access to market data to the Preferred Data Customers. For the reasons discussed herein, but for the Subscriber's receipt of stale market data, the Private Feed and co-location services would not have been valuable and desirable to the Preferred Data Customers, and the Exchange Defendants would not have been able to sell those services to the Preferred Data Customers.

140.    The value of the benefit Subscribers conferred on the Exchange Defendants is the price for which the Exchange Defendants sold the Private Feeds and co-location services to the Preferred Data Customers, and, therefore, can be measured by the fees received by the Exchange Defendants from the Preferred Data Customers in exchange for advance access to market data through Private Feeds and co-location services.

141.    The Exchange Defendants have been enriched at the expense and detriment of Plaintiff and the Subscriber Class in the form of the fees received by the Exchange Defendants from the Preferred Data Customers because Defendants sold to the Preferred Data Customers the

market data that Plaintiff and the Subscriber Class were promised, allowing the Preferred Data Customers to exploit the fact that the Subscribers' data was stale.

142.     Under the circumstances alleged herein, it is against equity and good conscience for the Exchange Defendants to retain the fees they received from the Preferred Data Customers for access to Private Feeds and co-location services.

143.     Plaintiff and the Subscriber Class are entitled to restitution and/or disgorgement of the value of the benefit they conferred on the Exchange Defendants—an amount equal to the fees received from the Preferred Data Customers.

## XII.     PRAYER FOR RELIEF

144.     Plaintiff and the putative Class pray for judgment and relief as follows:

A.     An order certifying the claims of the Subscriber Class and appointing Plaintiff Harold Lanier as a Rule 23 class representative and Lead Plaintiff, and certifying Plaintiff's Counsel as Lead Counsel.

B.     An order declaring void ab initio and/or unenforceable any illegal and/or unconscionable provisions of the Subscriber Contracts.

C.     An order declaring the rights of the Plaintiff and the Subscriber Class.

D.     Judgment entered in favor of the Class and against Exchange Defendants finding that Exchange Defendants breached the Contracts.

E.     An order requiring that Defendants specifically perform their obligations under the current Contracts in effect and enjoining any future non-performance or, in the alternative, rescinding the Subscriber Contracts.

F.     Restitution to the Subscriber Class of all fees paid by Subscribers under the Contracts.

G.      An order requiring Defendants to disgorge all fees paid to them by the Preferred Data Customers for Private Feeds and co-location services.

H.      For the imposition of a constructive trust upon all benefits, however derived, realized by Defendants as a result of Defendants' unlawful acts perpetrated on Plaintiff and the Subscriber Class.

I.      Costs, disbursements, attorneys' fees and any other relief that this Court deems appropriate.

## XIII.   REQUEST FOR JURY TRIAL

145.    Plaintiff demands a trial by jury on all counts.

DATED:      New York, New York

May 22, 2014

KELLER ROHRBACK L.L.P.

By _____
David S. Preminger
dpreminger@kellerrohrback.com
770 Broadway, Second Floor
New York, New York 10003
Telephone:  (646) 495-6198
Facsimile:  (646) 495-6197

Michael D. Woerner
mwoerner@kellerrohrback.com
Tana Lin
tlin@kellerrohrback.com
Laura R. Gerber
lgerber@kellerrohrback.com
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

Michael Brickman
mbrickman@rpwb.com
Richardson, Patrick, Westbrook &
Brickman, LLC
174 East Bay Street
P.O. Box 879
Charleston, SC  29401
Telephone: (843) 727-6520
Facsimile: (843) 727-3103

James C. Bradley
jbradley@rpwb.com
Nina Fields Britt
nfields@rpwb.com
Kimberly Keevers Palmer
kkeevers@rpwb.com
Richardson, Patrick, Westbrook &
Brickman, LLC
1017 Chuck Dawley Blvd.
Post Office Box 1007
Mount Pleasant, SC  29465
Telephone: (843) 727-6500
Facsimile: (843) 881-6183

Michael T. Lewis
Pauline Shuler Lewis
llmtl@bellsouth.net
pauline@lewisattorneys.com
llmtl@bellsouth.net
Lewis & Lewis Attorneys
P.O. Drawer 2430
Oxford, Mississippi 38655
Telephone:  (662) 232-8886
Facsimile:  (662) 232-8636

Mercer Bullard
mbullard9@gmail.com
300 Country Club Road
Oxford, Mississippi 38655
Telephone:  (662) 915-6835

Stuart McCluer
smccluer@mcculleymccluer.com
McCulley McCluer PLLC
1223 Jackson Avenue East, Suite 200
P.O. Box 2294
Oxford, Mississippi 38655
Telephone:  (662) 550-4511
Facsimile (662) 368-1506

R. Bryant McCulley
bmcculley@mcculleymccluer.com
McCulley McCluer PLLC
1919 Oxmoor Road, No. 213
Birmingham, AL 35209
Telephone:  (205) 138-6757
Facsimile:  (662) 368-1506

**Attorneys for Plaintiff**