UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAROLD R. LANIER, on behalf of himself, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BATS EXCHANGE, INC., BATS Y-EXCHANGE, INC., CHICAGO BOARD OPTIONS EXCHANGE, INC., CHICAGO STOCK EXCHANGE, INC., EDGA EXCHANGE, INC., EDGX EXCHANGE, INC., INTERNATIONAL SECURITIES EXCHANGE, LLC, NASDAQ OMX BX, INC., NASDAQ OMX PHLX LLC, THE NASDAQ STOCK MARKET, LLC, NATIONAL STOCK EXCHANGE, LLC, NEW YORK STOCK EXCHANGE, LLC, NYSE ARCA, INC., and NYSE MKT, LLC,<br><br>Defendants. | CIVIL ACTION NO. 14-CV-3745-KBF<br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................ 3

II.    NATURE OF THE ACTION ................................................................... 3

III.   BACKGROUND ..................................................................................... 4

     A.     Overview of the Significance of the Market Data and the Process by Which It Is Disseminated ............................................... 4

     B.     The Significance of the Exchange Defendants' Side Deals With Preferred Data Customers ....................................................... 5

     C.     The Significance of Time in the Financial World ............................. 6

IV.   JURISDICTION AND VENUE ............................................................... 8

V.    PARTIES .............................................................................................. 9

     A.     Plaintiff .................................................................................... 9

     B.     Defendants ............................................................................... 9

VI.   FACTUAL ALLEGATIONS ................................................................. 11

     A.     The Exchange Defendants Were Not Acting in Their Role as Self-Regulatory Organizations When Engaging in the Conduct of Which Plaintiff Complains ..................................................... 11

     B.     The Exchange Defendants' Dissemination of Market Data to Subscribers ............................................................................ 13

          1.     The Dissemination of Market Data to Subscribers Under the CQ Plan and the CTA Plan ............................................ 14

          2.     The CQ Plan and CTA Plan Requirements ........................... 18

          3.     The Subscriber Contracts .................................................. 19

     C.     The Exchange Defendants Provide Faster Access to Market Data to Preferred Data Customers Through Separate Distribution Channels .................................................................................. 21

          1.     The Exchange Defendants Provide Advance Access Through Private Feeds .................................................... 23

i

        2.      The Exchange Defendants Provide Advance Access
                Through Co-Location ........................................................................... 25

     D.     The Exchange Defendants' Breaches of the Subscriber Contracts
            and Unjust Enrichment at the Expense of Subscribers ..................................... 26

VII.    CLASS ACTION ALLEGATIONS........................................................................ 29

     A.     The Equitable Relief and Monetary Relief Classes ........................................... 30

     B.     The Issue Class ..................................................................................... 30

     C.     The Subscriber Class Meets the Requirements of Rule 23(a) ........................... 32

        1.      Numerosity........................................................................................ 32

        2.      Commonality...................................................................................... 32

        3.      Typicality .......................................................................................... 33

        4.      Adequacy .......................................................................................... 34

     D.     The Subscriber Class Meets the Requirements of Rule 23(b)........................... 34

CLAIMS FOR RELIEF ............................................................................................. 35

VIII.   FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT..................................... 35

IX.     SECOND CLAIM FOR RELIEF – IMPOSITION OF A
        CONSTRUCTIVE TRUST................................................................................ 39

X.      THIRD CLAIM FOR RELIEF – UNJUST ENRICHMENT (RECEIPT
        OF SUBSCRIPTION FEES) ............................................................................ 40

XI.     FOURTH CLAIM FOR RELIEF – UNJUST ENRICHMENT (RECEIPT
        OF FEES FROM PREFERRED DATA CUSTOMERS)............................................ 41

XII.    PRAYER FOR RELIEF ................................................................................... 42

XIII.   REQUEST FOR JURY TRIAL .......................................................................... 43

Plaintiff, through his undersigned counsel, submits this Amended Class Action Complaint ("Complaint") against the Defendants named herein and alleges the following:

1.      This case is about broken promises. Plaintiff Harold Lanier and other subscribers (collectively "Subscribers") entered into Contracts[1] to receive electronic market data[2] services offered by Defendants, all of which are securities exchanges ("Exchange Defendants"). These Contracts obligated the Exchange Defendants to: (1) provide the market data services in a non-discriminatory manner; and (2) provide the Subscribers with "valid" data (i.e., the actual data that is accurate, complete, and not stale). The Exchange Defendants did not live up to either promise.

2.      First, the Exchange Defendants failed to live up to their promise to provide Subscribers with the market data in a non-discriminatory manner.  Rather, in an effort to increase their profits and/or the volume of market activity on their exchanges, the Exchange Defendants created and/or utilized separate distribution channels through which they (1) provided direct data feeds ("Private Feeds") and/or (2) offered or enabled co-location.  These distribution channels enabled certain customers of the Exchange Defendants ("Preferred Data Customers") to have advance access to the market data for which Subscribers had contracted.[3] As detailed in this

---

[1] For the purposes of the Complaint, Plaintiff defines certain terms as follows: "Contracts" or "Subscriber Contracts" refer to the contracts (however titled) for the receipt of market data between the Defendants, or agents acting solely on their behalf, and users of the market data. "Subscribers" refers to direct or indirect recipients of market data pursuant to the "Contracts" or "Subscriber Contracts." References to "Subscribers," "Contracts," or "Subscriber Contracts" specifically exclude Preferred Data Customers discussed as defined in footnote 3 and their relationships, contractual or otherwise, with the Defendants.

[2] The electronic market data ("data," "market data," "bid and offer data," and "trade data") includes all electronic data disseminated pursuant to the written plan at issue in this case, which is described in Section VI.B.

[3] For purposes of this Complaint the term "Preferred Data Customers" includes any entity or individual who entered into arrangements with the Exchange Defendants to obtain direct market data through Private Feeds and/or co-location. Plaintiff uses "separate distribution channels" to refer to the Private Feeds and/or co-location offered or utilized by the Exchange Defendants.

Complaint, the Exchange Defendants provided access to Subscribers' data to Preferred Data Customers through side deals that guaranteed Preferred Data Customers would receive that data first. [4] Unbeknownst to Subscribers, the provision of data through the separate distribution channels resulted in Subscribers receiving data that was obsolete because Preferred Data Customers had advance access to the data. Moreover, Subscribers had no other source for the market data obtained through the Subscriber Contracts.

3.      Second, the Exchange Defendants failed to live up to their promise to provide Subscribers with valid data. The validity of the data is what made the electronic data services offered by the Exchange Defendants valuable to the Subscribers. But by entering into the side deals with Preferred Data Customers, the Exchange Defendants effectively provided to Preferred Data Customers the data that Subscribers had paid for, while giving Subscribers data that was stale. In other words, as a result of the side deals, the Exchange Defendants deprived the Subscribers of the fundamental benefit of their Contracts, i.e., fair and non-discriminatory access to valid data.

4.      The Exchange Defendants' breaches of the Contracts were intentional and/or reckless in that they had knowledge of their obligations under the Subscriber Contracts but nevertheless utilized the separate distribution channels to provide Preferred Data Customers advance access to the Subscribers' data. Plaintiff and the other Subscribers suffered injury and damage as a result of the Exchange Defendants' conduct.

---

[4] These arrangements whereby the Exchange Defendants used their separate distribution channels to provide market data to Preferred Data Customers are sometimes referred to herein as "side deals."

## I. PRELIMINARY STATEMENT

5.      This Complaint alleges ordinary state law claims, the crux of which revolve around the sale of stale data to Plaintiff and other Subscribers.  In other words, the gravamen of Plaintiff's Complaint is that the services he purchased from the Exchange Defendants (specifically, the receipt of valid data) were not delivered as promised. This Complaint does not involve any claims regarding the purchase or sale of securities or investors' losses, nor does Plaintiff seek any relief related to the purchase or sale of any security. Plaintiff also does not complain about the mechanism by which Subscribers receive the market data or the operation of the market data reporting plans (discussed herein) pursuant to which market data is disseminated; nor does Plaintiff complain about the *existence* of the separate distribution channels for the data. Rather, Plaintiff brings state law claims to enforce the terms of his Contract, and those of other Subscribers, which prohibit the Exchange Defendants from providing *earlier access* to that data to others, and to obtain damages suffered by Subscribers as a result of Defendants' breaches. Plaintiff also seeks to recoup the fees the Exchange Defendants unjustly received through their side deals with Preferred Data Customers.

## II. NATURE OF THE ACTION

6.      Plaintiff brings this Complaint individually and on behalf of other Subscribers who entered into Contracts with the Exchange Defendants or agents acting on their behalf, to receive market data. The Contracts are similar—in all respects material to this Complaint—to Plaintiff's Subscriber Contracts at issue in this case, in that they obligate the Exchange Defendants to provide valid market data.

7.      Pursuant to those Contracts, the Exchange Defendants received hundreds of millions of dollars in subscription fees for the provision of market data to Subscribers.

8.      The gravamen of this Complaint is that, by providing earlier access to the data to Preferred Data Customers through the use of the separate data distribution channels, the Exchange Defendants breached the Contracts, including the duty of good faith and fair dealing, because they deprived Subscribers of the value for which they contracted, thereby causing them harm. Through evasion of the essence of the bargain, the Exchange Defendants enriched themselves through: (1) the fees or other benefits associated with offering and providing valid data to Preferred Data Customers while providing stale data to Subscribers; and/or (2) increasing the volume of market activity on their own exchanges (and their revenue through fees charged for that market activity)—in essence, willful rendering of imperfect performance. The Exchange Defendants' earlier provision of the market data to Preferred Data Customers served Defendants' business interests because it enabled the Exchange Defendants to increase the volume of market activity on their exchanges and increase their profits.

### III.      BACKGROUND

**A.      Overview of the Significance of the Market Data and the Process by Which It Is Disseminated**

9.      The market data disseminated by the Exchange Defendants to Subscribers is required to be the best bid and offer and trade data for the securities traded on each Defendant's exchange. This data is only valid if it is complete, reflects the current market, and is not stale or inaccurate.

10.      The market data is distributed according to market data reporting plans in which Exchange Defendants are participants.[5]  Pursuant to these plans, Exchange Defendants distribute

---

[5] As discussed in more detail in Section VI.B, the plans at issue in this case are the Consolidation Quotation Plan ("CQ Plan") and the CTA Plan (collectively "the Plans").  The CQ Plan is available at: https://cta.nyxdata.com/cta/document/5931.  The CTA Plan is available at: https://cta.nyxdata.com/cta/document/5929.

data to Subscribers by submitting their market data to a processor ("Processor"). The Processor, acting as agent for and on behalf of the Exchange Defendants, determines the overall, or consolidated, best bid and offer and then distributes that data, as well as trade data, via the "SIP"[6] or "Subscriber Feed" to Subscribers. That data is then disseminated to Subscribers either directly by the Processor or through Distributors[7] (who may also be Subscribers as defined herein) who have been authorized by the Exchange Defendants or their agent to redistribute that data to Subscribers. The consolidated or aggregated market data is intended to be a single source of information across all markets, rather than requiring the public to obtain data from many different exchanges and other markets.

11.     The Subscriber Contracts obligated the Exchange Defendants to provide to Subscribers valid market data on a non-discriminatory basis. Instead, the Exchange Defendants breached the Contracts by providing Preferred Data Customers with access to the valid market data while providing stale market data to Subscribers.

**B.     The Significance of the Exchange Defendants' Side Deals With Preferred Data Customers**

12.     The Exchange Defendants' side deals with Preferred Data Customers to provide faster, advance access to market data breached Subscribers' Contracts and were designed to enable the Exchange Defendants to use their data monopoly to generate profits for themselves— either directly through the receipt of fees from Preferred Data Customers or through the increased volume of transactions on their respective exchanges.  Thus, by offering or enabling

---

[6] "SIP" refers to the "Securities Information Processor" or the "Subscriber Feed" which for purposes of this Complaint are defined as the central, consolidated live stream containing the aggregation of all of the Exchange Defendants' market data.

[7] "Distributors" are those entities that facilitate access to, disseminate, and/or redistribute the market data to others.

Private Feeds and/or co-location, Defendants not only had the ability to charge for access to these separate distribution channels but also incentivized Preferred Data Customers to use their exchanges in order to increase market activity and exchange revenue.

13.     Most, if not all, of the Exchange Defendants charge a substantial premium to Preferred Data Customers in exchange for their receiving the data *before* it is received by Subscribers. It is the very fact that Subscribers receive stale data that makes the earlier receipt of that data so valuable to Preferred Data Customers. Preferred Data Customers are willing to pay the Exchange Defendants' premium fees—hundreds of millions of dollars each year—for this head start because it guarantees profits for Preferred Data Customers.[8]

## C.     The Significance of Time in the Financial World

14.     Through their separate distribution channels, the Exchange Defendants make the data available to Preferred Data Customers before they make the same data available to the Processor, such that the data arrives at the Processor well over one thousand microseconds later than the same data distributed over faster channels reaches Preferred Data Customers. In human perception, those microseconds might appear unimportant, far less time than the blink of an eye. But in today's financial markets, one thousand microseconds is a virtual eon. And given that it only takes Preferred Data Customers a handful of microseconds to cancel orders and execute trades, it is more than enough time for them to transact their trading business and generate tremendous profits before Subscribers even receive the market data.

---

[8] The fact that Preferred Data Customers are willing to pay substantial premiums for earlier access to the data demonstrates the materiality of this information and of Defendants' breaches of the Subscriber Contracts. Other than the Fourth Claim for Relief, however, Plaintiff's claims do not hinge on the Exchange Defendants' receipt of Private Feed and/or co-location fees, directly or otherwise, from Preferred Data Customers.  Rather, Plaintiff claims that the Exchange Defendants breached the Subscriber Contracts by providing earlier access to the data to someone else—whether the Exchange Defendants were paid directly for doing so or not.

15.     By way of example, the illustration below shows the flow of market data from the exchanges to both Subscribers (through the Processor) and Preferred Data Customers. Through the use of Private Feeds and/or co-location, Preferred Data Customers can receive the data in as little as one microsecond and can begin acting on the data immediately. Meanwhile, due to the (1) size of the connection/bandwidth of the feed between the Exchanges and the Processor, (2) the procedures and protocols involved in transmitting data between the Exchanges and the Processor, and/or (3) the co-location or cross-connectivity of Preferred Data Customers' computer servers with the Exchanges' servers, the data contracted for by Subscribers is still *en route* from the Exchange Defendants to the Processor after Preferred Data Customers have received data and acted on it to their advantage. On average, the data is received by the Processor approximately 1,499 microseconds after Preferred Data Customers receive it.[9] The Processor then aggregates the data and disseminates it to Subscribers.



16.     As a result of the time discrepancy in the illustration above, Subscribers do not actually have the valid market data at any given time because their data is stale in comparison with the data received by Preferred Data Customers. The materiality of the receipt of valid, as

---

[9] *See* Shengwei Ding, John Hanna & Terrance Hendershott, *How Slow Is the NBBO? A Comparison with Direct Exchange Feeds*, 49 Fin. Rev. 2, 320 (2014).

opposed to stale, market data is demonstrated in part by the fact that Preferred Data Customers are willing to pay substantial premiums to obtain earlier access to the data.

17.     This Complaint explains: the contractual and procedural mechanism by which the Exchange Defendants disseminate their market data to Subscribers; how and why the Exchange Defendants provide faster access to market data to Preferred Data Customers; why the Exchange Defendants' side deals with Preferred Data Customers deprived Subscribers of the benefit of their Contracts and constitute a breach of those Contracts; and why the Exchange Defendants ought to be required to return the fees they received from Subscribers and to turn over to Subscribers the fees they received from Preferred Data Customers.

### IV.     JURISDICTION AND VENUE

18.     This Court has original jurisdiction over the subject matter of this dispute under 28 U.S.C. § 1332(d)(2), which provides for federal jurisdiction in class actions with minimal diversity when damages exceed five million dollars, exclusive of interest and costs. The aggregate amount at issue in this dispute exceeds five million dollars. In addition, "minimal diversity" is satisfied because at least one member of the proposed classes is a citizen of a State different from any Defendant.

19.     Venue is appropriate in this district pursuant to:

A.     28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York; and

B.     28 U.S.C. § 1391(b)(1) because certain Defendants reside in the Southern District of New York and all other Defendants are deemed to reside in the Southern District of New York pursuant to 28 U.S.C. § 1391(c)(2) because such Defendants are subject to personal jurisdiction in Southern District of New York with respect to this civil action.

## V.   PARTIES

### A.   Plaintiff

20.   Harold Lanier resides in Fairhope, Alabama. Plaintiff entered into Subscriber Contracts for the receipt of valid market data disseminated by the Exchange Defendants pursuant to the CQ Plan and the CTA Plan.

### B.   Defendants

21.   The Exchange Defendants are national securities exchanges that disseminate electronic market data to the Processor for distribution to Subscribers through the SIPs/Subscriber Feeds. The Exchange Defendants also enter into side deals to provide or enable advance access to this same data to Preferred Data Customers via Private Feeds and/or co-location, which occurs outside of the SIPs/Subscriber Feeds.

22.   BATS Exchange, Inc. is a Delaware Corporation with its main office at 8050 Marshall Drive, Lenexa, Kansas 66214. It maintains a New York office at 17 State Street 32nd Floor, New York, New York 10004.

23.   BATS Y-Exchange, Inc. is a Delaware Corporation with its main office at 8050 Marshall Drive, Lenexa, Kansas 66214. It maintains a New York office at 17 State Street 32nd Floor, New York, New York 10004.

24.   Chicago Board Options Exchange, Inc. is a Delaware Corporation with its main office at 400 South LaSalle Street, 26th Floor, Chicago, Illinois 60605. It maintains a New York office at 61 Broadway, Suite 1301, New York, New York 10006.

25.   Chicago Stock Exchange, Inc. is a Delaware Corporation with its main office at 440 South LaSalle Street, Chicago, Illinois 60605.

26.   EDGA Exchange, Inc. is a Delaware Corporation with its main office at 545 Washington Boulevard, Sixth Floor, Jersey City, New Jersey 07310.

27.     EDGX Exchange, Inc. is a Delaware Corporation with its main office at 545 Washington Boulevard, Sixth Floor, Jersey City, New Jersey 07310.

28.     International Securities Exchange, LLC is a Delaware LLC with its main office at 60 Broad Street, New York, New York 10004.

29.     NASDAQ OMX BX, Inc. is a Delaware Corporation with its main office at One Liberty Plaza, New York, New York 10006.

30.     NASDAQ OMX PHLX LLC is a Delaware Corporation with its main office at 1900 Market Street, Philadelphia, Pennsylvania 19103.

31.     The NASDAQ Stock Market, LLC is a Delaware LLC with its main office at 1 Liberty Plaza, 165 Broadway, New York, New York 10006.

32.     National Stock Exchange, Inc. is a Delaware Corporation with its main office at 101 Hudson, Suite 1200, Jersey City, New Jersey 07302.

33.     New York Stock Exchange, LLC is a New York LLC with its main office at 11 Wall Street, New York, New York 10005.  At all times relevant to this Complaint, New York Stock Exchange, LLC has served as the administrator for Network A market data, as described herein.  New York Stock Exchange, LLC is the successor to New York Stock Exchange, Inc.

34.     NYSE ARCA, Inc. is a Delaware Corporation with its main office at 100 South Wacker Drive, Suite 1800, Chicago, Illinois  60606.

35.     NYSE MKT, LLC is a Delaware LLC with its main office at 11 Wall Street, New York, New York 10005. At all times relevant to this Complaint, NYSE MKT, LLC has served as the administrator for Network B market data, as described herein.  NYSE MKT, LLC is the successor to NYSE Amex, Inc., which was the successor to American Stock Exchange, Inc.

36.     At all relevant times herein, each of the Exchange Defendants was and is doing business in and/or directing activities to New York, and specifically this judicial district, and derived substantial revenue from such business. Upon information and belief, the Exchange Defendants contracted with, disseminated, and provided the market data at issue in this Complaint to Subscribers in New York and throughout the United States.

## VI.     FACTUAL ALLEGATIONS

### A.     The Exchange Defendants Were Not Acting in Their Role as Self-Regulatory Organizations When Engaging in the Conduct of Which Plaintiff Complains

37.     National securities exchanges historically operated as not-for-profit mutual organizations charged with enforcing market rules to protect investors. This structure was intended to minimize conflicts of interest between the exchanges and the investing public and to enable the exchanges to fulfill their roles as self-regulatory organizations. However it was intended, the reality today is that the exchanges' control over the market data has enabled their members to exercise undue influence over the exchanges in order to serve their own economic interests at the expense of the investing public and other interested parties.

38.     Since the mid-1990s, the exchanges have demutualized, abandoning their not-for-profit structure for a for-profit model and shedding their responsibilities as self-regulatory organizations. All of the Exchange Defendants recently converted to or, in the case of the newer Exchange Defendants, have always been for-profit entities.

39.     With this shift in status to for-profit companies who answer to their shareholders' desire for profits, the Exchange Defendants developed a business model to capitalize on their control over market data. "The traditional model of self-regulation [for the exchanges] found its justification in the alignment of interests between the investing public and member firms," but that model has given way to the Exchange Defendants "now [being] oriented toward maximizing

profits for their shareholders."[10] This shift in focus resulted in quarterly earnings targets, efforts to increase the volume of activity on the exchanges, and revenues being earned from Preferred Data Customers taking priority over any obligations to Subscribers or the investing public.

40. Commentators have also observed the exchanges' fundamental shift from a regulatory to a profit-making role. As the Securities Industry and Financial Markets Association has recognized:

> The interests, incentives and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today. Since the wave of demutualizations, exchanges have rightly focused their efforts on the part of their business that earns profits to maximize the return for their shareholders, and, in some cases, ***minimized their actual performance of regulatory functions***.[11]

41. Judge Robert W. Sweet of the Southern District of New York summarized this transformation most succinctly: "As exchanges have evolved into for-profit enterprises, an irreconcilable conflict has arisen, rendering independence unattainable in the context of an exchange regulating its own, for-profit business conduct."[12]

42. The Exchange Defendants traditionally marketed and sold access to their data through the SIPs/Subscriber Feeds. In more recent years, however, the Exchange Defendants created and/or have utilized separate distribution channels to provide advance access to their data to an elite group of sophisticated Preferred Data Customers—who are willing to pay the Exchange Defendants handsomely for this advance look at the data or whose advance access to the data will lead to an increase in market activity (and concomitant revenue) for that exchange.

---

[10] Stavros Gadinis & Howell E. Jackson, *Markets as Regulators: A Survey*, 80 So. Cal. L. Rev. 1239, 1258 (2006).

[11] Letter from the Securities Industry and Financial Markets Association to SEC Chair Mary Jo White (July 31, 2013), *available at* www.sifma.org/issues/item.aspx?id=8589944673 (emphasis added).

[12] *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, MDL No. 12-2389, 2013 WL 6621024 at *16 (S.D.N.Y. Dec. 12, 2013).

43. The Exchange Defendants' sale and distribution of advance access to market data through their own separate distribution channels has nothing to do with their function as self-regulatory organizations (such as the discipline or regulatory oversight of their respective members or the discharge of any regulatory duties they have under the securities laws) and everything to do with serving their profit-based motives. Each Exchange Defendant created, and disseminated proprietary data pursuant to, separate distribution channels as a means to reap fees or boost exchange activity to generate additional revenue. In doing so, each of the Exchange Defendants was serving its private business interests and acting outside and independently of its role as a participant in the Plans. It is these business decisions, not the operation of the Plans, that form the basis of Plaintiff's claims and resulted in a breach of the Subscriber Contracts and served to unjustly enrich the Exchange Defendants.

**B.      The Exchange Defendants' Dissemination of Market Data to Subscribers**

44. Exchange Defendants distribute market data to Subscribers through four consolidated information collection and dissemination systems: the Consolidated Quotation System ("CQS"), the Consolidated Tape System ("CTS"), the Nasdaq UTP System, and the Options Price Reporting Authority System.

45. Each system operates pursuant to a market data reporting plan. The CQS operates pursuant to the CQ Plan and the CTS operates pursuant to the CTA Plan.

46. Each plan has a Processor, which collects, processes, and disseminates the applicable market data it receives from the Exchange Defendants that are participants in that

plan. On behalf of the participants in the plans, the Processor disseminates the market data to Subscribers through the SIPs/Subscriber Feeds.[13]

47.    This Complaint relates to the market data Subscribers contracted to receive that is disseminated under the CQ Plan and the CTA Plan.[14]  Plaintiff uses the term "the Plans" to refer to the CQ Plan and the CTA Plan collectively.

### 1.    The Dissemination of Market Data to Subscribers Under the CQ Plan and the CTA Plan

48.    The CQS and the CTS disseminate quotation information and last sale market data for the securities covered by the CQ Plan and the CTA Plan.  The CQS and CTS market data are distributed pursuant to the terms of the CQ Plan and the CTA Plan, respectively.

49.    The CQS and CTS market data are processed and disseminated through two separate networks: Network A comprises data for securities listed on New York Stock Exchange LLC ("NYSE"); and Network B comprises data for securities listed on BATS Exchange, Inc., BATS Y Exchange, Inc., Chicago Board Options Exchange, Inc., Chicago Stock Exchange, Inc., EDGA Exchange, Inc., EDGX Exchange, Inc., International Securities Exchange, LLC, NASDAQ OMX, BX, Inc., NASDAQ OMX PHLX LLC,[15] NASDAQ OMX PSX, National

---

[13] Pursuant to Regulation National Market System, the exchanges must file a market data reporting plan with which the exchanges must comply. *See* Rules 601(a), 608, 17 C.F.R. §§ 242.601(a), 242.608 (2005). Plaintiff does not challenge the provision of electronic data services pursuant to these plans or the operation of the CQ Plan or the CTA Plan; nor is Plaintiff's Complaint based on a breach of the Plans themselves.  Rather, Plaintiff's claims are based on Defendants' breaches of their contractual obligations to Subscribers by utilizing their separate distribution channels to provide earlier access to market data to others.

[14] *See supra* note 5.

[15] NASDAQ OMX PHLX LLC was formerly known as NASDAQ OMX PHLX, Inc.

Stock Exchange, Inc., NYSE ARCA, Inc., NYSE MKT, LLC[16] ("NYSE MKT"), or on any other exchange other than The NASDAQ Stock Market LLC, but not also listed on NYSE.[17]

50.     The participants in the CQ Plan and the CTA Plan ("Plan participants"), which are the exchanges that have reported market data under the Plans during the relevant period are:

- BATS Exchange, Inc.
- BATS Y-Exchange, Inc.
- Chicago Board Options Exchange, Inc.
- Chicago Stock Exchange, Inc.
- EDGA Exchange, Inc.
- EDGX Exchange, Inc.
- Financial Industry Regulatory Authority, Inc. [18]
- International Securities Exchange, LLC
- NASDAQ OMX BX, Inc.
- NASDAQ OMX PHLX LLC[19]
- NASDAQ OMX PSX[20]
- The NASDAQ Stock Market LLC
- National Stock Exchange, Inc.
- New York Stock Exchange LLC
- NYSE Arca, Inc.
- NYSE MKT, LLC[21]

51.     Membership in the Plans may change as other national securities associations or exchanges that trade the securities covered by the Plans are permitted to participate following completion of the relevant documentation.[22]

---

[16] *See supra* ¶ 35.

[17] *See* CQ Plan at §§ I.e & f; CTA Plan at §§ I.p & q.

[18] Although the Financial Industry Regulatory Authority, Inc. ("FINRA") is a participant in the CQ Plan and the CTA Plan, FINRA is not a securities exchange. Plaintiff has not brought claims against FINRA because it does not engage in the conduct of which Plaintiff complains.

[19] *See supra* note 13.

[20] Although NASDAQ OMX PSX is a participant in the Plans, it is not a separate legal entity but, rather, is operated pursuant to a license held by NASDAQ OMX PHLX LLC.

[21] *See supra* ¶ 35.

[22] *See* CQ Plan at § III.c; CTA Plan at § III.c.1.

52.     The Consolidated Tape Association ("CTA") is the operating authority for both the CQS and the CTS and, in that role, oversees the dissemination of quote and trade information for the securities covered by the Plans.

53.     The Securities Industry Automation Corporation ("SIAC") acts as the Processor for the CQ and CTA Plans. SIAC, on behalf of and as agent for the Exchange Defendants that are participants in the Plans, receives the Network A and Network B market data from the Exchange Defendants and aggregates that data into the consolidated data that is sent to all Subscribers.

54.     Each Network also has an administrator.  At all times relevant to this Complaint, NYSE has acted as the administrator for Network A and NYSE MKT has acted as the administrator for Network B ("Administrators").[23]

55.     In their role as Administrators for Network A and Network B, NYSE and NYSE MKT are responsible for contracting for the dissemination of market data on behalf of and as agents for all CQ and CTA Plan participants.[24]

56.     In particular, NYSE and NYSE MKT, on behalf of and as agents for all CQ and CTA Plan participants, must provide for the dissemination of Network A and Network B market data on "fair and reasonable terms" that are "not unreasonably discriminatory."[25]

57.     To receive the market data pursuant to the Plans, a Subscriber must enter into a Subscriber Contract with NYSE (with respect to Network A market data) and/or NYSE MKT (with respect to Network B market data), which contract with Subscribers on behalf of all

---

[23] *See* CQ Plan at § I.r; CTA Plan at § I.t.

[24] *See* CQ Plan at §§ VII.a & f; CTA Plan at §§ IX.a & f.

[25] *See* CQ Plan at § VII.a.; CTA Plan at § IX.a.

participants in the Plans, or enter into an agreement through an authorized Distributor (that may also be a Subscriber) that contains terms and conditions substantially similar to the "Subscriber Addendum" attached to the Plans, which run to the benefits of the Plan participants.[26]

58.     As the Administrators for Network A and Network B, respectively, NYSE and NYSE MKT act on behalf of and as agents for the Exchange Defendants that are participants in the Plans. The acts of NYSE and NYSE MKT therefore are acts of each of those Exchange Defendants.

59.     As the Administrators, NYSE and NYSE MKT contract with Distributors (who may also be Subscribers) and/or Subscribers for the sale of the CQ Plan and CTA Plan market data.[27]

60.     That data is then disseminated to Subscribers and/or to Distributors who, in turn, redistribute the data to Subscribers.

61.     NYSE and NYSE MKT collect subscription fees associated with the sale of Network A and B market data to Subscribers.

62.     After deducting the operating expenses for Network A and Network B, NYSE and NYSE MKT distribute to all Plan participants their allocated portion of net income from subscription fees attributable to Network A and Network B market data.

63.     In 2008, net revenues allocated among the CQ and CTA Plan participants exceeded $203 million for Network A and $116 million for Network B.

---

[26] *See* CQ Plan at § VII.a; CTA Plan at § IX.a.

[27] *See* CQ Plan at § VII.a; CTA Plan at § IX.a.

2.      **The CQ Plan and CTA Plan Requirements**

64.     The CQ and CTA Plans set forth terms under which market data covered by each Plan must be disseminated to Subscribers.

65.     The requirements of the CQ Plan and the CTA Plan are expressly incorporated into the Network A and Network B Subscriber Contracts.

66.     The dissemination of market data to Subscribers pursuant to their Subscriber Contracts is subject to, and may not deviate from or be inconsistent with, the Plans.

67.     The purpose of the Plans is to provide for the collection, consolidation and dissemination of quotation information and transaction reports in securities covered by the Plans from the Plans' participants.

68.     Under the express terms of the CQ and CTA Plans, the Exchange Defendants must furnish market data for securities covered by the Plans to the Processor "as promptly as possible" for dissemination to Subscribers.[28]

69.     The CQ and CTA Plans require each Administrator, on behalf of and as agent for the Exchange Defendants that are participants in the Plans, to disseminate valid market data for securities covered by the Plans to Subscribers on a fair and non-discriminatory basis.[29]

70.     The CQ and CTA Plans are joint agreements among their participants; all Plan participants are signatories to the Plans.[30]

---

[28] *See* CQ Plan at § VI. b; CTA Plan at § VIII.a.

[29] *See* CQ Plan at § VII.a; CTA Plan at § IX.a.

[30] *See* CQ Plan at § XI; CTA Plan at § XIV.

###### 3. The Subscriber Contracts

71.     Plaintiff Harold Lanier entered into a Network A Subscriber Contract with New York Stock Exchange, Inc.,[31] as agent for and "on behalf of the CTA Plan Participants … and the CQ Plan Participants," for the receipt of Network A market data.  *See* Exhibit A (attached).

72.     Plaintiff Harold Lanier also entered into a Network B Subscriber Contract with American Stock Exchange, Inc.,[32] as agent for and "on behalf of the CTA Plan Participants … and the CQ Plan Participants," for the receipt of Network B market data.  *See* Exhibit B (attached).

73.      Plaintiff Harold Lanier's Network A and Network B Subscriber Contracts are substantively the same in all respects material to this Complaint to the "Forms of Subscriber Contracts" attached to the CQ and CTA Plans.

74.     Upon information and belief, members of the Subscriber Class entered into Subscriber Contracts governing the receipt of Network A market data and Network B market data that were similar to Plaintiff's Network A and Network B Subscriber Contracts in all respects material to this Complaint.

75.     Subscriber Contracts for the receipt of market data pursuant to the CQ and CTA Plans are similar to each other in all respects material to this Complaint in terms of the Exchange Defendants' obligation to provide valid market data on a non-discriminatory basis.

76.     Through the express incorporation of the terms of the Plans and applicable law into the Subscriber Contracts, the Exchange Defendants promised to deliver "as promptly as

---

[31] *See supra* ¶ 33.

[32] *See supra* ¶ 35.

possible"—through the Processor and Administrators acting on the Exchange Defendants' behalf—valid market data to Subscribers in a fair and non-discriminatory manner.

77.     The fundamental benefit Subscribers contracted for in the Subscriber Contracts is the receipt of valid market data on a fair, nondiscriminatory basis. The validity of the market data is what makes it valuable to Subscribers.

78.     Pursuant to the Contracts, Plaintiff Lanier and the Subscribers paid periodic fees in exchange for the receipt of valid Network A and Network B market data on a non-discriminatory basis.

79.     What Plaintiff and the Subscribers received in exchange for those fees was not the nondiscriminatory access to the valid market data for which they had contracted but, rather, stale market data. The data was stale because the Exchange Defendants gave Preferred Data Customers advance access to the valid data before they even made the data available to the Processor.

80.     Nevertheless, Subscribers had no choice but to continue paying fees to maintain their Contracts in order to continue receiving the consolidated market data, as the SIPs/Subscriber Feeds were the only available source for that consolidated information. And because the terms of the Subscriber Contracts are adhesive in that their terms are non-negotiable and dictated by the Exchange Defendants, Subscribers had no choice but to "take it or leave it." Indeed, for Plaintiff Lanier and other class members who obtained the data through a Distributor, the Subscriber must enter into the Form Subscriber Contract(s) attached to the Plans or the Distributor must require the Subscriber to enter into a contract that contains substantially similar terms and conditions as those in the Form Subscriber Contracts, which run to the benefit of the Plans' participants.

81.     The Subscriber Contracts provide that they are governed by New York law. *See* Exhibit A ¶ 11; Exhibit B ¶ 11.

**C.     The Exchange Defendants Provide Faster Access to Market Data to Preferred Data Customers Through Separate Distribution Channels**

82.     Unlike the manner in which market data is disseminated to Subscribers through the Processor, each of the Exchange Defendants has created separate distribution channels that provide faster access to market data to Preferred Data Customers. These separate distribution channels bypass the Processor and enable Preferred Data Customers to have Private Feeds to the Exchange Defendants' data and/or allow Preferred Data Customers to co-locate in close physical proximity to the Exchange Defendants' servers.[33]

83.     Typically, the fees charged for Private Feed connection lines increase as the connection capacity/bandwidth size increases. Market data can be transmitted faster over connection lines with greater capacity/bandwidth size.  Meanwhile, the capacity of the Exchange Defendants' connection lines to the Processor is substantially lower, and the procedure for transmission is different.  This results in far slower transmission of data to the Processor, and in turn, the Subscribers.

84.     The Exchange Defendants also sell, offer, or enable co-location for these Private Feeds whereby the Exchange Defendants either directly lease or enable the leasing of server space or cable connections to Preferred Data Customers in close physical proximity to the Exchange Defendants' servers, which, due to the laws of physics, allows Preferred Data Customers to receive the data sooner.

---

[33] *See* Section VI.C.2.

85.     By offering, enabling or selling this advance access to the market data to Preferred Data Customers through Private Feeds and/or co-location, the Exchange Defendants contravene the essence and letter of their bargain with Subscribers.  The Exchange Defendants do this for the sole purpose of generating additional revenue and profits for them and their shareholders—either directly through the fees from the side deals or through increased market activity on their exchanges.

86.     The Exchange Defendants' decisions to offer these separate distribution channels to provide faster access to Preferred Data Customers stem from a desire to further their private business interests by increasing profits.

87.     Preferred Data Customers pay a premium for this advance access, which is "advance" by virtue of the fact that the data is made available to them before it is received by the Processor and, therefore, necessarily before it is delivered to Subscribers.  This timing discrepancy allows Preferred Data Customers to exploit the Subscribers' lack of valid market data and generate profits for themselves.

88.     Until recently, the significance of the side deals providing advance access to market data between the Exchange Defendants and Preferred Data Customers was not known to the investing community and the Subscribers, including Plaintiff Harold Lanier. Even the most sophisticated investors, including hedge fund managers, were unaware that Preferred Data Customers were given advance access to market data and that Preferred Data Customers could and did use that advance access to their benefit and the Subscribers' detriment before the data had even reached the Subscribers in the first instance. And, even if Subscribers had been aware, the SIPs/Subscriber Feeds for the CQ Plan and CTA Plan data are the only available sources for that consolidated market information.

1. **The Exchange Defendants Provide Advance Access Through Private Feeds**

89.     The Exchange Defendants sell and/or provide market data to Preferred Data Customers via Private Feeds that make the data available to Preferred Data Customers before the data is made available to the Processor. The Exchange Defendants use transmission lines for the Private Feeds that carry the data to Preferred Data Customers in a fraction of the time it takes for the slower transmission lines to make the same market data available to the Processor.

90.     While on average, it takes about *1500 microseconds* for the market data to initially arrive at the Processor, Preferred Data Customers receive the data directly in as fast as *one microsecond*.

91.     Preferred Data Customers have publicly stated that Private Feeds are the only way to know where the market really is because the SIPs/Subscriber Feeds are slow and not useful and that, with the Private Feeds, Preferred Data Customers know that an order has been submitted and/or a transaction has occurred even if the Processor does not yet reflect the quote or transaction.

92.     These Private Feeds are big business for the Exchange Defendants.  For example, the provision of market data accounted for approximately 20% of NASDAQ's and the New York Stock Exchange's revenues in 2013.

93.     Each of the Exchange Defendants offers and/or sells Private Feeds through which market data is made available to Preferred Data Customers via connections of up to 40 GB.  These Private Feeds are described as, among other things, providing "real time data," "microsecond latency," and the "lowest latency possible."  "Microsecond latency" refers to the smaller time lag between the time the Exchange Defendants begin the transmission of market data and the time that Preferred Data Customers receive the data relative to the time they would receive the same market data from the Processor.

94.     The Private Feeds offered by the Exchange Defendants include but are not limited

to:

| Exchange Defendant | Private Feeds |
| --- | --- |
| BATS Exchange | Multicast PITCH<br>TCP PITCH<br>TOP<br>Last Sale<br>BATS One Feed[34] |
| BATS Y-Exchange | Multicast PITCH<br>TCP PITCH<br>TOP<br>Last Sale<br>BATS One Feed |
| Chicago Stock Exchange | CHX Book Feed[35] |
| Chicago Board Options Exchange | CBOE Streaming Markets Feed<br>Complex Order Book Feed |
| EDGA Exchange | EdgeBook Depth<br>BATS One Feed |
| EDGX Exchange | EdgeBook Depth<br>BATS One Feed |
| International Securities Exchange | ISE Depth of Market Feed<br>TOP Quote Feed<br>Depth of Market Feed<br>Spread Feed<br>Order Feed<br>Reference Data Feed<br>Pre-Open Feed<br>Trade Feed |
| NASDAQ OMX BX | BX TotalView-ITCH<br>BX MatchView |
| NASDAQ OMX PHLX[36] | PHLX Depth of Market<br>TOPO Plus Orders<br>Top of PHLX Options<br>PHLX Orders |
| NASDAQ Stock Market | NASDAQ TotalView-ITCH<br>NASDAQ MatchView<br>NASDAQ Basic<br>NASDAQ Last Sale<br>NLS Plus |
| National Stock Exchange | NSX Depth of Book Multicast Feed<br>NSX Depth of Book Feed |
| NYSE ARCA | NYSE ARCA Integrated Feed |
| NYSE MKT | NYSE MKT OpenBook |
| NYSE | NYSE OpenBook Ultra |

---

[34] Available October 1, 2014.

[35] No longer offered as of July 2014.

[36] NASDAQ OMX PSX operates through a license held by NASDAQ OMX PHLX LLC.  The Private Feeds for
NASDAQ OMX PSX market data include PSX TotalView-ITCH.

### 2. The Exchange Defendants Provide Advance Access Through Co-Location

95. The Exchange Defendants also market and sell or enable advance access to market data to Preferred Data Customers by permitting them to "co-locate" their servers in close physical proximity to the servers that transmit market data. Co-location in this Complaint refers both to (1) co-location based on immediate physical proximity between a Preferred Data Customer's server and an Exchange Defendant's server within a data center and (2) interconnection or cross connect offerings whereby two parties within a data center are connected through cables.

96. Through co-location, Preferred Data Customers gain valuable additional microseconds because the data travels a shorter physical distance than the data travels from the exchanges to the Processor. Data necessarily arrives at close destinations sooner than it arrives at more distant destinations. The timing advantage of co-location is corroborated by the manner in which the Exchange Defendants tout the length of each transmission cable within their co-location warehouses as being identical, to ensure that no Preferred Data Customer has an advantage over any other Preferred Data Customer.

97. The Exchange Defendants describe co-location as offering, among other things, "extremely low latency," "microsecond latency advantage," and "equidistant cabling" to ensure that Preferred Data Customers have "the same latency away from the match engine." While the Exchange Defendants go to great lengths to ensure fair and equal treatment of the collective group of Preferred Data Customers by offering the co-location, they deprive Subscribers of the right to receive the benefits they contracted for—access to valid market data on a fair, non-discriminatory basis, or exactly what Preferred Data Customers received (i.e., receipt of the market data on a nondiscriminatory basis vis a vis other Preferred Data Customers).

98. Each of the Exchange Defendants offers co-location directly or indirectly, including at the following locations:

| Exchange Defendant | Co-Location |
|---|---|
| BATS Exchange | SAVVIS NJ2 Data Center, Weehawken, NJ<br>SAVVIS CH4 Data Center, Chicago, IL<br>EQUINIX CH1 Data Center, Chicago, IL<br>EQUINIX NY5 Data Center, Secaucus, NJ |
| BATS Y-Exchange | SAVVIS NJ2 Data Center, Weehawken, NJ<br>SAVVIS CH4 Data Center, Chicago, IL<br>EQUINIX CH1 Data Center, Chicago, IL<br>EQUINIX NY5 Data Center, Secaucus, NJ |
| Chicago Stock Exchange | EQUINIX NY4 Data Center, Secaucus, NJ<br>EQUINIX Data Center, Chicago, IL |
| Chicago Board Options Exchange | EQUINIX NY4 Data Center, Secaucus, NJ<br>EQUINIX Data Center, Chicago, IL |
| EDGA Exchange | EQUINIX NY4 Data Center, Secaucus, NJ<br>EQUINIX Data Center, Chicago, IL |
| EDGX Exchange | EQUINIX NY4 Data Center, Secaucus, NJ<br>EQUINIX Data Center, Chicago, IL |
| International Securities Exchange | EQUINIX NY4 Data Center, Secaucus, NJ<br>EQUINIX Data Center, Chicago, IL |
| NASDAQ OMX BX | NASDAQ OMX Data Center, Carteret, NJ |
| NASDAQ OMX PHLX | NASDAQ OMX Data Center, Carteret, NJ |
| NASDAQ Stock Market | NASDAQ OMX Data Center, Carteret, NJ |
| National Stock Exchange | EQUINIX NY4 IBX Data Center, Secaucus, NJ |
| NYSE | NYSE Liquidity Center, Mahwah, NJ |
| NYSE ARCA | NYSE Liquidity Center, Mahwah, NJ |
| NYSE MKT | NYSE Liquidity Center, Mahwah, NJ |

**D.      The Exchange Defendants' Breaches of the Subscriber Contracts and Unjust Enrichment at the Expense of Subscribers**

99. The Subscriber Contracts and the Plans obligated the Exchange Defendants to provide Plaintiff and Subscribers with valid market data on a fair and non-discriminatory basis.

100. The validity of that market data is what makes it valuable to all recipients, including Subscribers. Indeed, the validity of this market data is the fundamental consideration that Subscribers are to receive in return for the subscription fees they paid.

101.    The Exchange Defendants deliberately and intentionally deprived Subscribers of the principal benefit of the Contracts—fair and non-discriminatory access to valid market data—because they knowingly provided that data to Preferred Data Customers in advance of when it was provided to the Processor, as illustrated below, and *supra,* at Section VI.C.



102.    In doing so, Defendants showed a reckless disregard for the contractual rights of Subscribers because the Exchange Defendants had knowledge of their obligations under the Subscriber Contracts and the CQ Plan and the CTA Plan but, nevertheless, created and/or utilized separate distribution channels to disseminate the data to Preferred Data Customers on preferential terms—i.e., earlier, so that Preferred Data Customers could use the data before even the Processor, much less the Subscribers, had received it.

103.    In the illustration at paragraph 101, Preferred Data Customers received the market data on average 1,499 microseconds *before* the Processor even received that data for dissemination to Subscribers. The value for which Subscribers are paying is thus being transferred to Preferred Data Customers, who receive the *valid market data*. In other words, Preferred Data Customers received the benefit that Plaintiff and Subscribers contracted for, while Plaintiff and Subscribers did not because they received stale market data. In essence, the Exchange Defendants are selling the same set of market data twice, just at different speeds, such that it is only valid for one group of data customers—Preferred Data Customers.

27

104.    The Exchange Defendants thus breached the Subscriber Contracts, including the duty of good faith and fair dealing, by: (1) providing market data to Subscribers that was not the valid or complete market data, but rather stale market data; and (2) providing the valid market data to Preferred Data Customers through Private Feeds and/or co-location. Specifically, the Exchange Defendants violated their obligations under the Plans and the Subscriber Contracts to disseminate valid market data to the Processor as "promptly as possible" by disseminating the data to Preferred Data Customers first—outside of the SIPs/Subscriber Feeds—and by providing market data to the Processor that was always invalid because it was stale.  In other words, what Subscribers contracted for was valid data, what Subscribers got was stale data.

105.    The Exchange Defendants also breached the Contracts and the duty of good faith and fair dealing by placing, or causing to be placed by the Processor acting on their behalf, inaccurate times on the market data received by Subscribers.

106.    Advance access to the market data is more valuable to Preferred Data Customers because the Exchange Defendants utilized another class of their customers, the Subscribers, who receive the market date late and whom the Preferred Data Customers can exploit.

107.    Without the existence of someone (here, the Subscribers) who receives the data later, there could be no earlier receipt of the data by Preferred Data Customers, and their speedy receipt of the data would not be of  value. Without the Subscribers, the Exchange Defendants would neither be able to sell advance access to Preferred Data Customers nor incentivize them to increase their market activity on the Defendants' Exchanges.  By providing Preferred Data Customers with earlier access to the data, the Exchange Defendants thus subverted the Subscriber Contracts for their own financial gain.

108.     The Exchange Defendants' actions harmed Mr. Lanier and other Subscribers by providing stale data instead of the valid market data for which they had contracted.

## VII.    CLASS ACTION ALLEGATIONS

109.     This action is brought by Plaintiff on behalf of himself and those Subscribers similarly situated[37] who have entered into Subscriber Contracts with any of the Exchange Defendants (directly or through their agents) to receive market data disseminated pursuant to the CQ Plan and the CTA Plan.

110.     To resolve the common core issue in the litigation—the Exchange Defendants' breaches of the Subscriber Contracts—Plaintiff seeks certification of: an equitable relief class pursuant to Federal Rule of Civil Procedure 23(b)(2) ("Equitable Relief Class") and a monetary relief class pursuant to Rule 23(b)(1)(B) and Rule 23 (b)(3) ("Monetary Relief Class"). The objective of this relief is to halt the unfair and discriminatory practices of the Exchange Defendants, and to return the Plaintiff and members of the Equitable Relief Class and Monetary Relief Class to their position prior to entering into the Subscriber Contracts. Given that the common core issue of the litigation is whether the Exchange Defendants' breached the Subscriber Contracts, Plaintiff also requests certification pursuant to Rule 23(c)(4), which allows "particular issues" to be "brought or maintained as a class action" ("Issue Class"). Collectively the Equitable Relief Class, Monetary Relief Class, and Issue Class, and will be referred to as the "Subscriber Class."

---

[37] Preferred Data Customers are not "similarly situated" to Plaintiff or Subscribers and therefore are not included in the classes Plaintiff Harold Lanier seeks to represent.

## A.    The Equitable Relief and Monetary Relief Classes

111.    Rule 23(b)(1) provides that a class may be certified where the prosecution of separate actions by individual class members would create a risk of inconsistent adjudications with respect to individual class members, or adjudications of individual class members would be dispositive of the interests of the other class members not parties to the individual actions and would impede their ability to protect their interests.

112.    Rule 23(b)(2) provides that a class may be certified where the parties opposing the class have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

113.    Rule 23(b)(3) provides that a class may be certified where questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other methods for adjudicating the controversy.

114.    Pursuant to Rule 23(b)(1), (2), and (3), Plaintiff brings this action on behalf of himself and all others similarly situated in the United States, defined as follows:

> All persons within the United States of America who were Subscribers as defined herein and received market data under the Consolidated Quotation Plan and the CTA Plan pursuant to Subscriber Contracts at any time during the period from May 23, 2008 to the present ("Equitable Relief Class" or "Monetary Relief Class").

115.    Excluded from the Equitable Relief Class and the Monetary Relief Class are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, and Preferred Data Customers.

## B.    The Issue Class

116.    In the alternative, Plaintiff seeks certification under Rule 23(c)(4), which provides that an action may be brought or maintained as a class action with respect to particular issues.

117.    Pursuant to Federal Rule of Civil Procedure 23(c)(4), the Issue Class is defined as follows:

> All persons within the United States of America who were Subscribers as defined herein and received market data under the Consolidated Quotation Plan and the CTA Plan pursuant to Subscriber Contracts at any time during the period from May 23, 2008 to the present ("Issue Class").

118.    Excluded from the Issue Class are Defendants, the officers and directors of the Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, and Preferred Data Customers.

119.    An Issue Class is appropriate under Rule 23(c)(4) because, as discussed above, at the heart of this Complaint is whether the Exchange Defendants breached the Subscriber Contracts by providing market data in the same unfair, inaccurate, and discriminatory fashion to all Subscribers. Because the Exchange Defendants' conduct was uniform throughout the United States—breaching the Subscriber Contracts by utilizing the side deals with Preferred Data Customers to provide faster data to Preferred Data Customers to the disadvantage of all Subscribers—this issue is suited for class wide issue resolution. Specifically, the liability issues applicable to the Issue Class arise from the following question: whether the Exchange Defendants breached the Subscriber Contracts by failing to provide valid market data and/or by providing market data in the same unfair, inaccurate and/or discriminatory fashion to all Subscribers.

120.    Under Rule 23(c)(4), certification is appropriate when a Plaintiff establishes a class under Rule 23(a) and when a common issue threads through the case.

**C.    The Subscriber Class Meets the Requirements of Rule 23(a)**

121.    The Equitable Relief Class, Monetary Relief Class, and Issue Class (collectively referred to herein as the "Subscriber Class") are each properly brought and should be maintained as a class action under Rule 23(a), as they satisfy the class action prerequisites of numerosity, commonality, typicality, and adequacy.

**1.    Numerosity**

122.    The members of the Subscriber Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are millions of members in the proposed Subscriber Class. The exact number of Class members is in the control of and may be identified from records maintained by the Exchange Defendants.

**2.    Commonality**

123.    Questions of law and fact, which are common to the Subscriber Class, are numerous and predominate over questions affecting only individual members of the class, including, *inter alia*, the following:

A.    Whether the Exchange Defendants provided market data to Subscribers in an unfair, inaccurate and/or discriminatory fashion;

B.    Whether the Exchange Defendants breached the terms of the Subscriber Contracts;

C.    Whether claims of the Class arise from the same conduct constituting the Exchange Defendants' breaches of the Subscriber Contracts;

D.    Whether the Exchange Defendants breached the covenant of good faith and fair dealing in the Contracts when they entered into side deals with Preferred Data Customers pursuant to which Preferred Data Customers received faster access to market data;

E.      Whether the Exchange Defendants breached the covenant of good faith fair dealing in the Contracts by depriving the Subscriber Class of access to valid market data; and

F.      Whether the Exchange Defendants have been unjustly enriched.

124.    Questions of law and fact, which are common to the Equitable Relief Class and/or the Monetary Relief Class, are numerous and predominate over questions affecting only individual members of the class, including, *inter alia*, the following:

A.      Whether Plaintiff and the Classes have been damaged by the Exchange Defendants' breach of the Subscriber Contracts;

B.      Whether Plaintiff and the Classes are entitled to a return of fees paid pursuant to the Contracts; and/or fees the Exchange Defendants received from Preferred Data Customers for access to Private Feeds and co-location;

C.       Whether a constructive trust should be imposed on all monies unjustly obtained by the Exchange Defendants; and

D.      Whether the Exchange Defendants' practices complained of herein should be enjoined.

**3.    Typicality**

125.    Plaintiff's claims are typical of the claims of the Subscriber Class because his claims have the same essential characteristics as the claims of the class members and his claims arise from the same course of conduct by the Exchange Defendants, i.e., the Exchange Defendants breached the Subscriber Contracts by failing to provide valid market data and/or by providing market data in the same unfair, inaccurate and discriminatory fashion to all members of the Subscriber Class.

4.     **Adequacy**

126.    Plaintiff will fairly and adequately represent and protect the interests of the Subscriber Class. His claims are common to all members of the Class and he has strong interests in vindicating their rights. In addition, Plaintiff and the Class are represented by counsel who are competent and experienced in class action litigation.

**D.     The Subscriber Class Meets the Requirements of Rule 23(b)**

127.    Certification of the Monetary Relief Class under Rule 23(b)(1) is appropriate because prosecuting separate actions by or against individual class members (Subscribers) would create a substantial risk that adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications and would substantially impair or impede their ability to protect their interests.

128.    Certification of the Monetary Relief Class and Issue Class under Rule 23(b)(3) is also appropriate because common questions of law and fact that exist as to all members of the Class are central to the adjudication of this action and predominate over any questions solely affecting individual members of the Class.

129.    Moreover, a class action is superior to other available methods for the fair and efficient adjudication of this controversy in that, among other elements:

A.     The interests of the Plaintiff and members of the Classes in individually controlling the prosecution of separate actions are outweighed by the advantages of adjudicating the common issues of fact and law by means of a class action;

B.     Resolution of the liability issues for the Issue Class would materially advance the litigation of the case;

C.     The expense of prosecuting Plaintiff's and Class members' claims individually would significantly exceed any economic benefit Plaintiff or class members could

realize individually, and individual litigation would overload court dockets and magnify the delay and expense to all parties making individual litigation of liability and damages claims economically impractical and infeasible;

D.     It is desirable that litigation of the claims occur for the all Classes in this forum to preserve the resources of both the Courts and the litigants, and to reduce the risk of varying and inconsistent adjudications that could occur in individual adjudications; and

E.     Little, if any, difficulty is likely to be encountered in management of this class action because applicable law will uniformly apply to each of the claims on behalf of each of the Classes.

130.     Certification of the Equitable Relief Class under Rule 23(b)(2) is appropriate because the Exchange Defendants acted or refused to act on grounds that apply generally to the Equitable Relief Class. Specifically, the Exchange Defendants breached the Subscriber Contracts and the Plans by failing to provide valid market data and/or providing market data in the same unfair, inaccurate and discriminatory fashion to all members of the Equitable Relief Class. Any final injunctive or declaratory relief would apply to the entire Equitable Relief Class as the Exchange Defendants would be ordered to cease their unfair, inaccurate, and discriminatory distribution of market data.

## CLAIMS FOR RELIEF

## VIII.   FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT

131.     All of the preceding allegations in paragraphs 1 – 130 are incorporated by reference under this claim.

132.     Plaintiff and members of the Subscriber Class entered into Subscriber Contracts with the Exchange Defendants, or NYSE acting as their agent, for the receipt of Network A market data.

35

133. Plaintiff and members of the Subscriber Class entered into Subscriber Contracts with the Exchange Defendants, or NYSE MKT acting as their agent, for the receipt of Network B market data.

134. As the Administrators of Network A and Network B, respectively, NYSE and NYSE MKT act on behalf of and as agents for each of the Exchange Defendants that are participants in the CQ and CTA Plans. The acts of NYSE and NYSE MKT therefore are acts of all of the Exchange Defendants.

135. As the Administrators of Network A and Network B, respectively, with the responsibility (and, therefore, authority) to enter into transactions and disseminate data to all Subscribers, NYSE and NYSE MKT act as agents for each of the Exchange Defendants and had the authority to enter into the Contracts with all Subscribers for the provision of the Network A and Network B market data.

136. Pursuant to the Contracts, the Exchange Defendants, or NYSE as their agent with respect to Network A and NYSE MKT as their agent with respect to Network B, charged subscription fees to Plaintiff and the Subscriber Class in exchange for the delivery of valid market data on a non-discriminatory basis.

137. The net revenues from those subscription fees are allocated to the CQ Plan and CTA Plan participants.

138. Plaintiff and members of the Subscriber Class performed all contractual conditions required of them under the Contracts by paying the applicable fees and complying with the reporting requirements of the Contracts and all other terms of the Contracts.

139. As described herein, the Exchange Defendants breached the terms of the Subscriber Contracts and/or the implied covenant of good faith and fair dealing incorporated therein by, *inter alia*:

A.  Failing to provide the valid market data to Plaintiff and members of the Subscriber Class;

B.  Failing to disseminate market data to Plaintiff and the Subscriber Class in a fair and non-discriminatory manner;

C.  Failing to furnish market data to the Processor "as promptly as possible" for dissemination to Subscribers;

D.  Placing, or causing to be placed, inaccurate times on the market data delivered to Plaintiff and the Subscriber Class;

E.  Depriving Plaintiff and the Subscriber Class of the fundamental benefit they contracted for—i.e., the receipt of valid market data on a non-discriminatory basis—by providing advance access to market data to Preferred Data Customers;

F.  Withholding the benefits of the Subscriber Contracts from Plaintiff and the Class;

G.  Preventing specific performance of the Subscriber Contracts;

H.  Providing faster and/or advance access to valid market data to Preferred Data Customers; and

I.  Intentionally breaching contracts in order to enable Preferred Data Customers to exploit the time advantage gained by their advance access to the valid market data.

140. The Exchange Defendants' breaches were material in that they deprived Plaintiff and members of the Subscriber Class of the fundamental right they contracted for and defeated entirely the object of the Contracts.

141. The Exchange Defendants' breaches of the Contracts were willful and intentional in order to generate profits for themselves through the sale of valid market data to Preferred Data Customers and/or increased activity on their exchanges (and, therefore, increased revenue).

142. The Exchange Defendants were grossly negligent and/or acted with deliberate or callous indifference to the rights of Subscribers and the spirit of the law when they intentionally disregarded their promise to provide valid market data on a non-discriminatory basis.

143. Plaintiff and members of the Subscriber Class suffered damages as a direct and proximate result of the Exchange Defendants' breaches of the Contracts and/or the implied covenant of good faith and fair dealing incorporated therein.

144. In particular, Plaintiff and members of the Subscriber Class suffered compensatory damages because the value of the market data they contracted for was not what they received.

145. Monetary relief is not adequate to remedy the harm caused by Defendants' ongoing and/or future breaches of the Contracts, such that specific performance and/or an order enjoining Defendants' ongoing and/or future nonperformance is necessary to prevent irreparable harm to Plaintiff and members of the Subscriber Class.

146. Plaintiff and members of the Subscriber Class are entitled to damages, restitution in an amount equal to the fees received by Defendants under the Subscriber Contracts, rescission of the Subscriber Contracts and/or other equitable relief.

## IX.    SECOND CLAIM FOR RELIEF – IMPOSITION OF A CONSTRUCTIVE TRUST

147.    All of the preceding allegations in paragraphs 1 – 146 are incorporated by reference under this claim.

148.    This Claim is pled in the alternative to the First Claim (Breach of Contract), *supra*.

149.    A confidential relationship exists between Plaintiff and the members of the Subscriber Class and the Exchange Defendants in that, among other things, the Exchange Defendants had superior access to confidential information in the form of valid market data and Plaintiff and the members of the Subscriber Class do not deal on equal terms with the Exchange Defendants with respect to market data.

150.    The Exchange Defendants promised, expressly and/or impliedly, to provide to Plaintiff and members of the Subscriber Class valid market data and to do so in a fair and nondiscriminatory fashion.

151.    In reliance on that promise, Plaintiff and members of the Subscriber Class paid fees to receive market data that were received by the Exchange Defendants.

152.    For the reasons discussed herein, the Exchange Defendants did not provide Plaintiff and members of the Subscriber Class with non-discriminatory access to valid market data. Rather, driven by their desire to maximize profits for themselves, the Exchange Defendants sold advance access to market data to Preferred Data Customers, such that the data received by Plaintiff and the Subscriber Class was not valid, but stale.

153.    The Exchange Defendants thus have been unjustly enriched by, and to the extent of, their receipt of fees from Plaintiff and members of the Subscriber Class at the expense and detriment of Plaintiff and the Subscriber Class.

154.    The Exchange Defendants' retention of the fees paid by Plaintiff and the Subscriber Class would be unjust.

155.    Equity requires that the Exchange Defendants be deemed to hold those fees in trust for Plaintiff and the Subscriber Class.

156.    Plaintiff and the Subscriber Class are entitled to imposition of a constructive trust upon all benefits, however derived, realized by Defendants as a result of the acts complained of herein.

## X.    THIRD CLAIM FOR RELIEF – UNJUST ENRICHMENT (RECEIPT OF SUBSCRIPTION FEES)

157.    All of the preceding allegations in paragraphs 1 – 156 are incorporated by reference under this claim.

158.    This Claim is pled in the alternative to the First Claim (Breach of Contract).

159.    Plaintiff and the Subscriber Class conferred benefits on the Exchange Defendants in the form of the subscription fees they paid in order to receive access to valid market data in a non-discriminatory manner.

160.    For the reasons discussed herein, the data Plaintiff and the Subscriber Class received was not valid market data, and was provided to them in a discriminatory manner.

161.    The Exchange Defendants have been enriched at the expense and to the detriment of Plaintiff and the Subscriber Class in the form of the subscription fees they received.

162.    Under the circumstances alleged herein, it is against equity and good conscience for the Exchange Defendants to retain these fees.

163.    Plaintiff and the Subscriber Class are entitled to restitution of the subscription fees received by the Exchange Defendants.

## XI.    FOURTH CLAIM FOR RELIEF – UNJUST ENRICHMENT
## (RECEIPT OF FEES FROM PREFERRED DATA CUSTOMERS)

164.    All of the preceding allegations in paragraphs 1 – 163 are incorporated by reference under this claim.

165.    Plaintiff and the Subscriber Class conferred benefits on the Exchange Defendants in the form of the opportunity to sell advance access to market data to Preferred Data Customers. For the reasons discussed herein, but for the Subscriber's receipt of stale market data, the Private Feed and/or co-location would not have been valuable and desirable to Preferred Data Customers, and the Exchange Defendants would not have been able to sell those services to the Preferred Data Customers.

166.    The value of the benefit Subscribers conferred on the Exchange Defendants is the price for which the Exchange Defendants sold the Private Feeds and/or co-location to Preferred Data Customers, and, therefore, can be measured by the fees received by the Exchange Defendants from Preferred Data Customers in exchange for advance access to market data through Private Feeds and/or co-location.

167.    The Exchange Defendants have been enriched at the expense of and to the detriment of Plaintiff and the Subscriber Class in the form of the fees received by the Exchange Defendants from Preferred Data Customers because Defendants sold to Preferred Data Customers the market data that Plaintiff and the Subscriber Class were promised, allowing Preferred Data Customers to exploit the fact that the Subscribers' data was stale.

168.    Under the circumstances alleged herein, it is against equity and good conscience for the Exchange Defendants to retain the fees they received from Preferred Data Customers for access to Private Feeds and/or co-location.

169.   Plaintiff and the Subscriber Class are entitled to restitution and/or disgorgement of the value of the benefit they conferred on the Exchange Defendants—an amount equal to the fees received from Preferred Data Customers.

## XII.   PRAYER FOR RELIEF

170.   Plaintiff and the putative Class pray for judgment and relief as follows:

A.   An order certifying the claims of the Subscriber Class and appointing Plaintiff Harold Lanier as a Rule 23 class representative and Lead Plaintiff, and certifying Plaintiff's Counsel as Lead Counsel.

B.   An order declaring void ab initio and/or unenforceable any illegal and/or unconscionable provisions of the Subscriber Contracts.

C.   An order declaring the rights of the Plaintiff and the Subscriber Class.

D.   Judgment entered in favor of the Class and against Exchange Defendants finding that Exchange Defendants breached the Contracts.

E.   An order awarding compensatory damages to Plaintiff and the Subscriber Class.

F.   An order requiring that Defendants specifically perform their obligations under the Contracts in effect and enjoining any future non-performance or, in the alternative, rescinding the Subscriber Contracts.

G.   Restitution to the Subscriber Class of all fees received by the Defendants under the Contracts.

H.   An order requiring Defendants to disgorge all fees paid to them by Preferred Data Customers for Private Feeds and/or co-location.

    I.  For the imposition of a constructive trust upon all benefits, however derived, realized by Defendants as a result of Defendants' unlawful acts perpetrated on Plaintiff and the Subscriber Class.

    J.  Costs, disbursements, attorneys' fees and any other relief that this Court deems appropriate.

## XIII. REQUEST FOR JURY TRIAL

   171.  Plaintiff demands a trial by jury on all counts.

DATED:  New York, New York

     August 15, 2014

        KELLER ROHRBACK L.L.P.


      By /s/ David S. Preminger
        David S. Preminger
        dpreminger@kellerrohrback.com
        1140 Avenue of the Americas, Ninth Floor
        New York, NY 10036
        Telephone:  (646) 380-6690
        Facsimile:  (646) 380-6692

        Michael D. Woerner
        mwoerner@kellerrohrback.com
        Tana Lin
        tlin@kellerrohrback.com
        Laura R. Gerber
        lgerber@kellerrohrback.com
        Keller Rohrback L.L.P.
        1201 Third Avenue, Suite 3200
        Seattle, Washington 98101-3052
        Telephone:  (206) 623-1900
        Facsimile:  (206) 623-3384

Michael Brickman
mbrickman@rpwb.com
Richardson, Patrick, Westbrook & Brickman, LLC
174 East Bay Street
P.O. Box 879
Charleston, SC 29401
Telephone: (843) 727-6520
Facsimile: (843) 727-3103

James C. Bradley
jbradley@rpwb.com
Nina Fields Britt
nfields@rpwb.com
Kimberly Keevers Palmer
kkeevers@rpwb.com
Richardson, Patrick, Westbrook & Brickman, LLC
1017 Chuck Dawley Blvd.
Post Office Box 1007
Mount Pleasant, SC 29465
Telephone: (843) 727-6500
Facsimile: (843) 881-6183

Michael T. Lewis
mike@lewisattorneys.com
Pauline Shuler Lewis
pauline@lewisattorneys.com
Lewis & Lewis Attorneys
P.O. Drawer 2430
Oxford, Mississippi 38655
Telephone: (662) 232-8886
Facsimile: (662) 232-8636

Mercer Bullard
mbullard9@gmail.com
300 Country Club Road
Oxford, Mississippi 38655
Telephone: (662) 915-6835

Stuart McCluer
smccluer@mcculleymccluer.com
McCulley McCluer PLLC
1223 Jackson Avenue East, Suite 200
P.O. Box 2294
Oxford, Mississippi 38655
Telephone: (662) 550-4511
Facsimile (662) 368-1506

R. Bryant McCulley
bmcculley@mcculleymccluer.com
McCulley McCluer PLLC
1919 Oxmoor Road, No. 213
Birmingham, AL 35209
Telephone:  (205) 138-6757
Facsimile:  (662) 368-1506

**Attorneys for Plaintiff**