# KELLER ROHRBACK L.L.P.

| | | | |
|---|---|---|---|
| LAURIE B. ASHTON ①⑤❽ | GARY A. GOTTO ①❽ | MICHAEL M. LICATA | PAUL A. TONELLA |
| IAN S. BIRK | BENJAMIN GOULD ④ | TANA LIN ⑦⑨❻ | HAVILA C. UNREIN ④⑩ |
| JAMES A. BLOOM ①❽ | CHRISTOPHER GRAVER ①❽ | DEREK W. LOESER | MARGARET E. WETHERALD ❽ |
| STEPHEN R. BOATWRIGHT ①❽ | GARY D. GREENWALD ①❹❽ | HOLLY E. LYNCH | HARRY WILLIAMS, IV ❺ |
| KAREN E. BOXX | MARK A. GRIFFIN ③ | RYAN MCDEVITT | AMY WILLIAMS-DERRY |
| GRETCHEN FREEMAN CAPPIO | AMY N.L. HANSON | DANIEL MENSHER ❸❽ | MICHAEL WOERNER |
| ALISON CHASE ①④❽ | IRENE M. HECHT | IAN J. MENSHER | BENSON D. WONG |
| T. DAVID COPLEY ③ | SCOTT C. HENDERSON | GRETCHEN S. OBRIST | DIANA M. ZOTTMAN ③ |
| ALICIA M. CORBETT ①❽ | MICHAEL G. HOWARD | ROBERT S. OVER | |
| ROB J. CRICHTON ❷ | KHESRAW KARMAND ②❽ | DAVID S. PREMINGER ❶❽ | ① ADMITTED IN ARIZONA |
| DANIEL A. DECHESARO ①❽ | DEAN N. KAWAMOTO ④❻ | MATTHEW J. PREUSCH ②❸❽ | ② ADMITTED IN CALIFORNIA |
| MAUREEN M. FALECKI | RON KILGARD ①❷❻❽ | ERIN M. RILEY | ③ ALSO ADMITTED IN ARIZONA |
| JULI FARRIS ④ | SUSAN A. KIM ④❻ | ISAAC RUIZ | ④ ALSO ADMITTED IN CALIFORNIA |
| RAYMOND J. FARROW | KATHRYN M. KNUDSEN | DAVID J. RUSSELL | ⑤ ALSO ADMITTED IN COLORADO |
| ERIC J. FIERRO ①❽ | DAVID J. KO | MARK D. SAMSON ①❻❽ | ⑥ ALSO ADMITTED IN IDAHO |
| ALISON S. GAFFNEY | ERIC R. LALIBERTE | LYNN LINCOLN SARKO ❻❼ | ⑦ ALSO ADMITTED IN ILLINOIS |
| GLEN P. GARRISON ⑥ | BENJAMIN J. LANTZ | WILLIAM C. SMART | ⑧ ALSO ADMITTED IN MARYLAND |
| LAURA R. GERBER | LUKE M. LARIVIERE | THOMAS A. STERKEN | ⑨ ALSO ADMITTED IN MICHIGAN |
| MATTHEW M. GEREND | CARI CAMPEN LAUFENBERG | BETH M. STROSKY | ⑩ ALSO ADMITTED IN MONTANA |
| DEIRDRE P. GLYNN LEVIN | ELIZABETH A. LELAND | KARIN B. SWOPE | ❶ ADMITTED IN NEW YORK |
| | | | ❷ ALSO ADMITTED IN NEW YORK |
| | | | ❸ ALSO ADMITTED IN OREGON |
| | | | ❹ ALSO ADMITTED IN OHIO |
| | | | ❺ ALSO ADMITTED IN TEXAS |
| | | | ❻ ALSO ADMITTED IN WASHINGTON, D.C |
| | | | ❼ ALSO ADMITTED IN WISCONSIN |
| | | | ❽ NOT ADMITTED IN WASHINGTON |

August 18, 2014

*VIA ECF*

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street, Room 1950
New York, NY  10007

      Re:    *Harold R. Lanier et al. v. BATS Exchange, Inc., et al.*; No. 14-cv-3745
              *Request to Order Substitution of Exhibits A and B to ECF No. 89*

Dear Judge Forrest:

      Pursuant to this Court's August 4, 2014, Order (ECF No. 71), Counsel for Plaintiff Harold Lanier filed an Amended Complaint on August 15, 2014 at approximately 7:18 pm EDT. The Amended Complaint (ECF No. 89) included Exhibits A (89-1) and B (89-2). Upon reviewing the filing, we determined that Exhibits A and B had not been properly redacted pursuant to Federal Rule of Civil Procedure 5.2(a)(1). To remedy this problem, we immediately attempted to call the ECF Help Desk as well as the Clerk's office but were unable to reach anyone as it was after business hours. Thereafter, we emailed the Court's ECF helpdesk at approximately 8:30 pm EDT requesting assistance with removal from the docket and destruction of Exhibits A and B. We also immediately emailed all counsel in this matter, requesting that they destroy and not disseminate any copies of the as-filed documents and providing them with redacted versions of Exhibits A and B. This morning, we placed a telephone call to the Clerk's office and were informed that ECF No. 89 has been sealed. The Court requested that we submit a letter requesting the relief we seek.

      Accordingly, we are writing to request an Order from the Court instructing the Clerk to substitute the attached redacted versions of Exhibits A and B to ECF No. 89 for the as-filed versions, and then permit the unsealing of ECF No. 89 in its entirety. If this is not administratively feasible, we request that the ECF No. 89 be stricken from the docket and that

**KELLER ROHRBACK L.L.P.**

August 18, 2014
Page 2

Plaintiff's counsel be granted permission to re-file the Complaint and redacted exhibits. To the extent the Court prefers another mechanism for the replacement of these exhibits, Plaintiff requests the Court's guidance as to its preferred procedure.

    We apologize for any inconvenience this has caused and thank the Court in advance for its prompt attention to this matter.

Sincerely,

Laura R. Gerber

Attachments

cc (via ECF):  Counsel for all Defendants

**EXHIBIT A**

35451

# AGREEMENT FOR RECEIPT OF CONSOLIDATED NETWORK A DATA AND NYSE MARKET DATA

This Agreement permits the undersigned "Subscriber" to arrange with authorized vendors or with the New York Exchange, Inc. ("NYSE"), as appropriate to receive any one or more Types of Market Data* and to use that Market Data for interrogation* display, tape* display or other purposes not entailing retransmisssion. This Agreement governs whichever Type(s) of Market Data, means of receipt and use(s) Subscriber receives, arranges and makes. Subscriber and NYSE agree to all terms and conditions of this Agreement.

Subscribers's Name: __Harold Lanier__

__2840 Laurel Green Ct.__
(Street Address)                                                                                                   (Floor)

__Roswell__                __GA__               __30076__           __USA__
(City)                         (State)                  (Zip)                (Country)

Name and Title of Individual Signing: __Harold Lanier, Individual Subscriber__
(Individual Subscriber, General Partner or Officer)

Billing address if different than above: _____

Taxpayer Identification or Social Security Number: [REDACTED]  Type of Business: __Buy, Sell Stocks, options__  Tele. No.: __770-751-3822__
Check box if member of:

| Exchange | ☐ | Exchange | ☐ | Exchange | ☐ |
|---|---|---|---|---|---|
| American Stock Exchange, Inc. | ☐ | Chicago Stock Exchange, Inc. | ☐ | New York /Stock Exchange, Inc. | ☐ |
| Boston Stock Exchange, Inc. | ☐ | Cincinnati Stock Exchange, Inc. | ☐ | Pacific Stock Exchange, Inc. | ☐ |
| Chicago Board Options Exchange, Inc. | ☐ | National Association of Securities Dealers, Inc. | ☐ | Philadelphia Stock Exchange, Inc. | ☐ |

**SUBSCRIBER**

By: _(Subscriber Authorized Signature)_

Dated: __09-20-04__

**NEW YORK STOCK EXCHANGE, INC.**
On behalf of the CTA Plan Participants (in respect of CTA Network A last sale information) and the CQ Plan Participants (in respect of CQ Network A quotation information) and on its own behalf solely (in respect of NYSE Securities Information*)

By: _____

By: _____

## PART 1: PROVISIONS OF GENERAL APPLICABILITY

**1. DEFINITIONS**
(a) "Authorizing Sro" means each of the authorizing self-regulatory organizations (i.e., each CTA Plan Participant, each CQ Plan participant and NYSE).
(b) "Interrogation", as used to differentiate devices and displays, refers to (i) displaying Market Data for a security in response to Subscriber's specific inquires or (ii) displaying changes in Market Data as they occur for a limited number of securities specified by Subscriber.
(c) "Market Data: means (i) CTA Network A last sale information, (ii) CQ Network A quotation information, (iii) NYSE bond last sale information, (iv) NYSE bond quotation information, (v) NYSE index information and (vi) each other category of market information made available by NYSE as NYSE may designate time to time. Each of the above categories includes all information that derives from the category's information. Stock and bond last sale prices and information deriving from those prices cease to be "Market Date" 15 minutes after the Authorizing SRO(s) make the prices available over their low speed data transmission facilities. NYSE may alter such period from time to time on 60 days' written notice to Subscriber.
(d) "NYSE Securities Information" means the Types of Market Data enumerated or referred to in clauses (iii) and (iv) of Paragraph 1(c).
(e) "Person" includes any natural person or proprietorship or any corporation, partnership or other organization.
(f) "Processor" ,means the processor under the CTA Plan and CQ Plan.
(g) "Subscriber Device" means a component of Subscriber Equipment* that provides an interrogation display, a tape display or both displays.
(h) "Subscriber Equipment" means any display device, computer, software, wires, transmission facility or other equipment by which Subscriber receives, displays or otherwise uses Market Data.
(i) "Tape", as used to differentiate devices and displays, refers to displaying on a current and continuous basis (i) last sale process as made available over the data transmission facilities of one or more Authorizing SROs or as retransmitted by an authorized vendor or (ii) a subset of the prices so made available or retransmitted that Subscriber selects on the basis of, for example, transaction size or security.
(j) "Type of Market Data: means the Market Data in any of the categories enumerated or referred to in Paragraph 1(c).
**2. PROPRIETARY NATURE OF DATA** --Each Authorizing SRO asserts a proprietary interest in its "Relevant Market Data" (i.e., the Market Data that it furnishes to the Processor and in case of NYSE, that it otherwise makes available).
**3. NYSE CAPACITY: ENFORCEMENT**--Whenever this Agreement requires "NYSE" to take any action, or to receive any payment, information or notice, as to any Type of Market Data, NYSE acts on behalf of the Authorizing SRO(s) for the Type of Market Data. Any Authorizing SRO may enforce this Agreement as to its Relevant Market Data, by legal proceeding or otherwise, against Subscriber and may likewise proceed against any person that obtains its Relevant Market Data other than as this Agreement contemplates. Subscriber shall pay the reasonable attorney's fees that any Authorizing SRO incurs in enforcing this Agreement against Subscriber.
**4. CHARGES**
(a) PAYMENT-- Subscriber shall pay in United States dollars the applicable charges(s) as from time to time in effect, plus any applicable tax. Charges apply for receipt of Market Data whether or not used.
(b) BILLING -- Subscriber will be billed in advance for recurring data and equipment charges on a periodic basis (monthly unless otherwise notified) based upon information that Subscriber or authorized vendors report. Subscriber will be billed upon incurrence for one-time charges, such as those relating to installations, relocations and provision of additional equipment facilities. Subscriber shall pay invoices promptly upon receipt. Errors in and omissions from invoices, and errors or delays in sending, or failures to send or receive, invoices, do not relieve Subscriber of its payment obligations.
**5. DATE SECURITY**
(a) RETRANSMISSIONS PROHIBITED -- Subscriber shall use Market Data only for its individual use in its business. Subscriber shall neither furnish Market Data to any other person nor retransmit Market Data among its premises.
(b) CONTROL OF EQUIPMENT -- Subscriber shall assure that it or its partners or officers and employees have sole control or physical possession of, and sole access to Market Data through Subscriber Equipment.
(c) DISPLAYS ACCESSIBLE TO THE GENERAL PUBLIC -- Notwithstanding the limitations of Paragraphs 5(a) and 5(b), subscriber may install one or more Subscriber Devices on enclosed portions of premises to which the general public has access if Subscriber (i) controls the premises and access to them and (ii) gives NYSE written notice of the installation. Subscriber may permit individuals who are passing through or visiting the premises to operate or to view the devices on a sporadic basis, and for limited periods of time, during their temporary presence on the premises.
(d) EQUIPMENT SECURITY -- Subscriber understands that this Paragraph 5 requires Subscriber to carefully locate and protect Subscriber Equipment. Subscriber shall abide by any written

(e) INSPECTION -- At any reasonable time, Subscriber shall assure that authorized representatives of NYSE have access to the premises at which Subscriber Equipment is located and, in the presence of Subscriber's officials, the rights to examine the equipment and to observe Subscriber's use of the equipment.

6. DATA NOT GUARANTEED -- Neither NYSE, any other Authorizing SRO nor the Processor (the "disseminating parties") guarantees the timeliness, sequence, accuracy or completeness of Market Data or of other market information or messages disseminated by any disseminating party. No disseminating party shall be liable in any way to Subscriber or to any other person for any inaccuracy, error or delay in, or omission of, (i) any such data, information or message or (ii) the transmission or delivery of any such data, information or message, or (iii) any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, (ii) non-performance, or (iii) interruption in any such data, information or message, due either to any negligent act or omission by any disseminating party or to any "force majeure" (i.e., flood, extraordinary weather conditions, earthquake or other act of God, fire, war, insurrection, riot, labor dispute, accident, action of government, communications or power failure, equipment or software malfunction) or any other cause beyond the reasonable control of any disseminating party.

7. DISSEMINATION DISCONTINUANCE OR MODIFICATION -- The Authorizing SROs may discontinue disseminating any Type of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages to Subscriber.

8. DURATION; SURVIVAL -- Subject to Paragraph 7, either Subscriber or NYSE may terminate this Agreement on 30 days' written notice to the other. In addition, this Agreement terminates 90 days after Subscriber no longer has the ability to receive Market Data as contemplated by this Agreement. Withdrawal of an Authorizing SRO other than NYSE from the CTA Plan and CQ Plan terminates this Agreement solely as to that Authorizing SRO. Withdrawal of NYSE from the CTA Plan and CQ Plan terminates this Agreement as to all other Authorizing SROs. Paragraphs 5, 5(d), 6, 15(e), 15(e) and 16(e) survive termination of this Agreement.

9. ENTIRE AGREEMENT; MODIFICATIONS -- This writing contains the entire agreement between the parties in respect of its subject matter. This Agreement supersedes any prior agreement between Subscriber and NYSE pursuant to which Subscriber has been receiving Market Data except insofar as the earlier agreement covers receipt of Market Data through direct or indirect access to the high speed line described in the CTA Plan or the CQ Plan, or any comparable high speed transmission facility that NYSE uses to make Market Data available. The parties may modify this Agreement by a writing signed by or on behalf of each of them.

10. ASSIGNMENTS -- Subscriber may not assign all or part of this Agreement without the written consent of NYSE.

11. GOVERNING LAW; CONSTRUCTION -- The laws of the State of New York govern this Agreement. It shall be interpreted in accordance with those laws. In prohibiting Subscriber from doing any act, this Agreement also prohibits Subscriber from doing the act indirectly (e.g., by causing or permitting any person to do the act).

12. APPLICABILITY OF 1934 ACT AND PLANS -- This Agreement is subject to the Securities and Exchange Act of 1934, the rules under that act, the CTA Plan (as to CTA Network A last sale information) and the CQ Plan (as to CQ Network A quotation information).

13. NOTICES; NOTIFICATION OF CHANGES -- The parties shall send communications relating to this Agreement to:

New York Stock Exchange, Inc.        Subscriber (as above)
11 Wall Street
New York, New York 10005
Attention: Director of Market Data

Subscriber and NYSE may each change its address by written notice to the other. Subscriber shall give NYSE prompt written notice of any change in (a) the Subscriber information listed above, (b) any other information provided to NYSE in connection with initiating the receipt of any Type of Market Data or (c) any description provided pursuant to Paragraph 15(d).

## PART II: SPECIAL PROVISIONS

This Part II applies only to the extent that Subscriber's activity or equipment falls within the scope of one or more of Paragraphs 14 through 16.

14. SECURITIES PROFESSIONALS; FURNISHING DATA TO CUSTOMERS AND BRANCH OFFICES

(a) SCOPE -- This Paragraph 14 applies if Subscriber is a securities professional, such as a registered broker-dealer or investment adviser, and is an exception to Paragraphs 5(a) and 5(b).

(b) LIMITED PROVISION OF DATA -- Solely in the regular course of its securities business, Subscriber may occasionally furnish limited amounts of Market Data to its customers and to its branch offices. Subscriber may so furnish Market Data to its customers and clients who are not on Subscriber's premises solely (i) in written advertisements, educational materials, sales literature or similar written communications or (ii) during telephonic voice communication not entailing the use of computerized voice synthesization or similar technology. Subscriber may so furnish Market Data to its branch offices solely (i) as provided in the preceding sentence or (ii) through manual entry of the data over its teletype network. Subscriber shall not permit any branch office to take physical possession of Subscriber Equipment. Subscriber shall abide by any additional limitations that NYSE specifies in writing.

15. REPORTING; RECORDS; EQUIPMENT DESCRIPTION

(a) SCOPE -- This Paragraph 15 applies whenever an authorized vendor cannot know (e.g., by virtue of installing equipment or recognizing electronically a unique device identifier) all information necessary to bill Subscriber for applicable charges. For example, this Paragraph 15 typically applies to (i) Subscriber Devices not leased to NYSE or an authorized vendor, (ii) leasable Subscriber Devices and Subscriber Devices that use portable components (e.g., software) to receive Market Data and (iii) Subscriber's receipts of Market Data through voice-sized communications over telephones.

(b) REPORTING -- Subscriber shall furnish to NYSE in writing such information, in such form and at such times, as NYSE may reasonably specify from time to time in order to bill Subscriber for applicable charges. However, if an authorized vendor provides Market Data to any Subscriber Device, Subscriber shall furnish information regarding the device to the vendor or direct to NYSE unless NYSE notifies Subscriber otherwise in writing.

(c) RECORDS -- Subscriber shall maintain the records upon which it bases its reporting for two years following the period to which the records relate. Solely to measure Subscriber's compliance with this Paragraph 15, authorized representatives of NYSE may examine and verify those records at any reasonable time in the presence of Subscriber's officials.

(d) EQUIPMENT DESCRIPTIONS -- Upon NYSE's written request, Subscriber shall provide NYSE with a description acceptable to NYSE of any Subscriber Equipment that an authorized vendor or an Authorizing SRO does not supply.

(e) INDEMNIFICATION -- Subscriber shall indemnify and hold harmless each Authorizing SRO from and against any liability, loss or damages caused by (i) any notice or other communication from (ii) Subscriber's failure to furnish or to keep, or (iii) Subscriber's delay in furnishing or keeping, any report or record that this Paragraph 15 requires. Subscriber shall do so even if Subscriber depends on information from a third party and the third party caused the inaccuracy, omission, failure or delay. Without limiting the generality of the foregoing, if NYSE determines that as a consequence of any such inaccuracy, omission, failure or delay, applicable Subscriber charges were not billed when incurred, Subscriber may be billed for those charges and Subscriber shall pay all those charges plus any applicable tax.

16. EQUIPMENT SUPPLIED BY AUTHORIZING SROs

(a) SCOPE; DEFINITION -- This Paragraph 16 applies to Subscriber Equipment that one or more authorizing SROs supply ("SRO Equipment").

(b) OWNERSHIP -- the Authorizing SRO(s) or their supplier(s) own SRO Equipment. Subscriber shall not relocate, remove or alter SRO Equipment, or attach to SRO Equipment any equipment other than authorized vendor-supplied equipment that an authorized vendor supplies, without NYSE's written consent. Subscriber shall return SRO Equipment in the same condition as it was when installed except for normal wear and tear and for failures for which the Authorizing SROs are responsible under Paragraph 16(d).

(c) ACCESS TO PREMISES -- Subscriber shall assure that authorized representatives of the Authorizing SROs and of their suppliers and service-contractors may at all reasonable times install, operate and replace SRO Equipment, and may remove any SRO Equipment that Subscriber no longer wants or to which it is no longer entitled, at any reasonable time.

(d) SITE PREPARATION AND MAINTENANCE -- Subscriber shall prepare the site for SRO Equipment in a manner acceptable to the Authorizing SROs and shall keep the site adequately provide adequate space and power. The Authorizing SROs shall maintain SRO Equipment subject to applicable charges. Maintenance includes repair or replacement of failed SRO Equipment and parts as necessary. Extraordinary charges may apply if Subscriber caused the failure.

(e) WARRANTY AND SCOPE OF LIABILITY -- THE AUTHORIZING SROs PROVIDE NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Paragraph 16(d) sets forth the Authorizing SROs' entire liability for equipment failure. The Authorizing SROs' liability to Subscriber for any liability, loss or damages relating to SRO Equipment other than for the costs of maintenance repairs, whether under this Agreement or in tort (including negligence) and strict liability or any other theory, shall in the aggregate not exceed the lesser of (i) $1,000 or (ii) the total charges to Subscriber under this Agreement for the period preceding the breach or injury. The foregoing limitations do not apply to personal injury claims. In no event shall any Authorizing SRO be liable for any indirect, special, incidental, consequential or punitive liability, loss or damages relating to SRO Equipment, regardless of the form of the action and foreseeability of the liability, loss or damages or of the liability, loss or damages due to any "force majeure" (see Paragraph 6) or for any other cause beyond the reasonable control of the Authorizing SRO.

---

*Wherever an asterisk follows the first use of a term, Paragraph 1 defines the term.

**EXHIBIT B**

| American Stock Exchange | | Agreement for Receipt of Consolidated Network B Data and AMEX Market Data |
|---|---|---|
| 86 Trinity Place<br>New York, New York 10006-1881 | Market Communications<br>Tel: (212) 306-1340<br>Fax: (212) 306-2086 | |

This Agreement permits the undersigned "Subscriber" to arrange with authorized vendors or with the American Stock Exchange, Inc. ("AMEX"), as appropriate, to receive any one or more Types of Market Data* and to use that Market Data for interrogation* display, tape* display or other purposes not entailing retransmission. This Agreement governs whichever Type(s) of Market Data, means of receipt and use(s) Subscriber receives, arranges and makes. Subscriber and AMEX agree to all terms and conditions of this Agreement.

**(Type or Print)**

Subscriber Name: **Harold Lanier**
(Company Name)

Address: **2840 Laurel Green Ct.**

City, State, Zip: **Roswell, GA 30076**

Country: **USA**

Taxpayer ID or Social Security Number: [REDACTED]

Type of Business: **Buy & Sell Stocks & Options**

Tel. No.: **770-751-3822**

Fax No.: **770-751-0679**

SUBSCRIBER
Name: **Harold Lanier**
(Individual Name)

Title: _____

By: _____ (Subscriber Authorized Signature)

Dated: **09-20-04**

AMERICAN STOCK EXCHANGE, INC.
On behalf of the CTA Plan Participants (in respect of CTA Network B last sale information) and the CQ Plan Participants (in respect of CQ Network B quotation information) and on its own behalf solely (in respect of AMEX Securities Information*)

AMEX USE ONLY

By: _____

Dated: _____

Indicate following memberships:

American Stock Exchange, Inc. ☐         Chicago Stock Exchange, Inc. ☐            New York Stock Exchange, Inc. ☐
Boston Stock exchange, Inc. ☐           Cincinnati Stock Exchange, Inc. ☐         Pacific Stock Exchange, Inc. ☐
Chicago Board Options Exchange, Inc. ☐   National Association of Securities Dealers, Inc. ☐   Philadelphia Stock Exchange, Inc. ☐

**PART I: PROVISIONS OF GENERAL APPLICABILITY**

1. DEFINITIONS
(a) "Authorizing Sro" means each of the authorizing self-regulatory organizations (i.e., each CTA Plan Participant, each CQ Plan participant and AMEX).
(b) "Interrogation", as used to differentiate devices and displays, refers to (i) displaying Market Data for a security in response to Subscriber's specific inquires or (ii) displaying changes in Market Data as they occur for a limited number of securities specified by Subscriber.
(c) "Market Data: means (i) CTA Network B last sale information, (ii) CQ Network B quotation information, (iii) AMEX Index Information and (iv) each other category of market information made available by AMEX as the AMEX may designate from time to time. Each of the above categories includes all information that derives from the category's information. Last sale prices and information deriving from those prices cease to be "Market Date" 15 minutes after the Authorizing SRO(s) make the prices available over their low speed data transmission facilities. AMEX may alter such period from time to time on 60 days' written notice to Subscriber.
(d) "AMEX Securities Information" means the Types of Market Data enumerated or referred to in clauses (iii) and (iv) of Paragraph 1(c).
(e) "Person" includes any natural person or proprietorship or any corporation, partnership or other organization.
(f) "Processor" means the processor under the CTA Plan and CQ Plan.
(g) "Subscriber Device" means a component of Subscriber Equipment* that provides an interrogation display, a tape display or both displays.
(h) "Subscriber Equipment" means any display device, computer, software, wires, transmission facility or other equipment by which Subscriber receives, displays or otherwise uses Market Data
(i) "Tape", as used to differentiate devices and displays, refers to displaying on a current and continuous basis (i) Market Data as currently made available (or as may be made available in the future) over the data transmission facilities of one or more Authorizing SROs or as retransmitted by an authorized vendor or (ii) a subset of the Market /Data so made available or retransmitted that Subscriber selects on the basis of, for example, transaction size or security.
(j) "Type of Market Data: means the Market Data in any; of the categories enumerated or referred to in Paragraph 1(c).
2. PROPRIETARY NATURE OF DATA --Each Authorizing SRO asserts a proprietary interest in its "Relevant Market Data" (i.e., the Market Data that it furnishes to the Processor and in case of AMEX, that it otherwise makes available).
3. AMEX CAPACITY: ENFORCEMENT--Whenever this Agreement requires "AMEX" to take any action, or to receive any payment, information or notice, as to any Type of Market Data. AMEX acts on behalf of the Authorizing SRO(s) for the Type of Market Data. Any Authorizing SRO may enforce this Agreement as to its Relevant Market Data, by legal proceeding or otherwise, against Subscriber and may likewise proceed against any person that obtains its Relevant Market Data other than as this Agreement contemplates. Subscriber shall pay the reasonable attorney's fees that any Authorizing SRO incurs in enforcing this Agreement against Subscriber.
4. CHARGES
(a) PAYMENT-- Subscriber shall pay in United States dollars the applicable charges(s) as from time to time in effect, plus any applicable tax. Charges apply for receipt of Market Data whether or not used.
(b) BILLING -- Subscriber will be billed in advance for recurring data and equipment charges on a periodic basis (monthly unless otherwise notified) based upon information that Subscriber or authorized vendors report. Subscriber will be billed upon incurrence for one-time charges, such as those relating to installations, relocations and provision of additional equipment facilities. Subscriber shall pay invoices promptly upon receipt. Errors in and omissions from invoices, and errors or delays in sending, or failures to send or receive, invoices, do not relieve Subscriber of its payment obligations.
5. DATA SECURITY

(a) RE-TRANSMISSIONS PROHIBITED -- Subscriber shall use Market Data only for its individual use in its business. Subscriber shall neither furnish Market Data to any other person nor retransmit Market Data among its premises.

(b) CONTROL OF EQUIPMENT -- Subscriber shall assure that it or its partners or officers and employees have sole control or physical possession of, and sole access to Market Data through Subscriber Equipment.

(c) DISPLAYS ACCESSIBLE TO THE GENERAL PUBLIC -- Notwithstanding the limitations of Paragraphs 5(a) and 5(b), subscriber may install one or more Subscriber Devices on enclosed portions of premises to which the general public has access if Subscriber (i) controls the premises and access to them and (ii) gives AMEX written notice of the installation. Subscriber may permit individuals who are passing through or visiting the premises to operate or to view the devices on a sporadic basis, and for limited periods of time, during their temporary presence on the premises.

(d) EQUIPMENT SECURITY -- Subscriber understands that this Paragraph 5 requires Subscriber to carefully locate and protect Subscriber Equipment. Subscriber shall abide by any written requirements that AMEX specifies to regulate the location or connection of Subscriber Equipment or to otherwise assure compliance with this Paragraph 5. Subscriber guarantees that any person installing or maintaining Subscriber Equipment will comply with this Paragraph 5.

(e) INSPECTION -- At any reasonable time, Subscriber shall assure that authorized representatives of AMEX have access to the premises at which Subscriber Equipment is located and, in the presence of Subscriber's officials, the rights to examine the equipment and to observe Subscriber's use of the equipment.

6. DATA NOT GUARANTEED -- Neither AMEX, any other Authorizing SRO nor the Processor (the "disseminating parties") guarantees the timeliness, sequence, accuracy or completeness of Market Data or of other market information or messages disseminated by any disseminating party. No disseminating party shall be liable in any way to subscriber or to any other person for (a) any inaccuracy, error or delay in, or omission of, (i) any such data, information or message or (ii) the transmission or delivery of any such data, information or message, or (b) any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, (ii) non-performance, or (iii) interruption in any such data, information or message, due either to any negligent act or omission by any disseminating party or to any "force majeure" (i.e., flood, extraordinary weather conditions, earthquake or other act of God, fire, war, insurrection, riot, labor dispute, accident, action of government, communications or power failure, equipment or software malfunction) or any other cause beyond the reasonable control of any disseminating party.

7. DISSEMINATION DISCONTINUANCE OR MODIFICATION -- The Authorizing SROs may discontinue disseminating any Type of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages to Subscriber.

8. DURATION; SURVIVAL -- Subject to Paragraph 7, either Subscriber or AMEX may terminate this Agreement on 30 days' written notice to the other. In addition, this Agreement terminates 90 days after Subscriber no longer has the ability to receive Market Data as contemplated by this Agreement. Withdrawal of an Authorizing SRO other than AMEX from the CTA Plan and the CQ Plan terminates this Agreement solely as to that Authorizing SRO. Withdrawal of AMEX from the CTA Plan and CQ Plan terminates this Agreement as to all other Authorizing SROs. Paragraphs 3, 5(d), 6, 15(e), 15(e) and 16(e) survive termination of this Agreement.

9. ENTIRE AGREEMENT; MODIFICATIONS -- This writing contains the entire agreement between the parties in respect of its subject matter. This Agreement supersedes each prior agreement between Subscriber and AMEX pursuant to which Subscriber has been receiving Market Data except insofar as the earlier agreement covers receipt of Market Data through direct or indirect access to the high speed line described in the CTA Plan or the CQ Plan, or any comparable high speed transmission facility that AMEX uses to make Market Data available. The parties may only modify this Agreement by a writing signed by or on behalf of each of them.

10. ASSIGNMENTS -- Subscriber may not assign all or part of this Agreement without the written consent of AMEX.

11. GOVERNING LAW; CONSTRUCTION -- The laws of the State of New York govern this Agreement. It shall be interpreted in accordance with those laws. To prohibit Subscriber from doing any act, this Agreement also prohibits Subscriber from doing the act indirectly (e.g., by causing or permitting any person to do the act).

12. APPLICABILITY OF 1934 ACT AND PLANS -- This Agreement is subject to the Securities and Exchange Act of 1934, the rules under that act, the CTA Plan (as to CTA Network B last sale information) and the CQ Plan (as to CQ Network B quotation information).

13. NOTICES; NOTIFICATION OF CHANGES -- The parties shall send communications relating to this Agreement to:

American Stock Exchange, Inc.          Subscriber (as above)
86 Trinity Place
New York, New York 10006-1881
Attention: Market Communications

Subscriber and AMEX may each change its address by written notice to the other. Subscriber shall give AMEX prompt written notice of any change in (a) the Subscriber information listed above, (b) any other information provided to AMEX in connection with initiating the receipt of any Type of Market Data or (c) any description provided pursuant to Paragraph 15 (d).

## PART II: SPECIAL PROVISIONS

This Part II applies only to the extent that Subscriber's activity or equipment falls within the scope of one or more of Paragraphs 14 through 16.

14. SECURITIES PROFESSIONALS: FURNISHING DATA TO CUSTOMERS AND BRANCH OFFICES

(a) SCOPE -- This Paragraph 14 applies if Subscriber is a securities professional, such as a registered broker-dealer or investment adviser, and is an exception to Paragraphs 5(a), 5(b) and 5(c).

(b) LIMITED PROVISION OF DATA -- Solely in the regular course of its securities business, Subscriber may occasionally furnish limited amounts of Market Data to its customers and clients and to its branch offices. Subscriber may so furnish Market Data to its customers and clients who are not on Subscriber's premises solely (i) in written advertisements, educational material, sales literature or similar written communications or (ii) during telephonic voice communication not entailing the use of computerized voice synthesization or similar technology. Subscriber may so furnish Market Data to its branch offices solely (i) as provided in the preceding sentence or (ii) through manual entry of the data over its teletype network. Subscriber shall not permit any customer or client to take physical possession of Subscriber Equipment. Subscriber shall abide by any additional limitations that AMEX specifies in writing.

15. REPORTING; RECORDS; EQUIPMENT DESCRIPTION

(a) SCOPE -- This Paragraph 15 applies whenever an authorized vendor cannot know (e.g., by virtue of installing equipment or recognizing electronically a unique device identifier) all information necessary to bill Subscriber for applicable charge(s). For example, this Paragraph 15 typically applies to (i) Subscriber Devices not leased from AMEX or an authorized vendor, (ii) portable Subscriber Devices and Subscriber Devices that use portable components (e.g., software) to receive Market Data and (iii) Subscriber's receipts of Market Data through synthesized voice responses over telephones.

(b) REPORTING -- Subscriber shall furnish to AMEX in writing such information, in such form and at such times, as AMEX may reasonably specify from time to time to permit billing of Subscriber for applicable charge(s). However, if an authorized vendor provides Market Data to any Subscriber Device, Subscriber shall furnish information regarding the device to the vendor in lieu of AMEX unless AMEX notifies Subscriber otherwise in writing.

(c) RECORDS -- Subscriber shall maintain the records upon which it bases its reporting for two years following the period to which the records relate. Solely to monitor Subscriber's compliance with this Paragraph 15, authorized representatives of AMEX may examine and verify those records at any reasonable time in the presence of Subscriber's officials.

(d) EQUIPMENT DESCRIPTIONS -- Upon AMEX's written request, Subscriber shall provide AMEX with a description acceptable to AMEX of any Subscriber Equipment that an authorized vendor or an Authorizing SRO does not supply.

(e) INDEMNIFICATION -- Subscriber shall indemnify and hold harmless each Authorizing SRO from and against any liability, loss or damages caused by (i) any inaccuracy in, (ii) omission from, (ii) Subscriber's failure to furnish or to keep, or (iii) Subscriber's delay in furnishing or keeping, any report or record that this Paragraph 15 requires. Subscriber shall do so even if Subscriber depends on information from a third party and the third party caused the inaccuracy, omission, failure or delay. Without limiting the generality of the foregoing, if AMEX determines that, as a consequence of any such inaccuracy, omission, failure or delay, applicable Subscriber charges were not billed when incurred, Subscriber may be billed for those charges and Subscriber shall promptly pay those charges plus any applicable tax.

16. EQUIPMENT SUPPLIED BY AUTHORIZING SROs

(a) SCOPE; DEFINITION -- This Paragraph 16 applies to Subscriber Equipment that one or more authorizing SROs supply ("SRO Equipment").

(b) OWNERSHIP -- The Authorizing SRO(s) or their supplier(s) own SRO Equipment. Subscriber shall not relocate, remove or alter SRO Equipment, or attach to SRO Equipment any equipment other than authorized equipment that an authorized vendor supplies, without AMEX's written consent. Subscriber shall return SRO Equipment in the same condition as it was when installed except for normal wear and tear and for failures for which the Authorizing SROs are responsible under Paragraph 16(d).

(c) ACCESS TO PREMISES -- Subscriber shall assure that authorized representatives of the Authoring SROs and of their suppliers and services contractors may install, repair, maintain, relocate and replace SRO Equipment, and may remove any SRO Equipment that Subscriber no longer wants or to which it is no longer entitled, at any reasonable time.

(d) SITE PREPARATION AND MAINTENANCE -- Subscriber shall prepare the site for SRO Equipment in a manner acceptable to the Authorizing SROs and shall bear all costs of providing adequate space and power. The Authorizing SROs shall maintain SRO Equipment subject to applicable charges. Maintenance includes repair or replacement of failed SRO Equipment and parts as necessary. Extraordinary charges may apply if Subscriber caused the failure.

(e) WARRANTY AND SCOPE OF LIABILITY -- THE AUTHORIZING SROs PROVIDE NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Paragraph 16(d) sets forth the Authorizing SROs' entire liability for performance of SRO Equipment. The Authorizing SROs' liability to Subscriber for any liability, loss or damages relating to SRO Equipment (other than for the cost of maintaining, repairing or replacing SRO Equipment, whether based in contract, in tort (including negligence and strict liability) or any other theory, shall in the aggregate not exceed the lesser of (i) $1,000 or (ii) the total charges to Subscriber under this Agreement for the period preceding the breach or injury. The foregoing limitations do not apply to personal injury claims. In no event shall any Authorizing SRO be liable (i) for any indirect, incidental, special, consequential or punitive liability, loss or damages relating to SRO Equipment, regardless of the form of the action and foreseeability of the liability, loss or damages or (ii) for any liability, loss