**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAROLD R. LANIER, on behalf of himself, individually, and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>BATS EXCHANGE, INC., et al.,<br><br>       Defendants. | **Civil Action No. 14-CV-3745-KBF** |
| HAROLD R. LANIER, on behalf of himself, individually, and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>BATS EXCHANGE, INC., et al.,<br><br>       Defendants. | **Civil Action No. 14-CV-3865-KBF** |
| HAROLD R. LANIER, on behalf of himself, individually, and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>BATS EXCHANGE, INC., et al.,<br><br>       Defendants. | **Civil Action No. 14-CV-3866-KBF** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINTS**
**PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ...................................................................................................5
    A.    Exchanges And The Exchange Act.............................................5
    B.    Regulation NMS .......................................................................7
    C.    The NMS Plans.........................................................................9
    D.    Proprietary Data Feeds And Co-Location.................................12
        1.    Proprietary Feeds Have Been Approved By The SEC .............12
        2.    Co-Location Services Have Been Approved By The SEC........14
    E.    The Exchange Act's And Regulation NMS's Application To The
        Timeliness Of Consolidated Market Data..................................15
    F.    Avenues For Administrative Review ..........................................17
    G.    Plaintiff Lanier And His Complaints ........................................18

ARGUMENT ......................................................................................................21
I.    This Court Lacks Subject Matter Jurisdiction Because The Exchange Act
    Provides The Exclusive Procedure For Enforcing Regulation NMS..................21
    A.    Mr. Lanier's Claims Are Subject To Review By The SEC Under The
        Exchange Act's Comprehensive Review Process........................22
        1.    The Complaints Allege That The Exchanges Violated Their
            Obligations Under Regulation NMS And Their SEC-Approved
            NMS Plans. ..........................................................................22
        2.    The SEC Has Authority Under Both Regulation NMS And The
            Exchange Act To Adjudicate Alleged Violations Of Regulation
            NMS And The NMS Plans. ....................................................24
    B.    Mr. Lanier Cannot Bypass The Exchange Act's Review Process By Suing
        In Federal District Court. ..........................................................26

II.    Mr. Lanier's Claims Are Preempted By The Exchange Act And Regulation NMS. ........29

III.    Mr. Lanier's Claims Are Barred By Absolute Immunity. ...................................33
    A.    The Exchanges Are Immune From Private Damages Suits Challenging
        Their Regulatory Activities..........................................................33
    B.    Because Mr. Lanier Seeks Damages Allegedly Caused By The Exchanges'
        Failure To Properly Exercise Their Delegated Functions, His Claims Are
        Barred By Absolute Immunity.....................................................34
        1.    The Exchanges' Implementation Of The National Market System
            Is A Core Regulatory Function Under The Exchange Act. .......35
        2.    Mr. Lanier Cannot Plead Around Absolute Immunity By Invoking
            Supposed "Profit" Motivations.................................................38

IV.    Mr. Lanier's Claims Are Barred By SLUSA..................................................41

V.      The Complaints Fail To State A Claim...................................................................47
        A.      The Complaints Fail To State A Claim For Breach Of Contract..........................47
                1.      The Subscriber Agreements Do Not Contain The Promises Mr.
                        Lanier Alleges. .......................................................................47
                2.      There Has Been No Breach Of The Promises Mr. Lanier Alleges. ...........50
                3.      The Breach Of Contract Claims Are Barred By Waiver, Estoppel,
                        And Ratification. ........................................................................51
        B.      The Complaints Fail To State A Claim For Unjust Enrichment..........................53
                1.      Unjust Enrichment Is Not Available Because There Is A Contract
                        Between The Parties. ...................................................................53
                2.      Equity And Good Conscience Do Not Require Restitution......................54
        C.      The Complaints Fail To State A Claim For Constructive Trust. ..........................55
                1.      Mr. Lanier Fails To Plead Facts Sufficient To Establish Any Of
                        The Elements Of A Constructive Trust. ............................................55
                2.      A Constructive Trust Cannot Be Used To Recover Subscription
                        Fees. ......................................................................................56

CONCLUSION...................................................................................................57

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328 (2d Cir. 2006) ...............................21

*Altman v. SEC*, 687 F.3d 44 (2d Cir. 2012) (per curiam) ......................................................22, 27

*Am. Benefits Grp., Inc. v. NASD*, No. 99-cv-4733(JGK), 1999 WL 605246
  (S.D.N.Y. Aug. 10, 1999) ...............................................................................................29

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ....................................................................29, 30

*ASARCO LLC v. Goodwin*, 756 F.3d 191 (2d Cir. 2014) ...............................................................5

*Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333 (2d Cir. 2011) ...........................................54

*Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506 (S.D.N.Y. 2011)..............................56

*Baiul v. Williams Morris Agency, LLC*, No. 13-cv-8683(KBF), 2014 WL 1804526
  (S.D.N.Y. May 6, 2014) ...................................................................................................57

*Barbara v. NYSE, Inc.*, 99 F.3d 49 (2d Cir. 1996)........................................................................29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................21

*Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004)........................................................40

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d
  573 (2d Cir. 2006).....................................................................................................53, 54

*Bice v. Robb*, No. 07-cv-2214(PAC), 2012 WL 762168
  (S.D.N.Y. Mar. 9, 2012) ............................................................................................55, 56

*CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500 (S.D.N.Y. 2006) ..................................................53

*CETA Workers' Organizing Comm. v. City of New York*, 617 F.2d 926
  (2d Cir. 1980)....................................................................................................................27

*Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058 (2014) ......................................................44

*Cinicolo v. Morgan Stanley Dean Witter & Co.*, No. 01-cv-6940(GBD), 2004 WL
  2848542 (S.D.N.Y. Dec. 9, 2004).....................................................................................44

*Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*, No. 13 C 5833,
  slip op. (N.D. Ill. Aug. 4, 2014)................................................................................25, 29

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958)....................................27

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11–cv-9358(KBF),
    2012 WL 345902 (S.D.N.Y. Jan. 31, 2012) .........................................................22, 27

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11-cv-9358(RJS),
    2011 WL 7138696 (S.D.N.Y. Dec. 30, 2011) ..............................................................26

*Cook v. NASD Regulation, Inc.*, 31 F. Supp. 2d 1245 (D. Colo. 1998)...........................17, 25, 29

*Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005) ...............................30

*Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264 (2007) ......................................................30

*D'Alessio v. NYSE, Inc.*, 125 F. Supp. 2d 656 (S.D.N.Y. 2000).....................................................33

*D'Alessio v. NYSE, Inc.*, 258 F.3d 93 (2d Cir. 2001)......................................................33, 34, 38

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 395 F.3d 25
    (2d Cir. 2005)..........................................................................................................42

*Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999) ........................................................................28

*Dexter v. Depository Trust & Clearing Corp.*, 406 F. Supp. 2d 260
    (S.D.N.Y. 2005)......................................................................................................39, 40

*DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.*, 409 F.3d 93 (2d Cir. 2005)................ *passim*

*E. Cont'l Mining & Dev. Ltd. v. Signet Group, LLC*, No. 13-cv-1930(KBF), 2013
    WL 6503526 (S.D.N.Y. Dec. 9, 2013) .....................................................................53

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011).......................................................56

*Feins v. Am. Stock Exch., Inc.*, 81 F.3d 1215 (2d. Cir. 1996)................................................27, 28

*Felton v. Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684
    (S.D.N.Y. 2006).....................................................................................................43, 47

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) .............................................30

*First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690 (3d Cir. 1979) ....................................................29

*Garber v. Legg Mason, Inc.*, 347 F. App'x 665 (2d Cir. 2009) (summary order) .........................5

*Gordon v. NYSE, Inc.*, 422 U.S. 659 (1975) ...............................................................................30

*Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410 (2d Cir. 2009) (summary order)...................49, 50

*Hayden v. NYSE, Inc.*, 4 F. Supp. 2d 335 (S.D.N.Y. 1998).........................................................26

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ...................................52

*In re 650 Fifth Ave. & Related Props.*, No. 08-cv-10934(KBF),
    2013 WL 4572527 (S.D.N.Y. Aug. 27, 2013)............................................56

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389,
    2013 WL 6621024 (S.D.N.Y. Dec. 12, 2013) ..................................38, 41

*In re Herald, Prime & Thema*, 730 F.3d 112 (2d Cir. 2013)........................................44

*In re Mid-Island Hosp., Inc.*, 276 F.3d 123 (2d Cir. 2002)..........................................56

*In re NYSE Specialists Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007) ................................ *passim*

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110
    (D.C. Cir. 2008) ................................................................................... *passim*

*King v. Fox*, 418 F.3d 121 (2d Cir. 2005)......................................................................52

*Landmark Ventures, Inc. v. Wave Sys.*, 513 F. App'x 109
    (2d Cir. 2013) (summary order) ..................................................................5

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ...............................................21

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998) ...................................................54

*McCullagh v. Merrill Lynch & Co.*, No. 01-cv-7322(DAB),
    2002 WL 362774 (S.D.N.Y. Mar. 6, 2002) ................................................44

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006) ...........................42, 44

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*, 616 F.2d 1363
    (5th Cir. 1980)...............................................................................................21

*Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656 (S.D.N.Y. 1991)....................................52

*Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005) ...........................................56, 57

*PennMont Sec. v. Frucher*, 586 F.3d 242 (3d Cir. 2009) ...........................................17

*Perry v. NYSARC, Inc.*, 424 F. App'x 23 (2d Cir. 2011).................................................52

*Piemonte v. Chi. Bd. Options Exch., Inc.*, 405 F. Supp. 711 (S.D.N.Y. 1975)...........................55

*Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010)..................................................43, 44, 45

*SEC v. Tourre*, -- F. Supp. 2d --, 2014 WL 969442 (S.D.N.Y. Mar. 12, 2014) .........................26

*SEC v. Wang*, 944 F.2d 80 (2d Cir. 1991) ...................................................................26

*Shmueli v. City of New York*, 424 F.3d 231 (2d Cir. 2005) ...........................................................39

*Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998) ...............................30, 33, 34, 39

*Standard Inv. Chartered, Inc. v. NASD*, 07–cv-2014(SWK), 2007 WL 1296712
 (S.D.N.Y. May 2, 2007)..........................................................................................24, 25, 26

*Standard Inv. Chartered, Inc. v. NASD*, 560 F.3d 118 (2d Cir. 2009) ...................................17, 33

*Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112 (2d Cir. 2011) (per curiam).....................33

*Swirsky v. NASD*, 124 F.3d 59 (1st Cir. 1997) ..............................................................................29

*Tasini v. AOL, Inc.*, 505 F. App'x 45 (2d Cir. 2012) ....................................................................54

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)................................27

*United States v. NASD*, 422 U.S. 694 (1975)................................................................................30

*Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411 (1965).........................27

*Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354 (S.D.N.Y. 2001) ............................................47

## STATE CASES

*Benjamin Goldstein Prods., Ltd. v. Fish*, 198 A.D.2d 137 (1st Dep't 1993)................................52

*Clark-Fitzpatrick, Inc. v. Long Is. R. Co.*, 516 N.E.2d 190 (N.Y. 1987).....................................53

*Davis v. CornerStone Tel. Co., LLC*, 867 N.Y.S.2d 16, 2008 WL 2329176
 (Sup. Ct. 2008)......................................................................................................................55

*El Reda v. Love Taxi, Inc.*, 202 A.D.2d 275 (1st Dep't 1994)......................................................52

*First Keystone Consultants, Inc. v. DDR Constr. Servs.*, 74 A.D.3d 1135
 (2d Dep't 2010)......................................................................................................................56

*Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293 (1983) ........................................................50

*Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*, 66 A.D.3d 580 (1st Dep't 2009) ...................50

## OTHER AUTHORITIES

15 U.S.C. § 78c .................................................................................................................................5

15 U.S.C. § 78f ..................................................................................................................................5

15 U.S.C. § 78k-1 ...................................................................................................................*passim*

15 U.S.C. § 78s ........................................................................................................22, 25

15 U.S.C. § 78u ................................................................................................................26

15 U.S.C. § 78u-3 ............................................................................................................26

15 U.S.C. § 78y .........................................................................................17, 22, 25, 27

15 U.S.C. § 78bb ..............................................................................................................42

17 C.F.R. §§ 242.600 *et seq.* ................................................................................. *passim*

Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974) ..............................9

Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851 (Aug. 7, 1978) ..............................9

Exchange Act Release No. 34-16589, 45 Fed. Reg. 12,377 (Feb. 26, 1980) ............................16

Exchange Act Release No. 34-17638 (Mar. 18, 1981),
     *available at* 1981 WL 36678 .............................................................................9

Exchange Act Release No. 20386, 48 Fed. Reg. 53,616 (Nov. 28, 1983) ................................11

Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917 (July 6, 1990).................................9

Exchange Act Release No. 34-41977, 64 Fed. Reg. 55,503 (Oct. 13, 1999) ...............................11

Exchange Act Release No. 34-42138, 64 Fed. Reg. 63,350 (Nov. 19, 1999) .............................11

Exchange Act Release No. 34-42208, 64 Fed. Reg. 70,613 (Dec. 17, 1999)..................6, 8, 9, 12

Exchange Act Release No. 34-43313, 65 Fed. Reg. 58,135 (Sept. 27, 2000) ..............................8

Exchange Act Release No. 34-47230, 68 Fed. Reg. 4259 (Jan. 28, 2003) ................................11

Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126 (Mar. 9, 2004)...........................8, 35

Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005)................7, 8, 12, 16

Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,770 (Dec. 9, 2008)................................12

Exchange Act Release No. 34-56611, 72 Fed Reg. 57,980 (Oct. 11, 2007) ..............................14

Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293 (Mar. 26, 2009).............................13

Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594 (Jan. 21, 2010).......................... *passim*

Exchange Act Release No. 34-61680, 75 Fed. Reg. 12,590 (Mar. 16, 2010) .............................15

Exchange Act Release No. 34-61885, 75 Fed. Reg. 20,018 (April 16, 2010).............................13

Exchange Act Release No. 34-62181, 75 Fed. Reg. 31,488 (June 3, 2010) .................................13

Exchange Act Release No. 34-62397, 75 Fed. Reg. 38,860 (July 6, 2010) .................................15

Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (Sept. 27, 2010) .......................14, 15

Exchange Act Release No. 34-64553 (May 26, 2011), *available at* 2011 WL 2098098...............................................................................................................26

Exchange Act Release No. 34-65866, 76 Fed. Reg. 76,455 (Dec. 7, 2011)...............................11

Exchange Act Release No. 34-66564, 77 Fed. Reg. 15,833 (Mar. 16, 2012)...................... *passim*

Exchange Act Release No. 34-70010, 78 Fed. Reg. 44,984 (July 25, 2013) ...............................11

H.R. Report No. 94-229, 94th Cong., 1st Sess. (1975) (Conf. Rep.), *reprinted in* 1975 U.S.C.C.A.N. 321 .........................................................................................6, 35

Harold R. Lanier, *Comments on File No. S7-02-10 Concept Release on Equity Market Structure* (Sept. 13, 2010), *available at* http://www.sec.gov/comments/s7-02-10/s70210.shtml.................................17, 51

*In re Chi. Bd. Options Exch., Inc.*, Exchange Act Release No. 34-69726 (June 11, 2013) ........................................................................................................................16

*In re NASDAQ Stock Market, LLC*, Exchange Act Release No. 34-69655 (May 29, 2013) ........................................................................................................................16

*In re NYSE LLC*, Exchange Act Release No. 67857 (Sept. 14, 2012)................................ *passim*

Limited Liability Company Agreement of Options Price Reporting Authority, LLC, *available at* http://www.opradata.com/pdf/ opra_plan.pdf ...........................................................................................................8, 15

3 Richard J. Pierce, Jr., *Administrative Law Treatise* (5th ed. 2010) ...........................................27

Report of the Advisory Committee on Market Information: A Blueprint for Responsible Change (Sept. 14, 2001) .....................................................................8

S. Rep. No. 94-75, 94th Cong., 1st Sess. (1975) ....................................................................6, 7

Mary Jo White, *Enhancing Our Equity Market Structure* (June 5, 2014), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.....................................17

Defendants BATS Exchange, Inc., BATS Y-Exchange, Inc., BOX Options Exchange, LLC, C2 Options Exchange, Incorporated, Chicago Board Options Exchange, Incorporated, Chicago Stock Exchange, Inc., EDGA Exchange, Inc., EDGX Exchange, Inc., International Securities Exchange, LLC, ISE Gemini, LLC, Miami International Securities Exchange, LLC, NASDAQ OMX BX, Inc., NASDAQ OMX PHLX LLC, The NASDAQ Stock Market, LLC, NASDAQ OMX Group, Inc., National Stock Exchange, Inc., New York Stock Exchange, LLC ("NYSE"), NYSE ARCA, Inc., and NYSE MKT, LLC (collectively, "Exchanges") respectfully submit this memorandum of law in support of their motions under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Complaints filed by Plaintiff Harold R. Lanier.[1]

## PRELIMINARY STATEMENT

The Complaints challenge a core function of national securities exchanges under the Securities Exchange Act of 1934 ("Exchange Act"): the transmission of market information from those exchanges. Pursuant to Section 11A of the Exchange Act, the Securities and Exchange Commission promulgated Regulation NMS, which governs dissemination of market data by exchanges and requires dissemination to be on terms that are "fair" and "not unreasonably discriminatory."

Under Regulation NMS, the Exchanges must transmit information about transactions and quotes to a processor, which then disseminates a "consolidated feed" of the information obtained from all relevant exchanges. The SEC also expressly has authorized the Exchanges to offer unconsolidated "proprietary feeds"—channels of exchange-specific data—to anyone who pays

---

[1] Mr. Lanier filed three separate amended complaints that allege the same causes of action against overlapping sets of Exchanges. The Exchanges named as defendants in each case have filed motions to dismiss each of the respective Complaints. This memorandum supports all three motions and addresses all three amended Complaints, which are referred to herein as the "3745 Compl.," the "3865 Compl.," and the "3866 Compl." (collectively, "Complaints").

any applicable fees that the SEC has permitted.  The SEC has interpreted Regulation NMS to require exchanges to *send* market data to the processor for the consolidated feeds no later than they send the same data to proprietary feeds.  The SEC also has made clear, however, that the law does not require that recipients of the respective channels of market information *receive* the information at the same time, a result that would be difficult if not impossible to achieve.  In fact, the SEC has recognized that recipients of the consolidated feeds generally will receive that data after recipients of the proprietary feeds receive the exchange-specific data.

Mr. Lanier, a stock and options trader, is well aware of the SEC's position on these issues.  He has previously submitted comments to the SEC about the practices of high-frequency trading firms and their high-speed access to market information.  Now, Mr. Lanier has moved on to a different strategy—putative class-action suits against the Exchanges, on behalf of all subscribers to the consolidated market information that the Exchanges are required to provide pursuant to Regulation NMS.  His Complaints allege that the Exchanges owe contractual obligations under state law to provide the subscribers with "valid" consolidated data on a "non-discriminatory" basis and breached those obligations by permitting other "preferred" customers to receive unconsolidated market data first.

The agreements on which Mr. Lanier sues, however, say nothing about "valid" data or "non-discriminatory" access.  Rather, the standards Mr. Lanier alleges were breached—aside from those that are wholesale inventions—arise under Section 11A of the Exchange Act, Regulation NMS, and the information-dissemination plans that the Exchanges are required to file (and have filed) under that regulation ("NMS Plans").  The SEC already has considered the specific result about which Mr. Lanier complains—the earlier receipt of unconsolidated exchange-specific market data by customers who receive proprietary feeds or use co-location

2

services—and has approved it as consistent with the Exchange Act and Regulation NMS. Consequently, Mr. Lanier's claims should be dismissed on the following three independently sufficient threshold grounds.

First, this Court lacks subject matter jurisdiction because all of Mr. Lanier's claims are subject to exclusive review by the SEC and, on appeal, a federal court of appeals.  The Exchange Act and Regulation NMS provide multiple avenues by which Mr. Lanier can obtain SEC review of his complaints, and the SEC has not hesitated to use its authority to enforce Regulation NMS when it believes exchanges have violated the obligations imposed by that regulation.  The Exchange Act also provides for direct appellate review of SEC decisions by a federal court of appeals.  As the Second Circuit and this Court have recognized in analogous cases, because this review process provides no role for district courts, this Court lacks jurisdiction over these cases. *See* Part I *infra*.

Second, Mr. Lanier's claims are preempted by the Exchange Act and Regulation NMS. His state-law claims cannot be permitted to create a patchwork of potentially conflicting standards for conduct that is subject to pervasive and detailed federal regulation.  To allow otherwise would undermine the intent of Congress to create a *national* market system. Preemption clearly applies here because the SEC has approved the specific result on which Mr. Lanier's claims are based—the earlier receipt of unconsolidated market data by some customers. *See* Part II *infra*.

Third, Mr. Lanier's claims are barred by self-regulatory organization ("SRO") immunity, which affords the Exchanges absolute immunity from liability for conduct within their responsibilities under the Exchange Act, including the dissemination of market data under the NMS Plans.  *See* Part III *infra*.

In addition to these grounds for dismissal, which arise from the Complaints' intrusion into the federal statutory and regulatory framework for dissemination of market data, the Securities Litigation Uniform Standards Act ("SLUSA") requires dismissal of the claims. That statute applies because Mr. Lanier alleges that the Exchanges made untrue statements or engaged in manipulative practices in connection with the purchase or sale of securities, despite his artful attempts to plead to the contrary. SLUSA mandates that all such claims be brought exclusively under federal law and forbids basing them on state law. *See* Part IV *infra*.

Finally, Mr. Lanier's Complaints fail to state a claim. His breach of contract claim fails because none of the contracts upon which he is suing contains the promises he alleges, and the facts alleged in the Complaints show that there has been no breach of the contracts' actual terms. Indeed, each of the contracts on which he relies actually disclaims any guarantee as to the timeliness of the data to which he subscribes. Moreover, because he has known about the facts of which he complains for years and has continued to subscribe to the consolidated feed, his contract claim is barred by waiver, estoppel, and ratification. His tag-along claims of unjust enrichment and constructive trust also fail because there is no legal basis for those claims. *See* Part V *infra*.

# BACKGROUND[2]

### A.      Exchanges And The Exchange Act

The Exchanges are national securities exchanges registered with the SEC under Section 6(a) of the Securities Exchange Act of 1934. 15 U.S.C. § 78f(a).  Registered national securities exchanges are "self-regulatory organization[s]" under the Exchange Act.  *Id.* § 78c(a)(26).  In the Exchange Act and its amendments, Congress has established a comprehensive system to regulate the functioning of the securities markets and those who participate in them.  Under the Act, Congress has delegated to SROs, including securities exchanges, the responsibility to operate and maintain fair and orderly markets, subject to supervision by the SEC.  *Id.* §§ 78f(b)(5), 78k-1(a)(1)(C).  The regulatory powers and responsibilities delegated to the Exchanges under the Act include "planning, developing, operating, [and] regulating" their markets.  *Id.* § 78k-1(a)(3)(B); *see also DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005).

Dissemination of information about trading is and always has been a core function of exchanges.  Indeed, the Second Circuit has recognized that "safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place."  *DL Capital*, 409 F.3d at 98.  Before 1975, however, the various exchanges reported trades and quotes solely on their own markets.  As the volume of trading and number of trading venues increased, Congress and the SEC perceived a need for investors to receive consolidated

---

[2] The facts in this Background section are drawn from (1) the Complaints, whose well-pleaded factual allegations are assumed to be true solely for purposes of this motion; (2) the relevant legal and regulatory background; (3) the NMS Plans, which are referred to in the Complaints, relied upon by Mr. Lanier, and thus properly before the Court, *see, e.g., ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014); (4) the Subscriber Agreements, which are attached to the Complaints and thus incorporated by reference, *see, e.g., Landmark Ventures, Inc. v. Wave Sys.*, 513 F. App'x 109, 111 (2d Cir. 2013) (summary order); and (5) Mr. Lanier's filings with the SEC, the fact and content of which the Court is entitled to consider under long-standing precedent (without regard to the truth of their content), *see, e.g., Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (summary order).

market information.  As a result, in 1975, Congress made significant amendments to the

Exchange Act and, as relevant here, mandated the creation of a national market system to

promote the "linking of all markets for qualified securities through communication and data

processing facilities."  15 U.S.C. § 78k-1(a)(1)(D).  In particular, Congress specifically

authorized the SEC to require SROs to "act jointly . . . in planning, developing, operating, or

regulating a national market system" and gave the SEC "broad authority to oversee the

implementation, operation, and regulation" of that system.  *Id.* § 78k-1(a)(3)(B); S. Rep. No. 94-

75,  94th Cong., 1st Sess. 8–9 (1975).

       In Section 11A of the Exchange Act, Congress directed the SEC to "impose" rules "as

necessary or appropriate for the protection of investors or maintenance of fair and orderly

markets" to ensure that investors "may obtain on terms which are not unreasonably

discriminatory . . . information with respect to quotations for and transactions in such securities

as is published or distributed by any self-regulatory organization or securities information

processor."  15 U.S.C. § 78k-1(c)(1)(D).  Section 11A gives the SEC "pervasive rulemaking

power to regulate securities communications systems,"[3] and it explicitly requires the Exchanges

to comply with rules and regulations promulgated by the SEC governing "distribution" of

information "with respect to quotations for and transactions in [securities]."  *Id.* § 78k-1(c)(1).

Thus, "market information, at least since 1975, has been subject to comprehensive regulation

under the Exchange Act."  Exchange Act Release No. 34-42208, 64 Fed. Reg. 70,613, 70,615

(Dec. 17, 1999) ("Market Data Concept Release").

       Importantly, Congress did not envision that SEC rulemaking alone would create the

national market system, but rather facilitate its establishment.  *See* S. Rep. No. 94-75,

---

[3] H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975) (Conf. Rep.), *reprinted in* 1975
U.S.C.C.A.N. 321, 324.

94th Cong., 1st Sess. 8 (1975) ("Section 11A(a)(2) . . . directs the [SEC] to facilitate the establishment of a national market system in accordance with the foregoing findings and objectives.").  The SEC's role, in significant part, is one of oversight—to "assure that the system develops and operates in accordance with Congressionally determined goals and objectives." *Id.* at 9.  In performing the role mandated by Congress, the SEC, by design, relies heavily on the efforts of SROs in developing, operating, and regulating the system.  *See* 15 U.S.C. § 78k-1(a)(3)(B).  Under this system, SROs promulgate rules under SEC oversight, enforce those rules, and maintain and enhance the infrastructure of the national market system.[4]

### B.    Regulation NMS

The SEC has promulgated several regulations to comply with the congressional directive in Section 11A of the Exchange Act.  The most recent such regulation is Regulation NMS, 17 C.F.R. §§ 242.600–.613 *et seq.*, which was adopted in 2005.  *See* Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005) ("NMS Adopting Release").  Rule 603 of Regulation NMS requires exchanges to "act jointly pursuant to one or more effective national market system plans to disseminate consolidated information, including a national best bid and national best offer, on quotations for and transactions in NMS stocks."  17 C.F.R. § 242.603(b).  Under the rule, exchanges are required to distribute quotation and transaction information on "terms that are fair and reasonable," and that "are not unreasonably discriminatory."  *Id.* § 242.603(a).[5]  Rule 603's approach to the regulation of market information (mandating the

---

[4] *See, e.g.*, NMS Adopting Release, 70 Fed. Reg. 37,496, 37,504 (noting that "nearly the entire burden of collecting and producing market data is borne by the individual [exchanges]").

[5] Rule 603 does not apply to exchanges that trade *options* because that rule applies only to "quotations for or transactions in an NMS stock," 17 C.F.R. § 242.603(a), and an "NMS stock" is defined in Regulation NMS as "any NMS security *other than an option*," *id.* § 242.600(47) (emphasis added).  As discussed below, however, the national securities exchanges that trade options also submitted a plan related to the dissemination of quotations and transactions in

consolidation and dissemination of certain core market data, while permitting the distribution of non-core or proprietary data on an unconsolidated basis by individual exchanges) was the product of years of continuous and comprehensive regulatory consideration.[6]

Regulation NMS requires that every national securities exchange (or group of exchanges) that trades NMS stocks file a plan, to be approved by the SEC, for consolidated reporting of (i) best bid and best offer quotations and (ii) all transactions in listed securities.  17 C.F.R. §§ 242.601, .602, .603(b), .608; *see also* 3745 Compl. ¶ 46 n.13 ("the exchanges *must* file a market data reporting plan with which the exchanges *must comply*" (emphasis added)); 3865 Compl. ¶ 47 n.16 (same); 3866 Compl. ¶ 44 n.13 (same).  Mr. Lanier acknowledges that the NMS Plans set forth the terms on which market data must be disseminated.  *See* 3745 Compl. ¶ 64; 3865 Compl. ¶ 61; 3866 Compl. ¶ 57.  In adopting the NMS plan structure, the SEC has emphasized that "it [is] the SROs who should be primarily responsible for disseminating consolidated information . . . [b]ecause of their unique role in the statutory scheme, including their obligation to enforce the federal securities laws subject to the [SEC's] review."  Market Data Concept Release, 64 Fed. Reg. 70,620 (internal quotation marks omitted).

---

options to the SEC pursuant to Rule 608, and that plan has been approved by the SEC.  Section 5.2(c)(i) of the OPRA Plan imposes the same standards required by Rule 603—namely, that the dissemination of data be "uniform [and] nondiscriminatory" and be on "on fair and reasonable terms."  Limited Liability Company Agreement of Options Price Reporting Authority, LLC ("OPRA Plan"), *available at* http://www.opradata.com/pdf/opra_plan.pdf.

[6] *See, e.g.*, Exchange Act Release No. 34-43313, 65 Fed. Reg. 58,135 (Sept. 27, 2000) (providing notice of the establishment of the SEC's Advisory Committee on Market Information); Report of the Advisory Committee on Market Information: A Blueprint for Responsible Change (Sept. 14, 2001) (providing recommendations to the SEC regarding the regulation of market information); Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126, 11,184–85 (Mar. 9, 2004) (publishing proposed Regulation NMS for public comment); NMS Adopting Release, 70 Fed. Reg. 37,496, 37,569 (adopting Regulation NMS and amendments to the NMS Plans).

C.      **The NMS Plans**

There are four plans for disseminating consolidated information: the CTA Plan and CQ Plan (covering transactions and quotes, respectively, for securities listed on stock exchanges other than NASDAQ); the NASDAQ UTP Plan (covering transactions and quotes for securities listed on NASDAQ); and the OPRA Plan (covering transactions and quotes for exchange-listed options). *See* 3745 Compl. ¶¶ 45, 49; 3865 Compl. ¶ 49; 3866 Compl. ¶¶ 9, 43.[7] "These plans govern all aspects of the arrangements for disseminating market information." Market Data Concept Release, 64 Fed. Reg. 70,615. The SEC has approved each of these plans, and that approval was required before the NMS Plans could go into effect.[8] The 3745 Complaint addresses the CTA and CQ Plans; the 3865 Complaint addresses the NASDAQ UTP Plan; and the 3866 Complaint addresses the OPRA Plan.

---

[7] The CTA and CQ Plans can be found at https://cta.nyxdata.com/CTA. The NASDAQ UTP Plan can be found at http://www.utpplan.com/DOC/UTP_Plan.pdf. The OPRA Plan can be found at http://www.opradata.com/pdf/opra_plan.pdf.

[8] The SEC first approved the CTA Plan on May 17, 1974, finding it to be "an appropriate vehicle for the consolidated reporting of transactions in listed securities" and that its approval was consistent with "the maintenance of fair and orderly markets, the public interest and the protection of investors." Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974). The SEC first approved the CQ Plan on August 7, 1978, finding it would "provide an appropriate basis for the creation of a composite quotation system—an essential element of a national market system." Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851, 34,856 (Aug. 7, 1978). The SEC first approved the NASDAQ UTP Plan on June 26, 1990, finding that it would "enhance market efficiency and fair competition, avoid investor [con]fusion, and facilitate regulatory surveillance of concurrent exchange and OTC trading." Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917, 27,924 (July 6, 1990). The SEC first approved the OPRA Plan on March 18, 1981. Exchange Act Release No. 34-17638 (Mar. 18, 1981), *available at* 1981 WL 36678.

In the 3866 Complaint, Mr. Lanier erroneously alleges that "[t]he OPRA System is not formally a national market system." 3866 Compl. ¶ 43. Contrary to Mr. Lanier's allegation, the SEC specifically has recognized that "[t]he OPRA Plan is a national market system plan approved by the [SEC] pursuant to Section 11A of the Act and Rule 608 thereunder." Exchange Act Release No. 34-66564, 77 Fed. Reg. 15,833, 15,833 n.3 (Mar. 16, 2012).

The participants in each of these plans are the exchanges on which the relevant securities are traded.  Thus, all exchanges on which NYSE-listed securities are traded participate in the CTA and CQ Plans; all exchanges on which NASDAQ-listed securities are traded participate in the NASDAQ UTP Plan; and all exchanges on which exchange-listed options are traded participate in the OPRA Plan.[9]

Under each NMS Plan, the participating exchanges transmit information on transactions and quotes to a securities information processor ("Processor"),[10] which then consolidates the information and transmits it to parties who purchase it, either directly or through vendors.  3745 Compl. ¶ 46; 3865 Compl. ¶ 47; 3866 Compl. ¶ 44.[11]  Each of the SEC-approved NMS Plans provides for self-regulation of the process of producing consolidated market information.  Each plan, for example, establishes a governing body, made up of representatives of the exchanges that participate in the plan.[12]  Each NMS Plan also has an administrator, which manages its day-to-day operations.[13]  And, under Rule 608(c) of Regulation NMS, each exchange not only must comply with any effective NMS plan, but also "shall, absent reasonable justification or excuse, enforce compliance with any such plan."  17 C.F.R. § 242.608(c).

---

[9] Securities listed on one exchange are permitted to be traded on others.

[10] For the CTA, CQ Plans and OPRA plans, the Processor is the Securities Industry Automation Corporation.  For the NASDAQ UTP Plan, the Processor is NASDAQ.

[11] The Processors transmit consolidated data over four separate networks or "tapes": Network A includes all securities listed on NYSE; Network B covers securities listed on exchanges other than NYSE or NASDAQ; Network C covers securities listed on NASDAQ; and the OPRA tape covers options.  3745 Compl. ¶ 44; 3865 Compl. ¶ 45; 3866 Compl. ¶ 42.

[12] The governing body of the CTA Plan is the Consolidated Tape Association.  The governing body of the CQ Plan is its Operating Committee.  The governing body of the NASDAQ UTP Plan is its Operating Committee.  The governing body of the OPRA Plan is the OPRA Management Committee of the Options Price Reporting Authority, LLC.

[13] The administrator of the CTA and CQ plans is NYSE.  The administrator of the NASDAQ UTP plan is NASDAQ.  The administrator of the OPRA plan is the Chicago Board Options Exchange, Incorporated.

The NMS Plans also contemplate the use of contracts to govern the dissemination of consolidated market data.  Forms of some of these contracts are exhibits to the respective NMS Plans, and the SEC has approved those contract forms.[14]  In addition, the SEC has approved some of these contract forms separately.[15]  Among other things, these approved contract forms apply to vendors who receive and then redistribute the data to individual subscribers such as Mr. Lanier, who may be covered by separate contract forms depending on whether they are professional or non-professional investors.

Each of the NMS Plans also specifies the fees that may be charged for consolidated market data.  For example, the fees for a non-professional user to receive the four consolidated feeds are $1 per month for each of the networks under the CTA and CQ plans (Networks A and B), $1 per month for the NASDAQ UTP tape (Network C), and $1.25 per month for the OPRA data.[16]  Professional users pay higher fees.  The SEC has permitted all these fees.[17]  The SEC has recognized that "revenues derived from market information fees continue to be an appropriate

---

[14] *See, e.g.*, Exchange Act Release No. 20386, 48 Fed. Reg. 53,616 (Nov. 28, 1983) (approving CTA non-professional subscriber agreement).

[15] *See, e.g.*, Exchange Act Release No. 34-47230, 68 Fed. Reg. 4259 (Jan. 28, 2003) (approving OPRA's revised form vendor agreement and a revised and consolidated form of "Subscriber Agreement").

[16] *See* Exchange Act Release No. 34-70010, 78 Fed. Reg. 44,984, 44,987 (July 25, 2013).  The CTA and CQ fee schedules are located at https://cta.nyxdata.com/CTA.  The NASDAQ UTP fee schedule is located at http://www.nasdaqtrader.com/content/AdministrationSupport/Agreements Data/utpfeeschedule.pdf.  The OPRA fee schedule is located at http://www.opradata.com/ pdf/fee_schedule.pdf.

[17] Exchange Act Release No. 34-41977, 64 Fed. Reg. 55,503, 55,503 (Oct. 13, 1999) (Network A); Exchange Act Release No. 34-42138, 64 Fed. Reg. 63,350, 63,351 (Nov. 19, 1999) (Network B); Exchange Act Release No. 34-65866, 76 Fed. Reg. 76,455 (Dec. 7, 2011) (Network C); Exchange Act Release No. 34-66564, 77 Fed. Reg. 15,833, 15,833 (Mar. 16, 2012) (OPRA).

part of SRO funding" and "enable the SROs to fulfill their self-regulatory functions" under the Exchange Act.  *See* Market Data Concept Release, 64 Fed. Reg. 70,615, 70,624.[18]

### D.  Proprietary Data Feeds And Co-Location

#### 1.  Proprietary Feeds Have Been Approved By The SEC

In addition to sending market data to the Processors for consolidation, the Exchanges are permitted to disseminate the same last sale data and best bid and offer quotes they send to the Processors through what the Complaints call "private feeds" (also known as "proprietary feeds").[19]  When it promulgated Regulation NMS, the SEC approved the use of proprietary feeds because doing so "would allow investors and vendors greater freedom to make their own decisions regarding the data they need."  NMS Adopting Release, 70 Fed. Reg. 37,566; *see also, e.g.*, Exchange Act Release No. 34-59039, 73 Fed. Reg. 74770, 74780 (Dec. 9, 2008) (referring to the SEC's findings in 2005 that allowing the independent dissemination of unconsolidated data by exchanges was desirable because it "allows greater flexibility for market forces to determine data products and fees").  Exchanges submit to the SEC for review specific proposals to offer proprietary feeds.  Exchanges also file for SEC review of the fees they charge (if any) for their proprietary feeds.  Rule 603(a)'s distribution standards apply fully to proprietary feeds

---

[18] In considering the question of market data revenue and SRO funding, the SEC has explicitly rejected a restrictive delineation of SRO regulatory efforts, stressing "the direct connection between an SRO's operational and regulatory functions and the value of its market information" and noting that "[t]he value of a market's information is dependent on the quality of the market's operation and regulation."  NMS Adopting Release, 70 Fed. Reg. 37,496, 37,560 (internal quotation marks omitted); *see also* Market Data Concept Release, 64 Fed. Reg. 70,614.

[19] In addition to disseminating the same information they send to the Processors, the Exchanges are permitted to offer proprietary feeds of additional information not sent to the Processors, such as "depth of book" information relating to the balance of orders on an exchange's order book. Mr. Lanier does not appear to complain about the provision of this additional data to other customers, but in any event it, too, has been approved by the SEC.  Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,780–81.

related to NMS stocks, and they require exchanges that offer proprietary feeds to do so on terms

that are fair and reasonable and not unreasonably discriminatory.

In approving exchange applications to offer proprietary feeds of the same data that the

Exchanges transmit to the Processors, the SEC has expressly recognized that the proprietary

feeds cater to "traders who are very latency sensitive [and] who desire to use [the data] to power

certain trading algorithms or smart order routers."  Exchange Act Release No. 34-59606, 74 Fed.

Reg. 13,293, 13,294 (Mar. 26, 2009) (order approving proprietary feed of last-sale data by

NYSE).  In other words, these proprietary feeds offer speed advantages over the consolidated

data feeds that "can be measured in tens of milliseconds," advantages that are significant to

traders who use sophisticated computer programs to trade.  *Id*. at 13,294 n.7.  With full

knowledge of these differences, the SEC has approved proprietary feeds offered by the

Exchanges.  The SEC expressly found that proprietary feeds are "consistent with the

requirements of the [Exchange] Act and the rules and regulations thereunder," including Section

6(b)(5)'s "require[ment] . . . that the rules of a national securities exchange be designed to

promote just and equitable principles of trade, to remove impediments to and perfect the

mechanism of a free and open market and a national market system and, in general, to protect

investors and the public interest, and not be designed to permit unfair discrimination between

customers, issuers, brokers, or dealers."  *Id*. at 13,294.[20]  Proprietary feeds are available to

anyone—including Mr. Lanier—willing to pay the fees that the SEC has permitted for them.  In

---

[20] *See also, e.g.*, Exchange Act Release No. 34-62181, 75 Fed. Reg. 31,488, 31,489 (June 3, 2010) (approving proprietary feed of NYSE best bid and best offer quotes, while recognizing it as "likely to be a premium service, used by investors most concerned with receiving NYSE BBO Information on a low latency basis"); Exchange Act Release No. 34-61885, 75 Fed. Reg. 20,018 (April 16, 2010) (approving multiple proprietary feeds offered by BATS).

fact, on some Exchanges that have been made Defendants here, the proprietary feeds are available for free to anyone who is interested in receiving them.[21]

### 2.     Co-Location Services Have Been Approved By The SEC

Mr. Lanier challenges the co-location services offered by some of the Exchanges.  These services allow some customers to place their computer servers in close physical proximity to the Exchanges' computer systems in order to receive market information more quickly.  The SEC regulates co-location services because it "views co-location services as being a material aspect of the operation of the facilities of an exchange," and thus concludes that "co-location services offered by registered exchanges are subject to the Exchange Act."  Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3610 & n.76 (Jan. 21, 2010) ("EMS Concept Release"). Accordingly, "[e]xchanges that intend to offer co-location services must file proposed rule changes and receive approval of such rule changes."  *Id*.

The SEC expressly acknowledges that "[m]any proprietary firm strategies are highly dependent upon speed" and that "[c]o-location is one means to save micro-seconds of latency," allowing these traders to be "faster than competitors."  EMS Concept Release, 75 Fed. Reg. 3610; *see also* Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299, 59,311 (Sept. 27, 2010) ("Users that receive co-location services normally would expect reduced latencies [*i.e.*, increased speed] in sending orders to the Exchange and receiving market data from the Exchange.").  With full knowledge of the increased speed offered by co-location, the SEC has approved of that practice, finding it to be "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder," including Section 6(b)(5)'s "require[ment] . . . that

---

[21] *See, e.g.*, Exchange Act Release No. 34-56611, 72 Fed Reg. 57,980 (Oct. 11, 2007) (approving proprietary feed of Chicago Stock Exchange and confirming that it will not charge a fee for distribution of the feed).

the rules of a national securities exchange be designed to promote just and equitable principles of trade, to remove impediments to and perfect the mechanism of a free and open market and a national market system and, in general, to protect investors and the public interest, and not be designed to permit unfair discrimination between customers, issuers, brokers, or dealers." *E.g.*, Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (approving NYSE co-location services); Exchange Act Release No. 34-62397, 75 Fed. Reg. 38,860 (July 6, 2010) (approving NASDAQ co-location services); Exchange Act Release No. 34-61680, 75 Fed. Reg. 12,590 (Mar. 16, 2010) (approving Chicago Stock Exchange co-location services).

### E.     The Exchange Act's And Regulation NMS's Application To The Timeliness Of Consolidated Market Data

Under Section 11A of the Exchange Act, Rule 603(a) of Regulation NMS adopted thereunder, and the OPRA Plan approved under Rule 608, exchanges are required to transmit market information to their respective Processors on terms that are "fair and reasonable" and "not unreasonably discriminatory."  17 C.F.R. § 242.603(a); *see also* OPRA Plan § 5.2(c)(i) (requiring "fair and reasonable" and "nondiscriminatory" transmission).  The SEC has interpreted Rule 603 to require exchanges to *send* data to the Processors no later than they transmit data through proprietary feeds, but not to require that all subscribers *receive* the consolidated feed at the same time or earlier than other customers receive the proprietary feeds. *See In re NYSE LLC*, Exchange Act Release No. 34-67857, at 2 (Sept. 14, 2012).  The OPRA Plan includes the same concept and provides that an options exchange "may not disseminate its Proprietary Information on any more timely basis than the same information is furnished to the OPRA System for inclusion in OPRA's consolidated dissemination of Options Information." OPRA Plan § 5.2(c)(iii)(B).

During the notice and comment period for Regulation NMS, the SEC specifically was asked to clarify whether the proposed rules would require an exchange to slow the delivery of its proprietary data in order to synchronize that delivery with the delivery of data disseminated through the consolidated data stream.  The SEC unequivocally responded that "Rule 603(a) will not require a market center to synchronize the delivery of its data to end-users with delivery of data by a Network processor to end-users."  NMS Adopting Release, 70 Fed. Reg. 37,496, 37,567.  Indeed, the SEC has recognized that even if an exchange sends data to a Processor and to a proprietary feed at the same time, the amount of time required for consolidation will inevitably cause the consolidated data to reach subscribers later than the proprietary data.  *See In re NYSE*, Exchange Act Release No. 34-67857, at 9; EMS Concept Release, 75 Fed. Reg. 3594, 3601, 3611.  For a variety of reasons, including the laws of physics, it is impossible to ensure that every subscriber receives consolidated information at the same time or earlier than other customers receive proprietary feeds.[22]

The SEC actively exercises its oversight authority and has not hesitated to bring enforcement proceedings against exchanges for a variety of reasons in recent years,[23] and in particular has exercised its authority to enforce Rule 603.  In 2012, it brought a cease-and-desist proceeding against NYSE and NYSE Euronext for alleged violation of the rule.  *In re NYSE*,

---

[22] The SEC confronted this issue in 1980, when it first required exchanges to permit purchasers of consolidated feeds to retransmit those feeds to others.  In response to concerns that some vendors' high-speed transmissions of consolidated data might reach their subscribers earlier than the same information would reach others, the [SEC] found that any requirement of simultaneous delivery would be "technically and economically difficult to satisfy" and that there was no way to "ensure that all vendor subscribers receive transaction information at the same time." Exchange Act Release No. 34-16589, 45 Fed. Reg. 12,377, 12,384 (Feb. 26, 1980).

[23] *See, e.g., In re Chi. Bd. Options Exch., Inc*., Exchange Act Release No. 34-69726 (June 11, 2013); *In re NASDAQ Stock Mkt., LLC*, Exchange Act Release No. 34-69655 (May 29, 2013).

Exchange Act Release No. 34-67857, at 2, 9–10.  In recent months, the Chair of the SEC has again reiterated the agency's focus on the question of consolidated data latency.[24]

### F.    Avenues For Administrative Review

The Exchange Act and Regulation NMS provide two avenues for administrative review of exchange conduct in connection with the dissemination of market information.  *First*, under Rule 608(d) of Regulation NMS, "any person aggrieved" by "[a]ny action taken or failure to act by any person in connection with an effective national market system plan" may apply to the SEC for review.  17 C.F.R. § 242.608(d)(1).  *Second*, the SEC retains "'broad oversight'" to enforce the Exchange Act's requirements and its own regulations, *Standard Inv. Chartered, Inc. v. NASD*, 560 F.3d 118, 119 (2d Cir. 2009) (quoting *DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005)), including "plenary" authority to "remedy the acts and omissions of self-regulatory organizations," *Cook v. NASD Regulation, Inc.*, 31 F. Supp. 2d 1245, 1248 (D. Colo. 1998); *see also, e.g.*, *PennMont Sec. v. Frucher*, 586 F.3d 242, 246 (3d Cir. 2009) (noting that SRO decisions are "subject to administrative review by the SEC").  These avenues for review are discussed in more detail in Part I.A.2 *infra*.

Not only are there avenues for initial administrative review, but there also exists an express right to appeal administrative decisions: Section 25(a)(1) of the Exchange Act provides that any "person aggrieved by a final order of the [SEC] entered pursuant to [the Exchange Act] may obtain review of the order in the United States Courts of Appeals."  15 U.S.C. § 78y(a)(1).

---

[24] *See* Mary Jo White, *Enhancing Our Equity Market Structure* (June 5, 2014) (noting that algorithmic traders "use a variety of low-latency tools, including co-located servers in trading data facilities and direct data feeds from trading venues rather than the slower consolidated data feeds of the [Processors]" and stating that the SEC "will continue to focus the efforts of the exchanges and FINRA in minimizing consolidated data latency"), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

### G.        Plaintiff Lanier And His Complaints

Mr. Lanier subscribes to each of the consolidated data feeds.  *See* 3745 Compl. Exs. A,

B; 3865 Compl. Ex. A; 3866 Compl. Ex. B.  In the agreements attached as exhibits to the

Complaints, he describes himself as an individual stock and options trader.  *See* 3745 Compl.

Exs. A, B.

In 2010, Mr. Lanier filed comments with the SEC in response to that agency's Concept

Release on Equity Market Structure.  In a letter that was submitted in September 2010, Mr.

Lanier complained to the SEC that some tactics used by high-frequency traders are "counter

productive if not illegal."[25]  Mr. Lanier also specifically addressed what is now the subject of this

lawsuit—the timeliness of the consolidated data feeds.  He argued to the SEC that "[t]he

consolidated data stream (both trades and quotes) should be the best source of data that money

(**no matter how much**) can buy."[26]  Mr. Lanier advocated that exchanges "should not be

allowed to publish any bid/ask/trade information ahead of the consolidated data stream" because

doing so "is wrong!"[27]  The SEC received these comments, along with many others on the same

topic, but it has not adopted Mr. Lanier's views.

Each of Mr. Lanier's Complaints pleads that he has a contract with each Exchange, and

he asserts that these contracts "prohibit the Exchange Defendants from providing *earlier access*

to [the data he receives] to others."  3745 Compl. ¶ 5; 3865 Compl. ¶ 5; 3866 Compl. ¶ 5.

(These contracts, which Mr. Lanier has attached as exhibits to the respective Complaints, are

---

[25] *See* Harold Lanier, *Comments on File No. S7-02-10 Concept Release on Equity Market Structure* (Sept. 13, 2010), *available at* http://www.sec.gov/comments/s7-02-10/s70210.shtml.

[26] *Id.* at 2 (emphasis in original).

[27] *Id.*

hereinafter referred to as the "Subscriber Agreements."[28])  Mr. Lanier bases this claim on his allegation that the Subscriber Agreements require the Exchanges to provide him with "valid" and "non-stale" data on a "fair" and "non-discriminatory" basis.  3745 Compl. ¶¶ 1–3; 3865 Compl. ¶¶ 1–3; 3866 Compl. ¶¶ 1–3.  Mr. Lanier alleges that the Exchanges have breached these contracts because "Preferred Data Customers" who have paid for "private feeds" or co-location services "receive th[e] data first."  3745 Compl. ¶ 2; 3865 Compl. ¶ 2; 3866 Compl. ¶ 2.

As is evident from the Subscriber Agreements attached to the Complaints, however, none includes the terms "valid," "non-stale," "fair," or "non-discriminatory" in reference to the data that is provided to Mr. Lanier.  Nor do any of the contracts include any provisions limiting the Exchanges' provision of other services or products to other customers, much less a provision requiring that subscribers to the consolidated feeds receive their data as early as recipients of proprietary feeds receive theirs.  Indeed, as discussed below, the contracts make clear that they do not promise that any data will be received at any particular speed.

The "fair" and "nondiscriminatory" standards that are the basis of Mr. Lanier's claims are not set forth in the Subscriber Agreements, but rather are standards contained in the NMS Plans and Regulation NMS.  Mr. Lanier's reliance on the standards contained in the NMS Plans and Regulation NMS was pleaded expressly in the original Complaints, which repeatedly alleged violations of the NMS Plans.  *See, e.g.*, Orig. 3745 Compl. ¶¶ 50–54, 57, 59, 80; Orig. 3865 Compl. ¶¶ 49–52, 55, 57, 78; Orig. 3866 Compl. ¶¶ 46–50, 53, 55, 76.  In his amended Complaints, Mr. Lanier attempts to distance himself from his prior allegations, with a footnote

---

[28] The Exchanges note that the Subscriber Agreements may not be the most recent versions of Mr. Lanier's agreements for the dissemination of market data and that none of the agreements attached to the Complaints is signed by anyone other than Mr. Lanier.  The Exchanges have no reason to believe, however, that any other versions of the agreements have materially different terms that would affect the outcome of this motion to dismiss.

claiming that he is not alleging "a breach of the Plans themselves."  3745 Compl. ¶ 46 n.13; *see also* 3865 Compl. ¶ 47 n.16 (same); 3866 Compl. ¶ 44 n.13 (same).  But even the amended Complaints continue to allege that the "Exchange Defendants violated their obligations under the Plans."  3745 Compl. ¶¶ 65, 104; *see also* 3865 Compl. ¶¶ 62, 100 (same); 3866 Compl. ¶¶ 58, 96 (same).  The Complaints also continue to allege violations of standards that are found, if anywhere, only in the NMS Plans and Regulation NMS, not the Subscriber Agreements.  *See* 3745 Compl. ¶¶ 76, 104, 139(C); 3866 Compl. ¶¶ 62, 63, 69.  The "non-discriminatory" language that the Complaints repeat over and again is not in the Subscriber Agreements but instead is taken from Rule 603's requirement that exchanges provide data on a basis that is "not unreasonably discriminatory" or from the parallel provision in Section 5.2 of the OPRA Plan.

Also evident from the contracts is that Mr. Lanier is a "non-professional" user.  3865 Compl. Ex. A; 3866 Compl. Ex. A.  As a result, the exchange fees he can be charged for each consolidated feed are capped ($1 per month for Networks A, B and C and $1.25 per month for the OPRA feed, for a total of $4.25 per month).[29]

Mr. Lanier purports to represent a class of subscribers to the consolidated data feeds and seeks compensatory damages, injunctive relief, and disgorgement of the fees the subscribers have paid, either as a remedy for breach of contract or on an unjust enrichment or constructive trust theory.  *See* 3745 Compl. ¶¶ 131–63; 3865 Compl. ¶¶ 127–58; 3866 Compl. ¶¶ 123–52.  He also seeks to recover all fees paid to the Exchanges by "Preferred Data Customers" who received proprietary data feeds or co-location services, on the basis that those fees unjustly enriched the Exchanges.  3745 Compl. ¶¶ 164–69; 3865 Compl. ¶¶ 159–64; 3866 Compl. ¶¶ 153–58.  Mr. Lanier asserts that he is entitled to this relief because the proprietary data feeds and co-location

---

[29] *See supra* note 16.

services allow those "preferred" customers to "generate tremendous profits" by trading on the Exchanges, to the alleged detriment of the class.  3745 Compl. ¶ 14; 3865 Compl. ¶ 14; 3866 Compl. ¶ 14.

## ARGUMENT

Mr. Lanier's Complaints must be dismissed because this Court lacks subject matter jurisdiction and because the Complaints fail to state a claim upon which relief can be granted. "A case is properly dismissed . . . under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. . . . A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  For a complaint to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Although the Court must accept all well-pleaded factual allegations in the Complaints, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (brackets and internal quotation marks omitted). Under these settled legal standards, Mr. Lanier's Complaints should be dismissed.

## I.   This Court Lacks Subject Matter Jurisdiction Because The Exchange Act Provides The Exclusive Procedure For Enforcing Regulation NMS.

When Congress chose to rely upon SROs for the regulation of the securities markets, it created a "complex self-regulatory scheme" enforced by the SEC using a "broad . . . range of administrative remedies . . . for those aggrieved by [SRO] action."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD*, 616 F.2d 1363, 1368 (5th Cir. 1980).  Under the Exchange Act's two-tiered review procedure, any allegation that the Exchanges violated the Exchange Act,

Regulation NMS, or their NMS Plans must first be presented to the SEC.  *See, e.g.*, 15 U.S.C.

§ 78s.  Rule 608(d) explicitly authorizes Mr. Lanier to challenge the Exchanges' procedures for

disseminating market data.  17 C.F.R. § 242.608(d).  Any party aggrieved by a final order of the

SEC can then seek further review, but only in a federal court of appeals.  *See, e.g.*, 15 U.S.C.

§ 78y(a)(1).  The Exchange Act does not permit Mr. Lanier to circumvent this review procedure

by proceeding in district court on claims like these.  This Court accordingly lacks jurisdiction

over Mr. Lanier's claims.  *See, e.g.*, *Altman v. SEC*, 687 F.3d 44, 46 (2d Cir. 2012) (per curiam)

(affirming dismissal for lack of subject matter jurisdiction where plaintiff failed to exhaust

administrative remedies); *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11–cv–

9358(KBF), 2012 WL 345902, at *1 (S.D.N.Y. Jan. 31, 2012) ("*Cleantech II*") (dismissing for

lack of subject matter jurisdiction for failure to exhaust administrative remedies).

> **A.    Mr. Lanier's Claims Are Subject To Review By The SEC Under The Exchange Act's Comprehensive Review Process.**
>
> > **1.    The Complaints Allege That The Exchanges Violated Their Obligations Under Regulation NMS And Their SEC-Approved NMS Plans.**

Although Mr. Lanier presents his claims in the guise of "ordinary state law," 3745

Compl. ¶ 5; 3865 Compl. ¶ 5; 3866 Compl. ¶ 5, his own pleadings demonstrate that he is

challenging the Exchanges' conduct under Regulation NMS and the SEC-approved NMS Plans.

As described above, the crux of Mr. Lanier's case is his reliance on the "non-discriminatory"

standard that appears in Rule 603 of Regulation NMS and his express allegation that

"Defendants violated their obligations under the [NMS] Plans."  3745 Compl. ¶ 104; 3865

Compl. ¶ 100; 3866 Compl. ¶ 96.  Tellingly, none of these alleged obligations appears in the

Subscriber Agreements attached to the Complaints.  Rather, the Complaints allege violations of

regulatory duties created solely by Regulation NMS and the NMS Plans.  *See* 17 C.F.R.

§ 242.603(a); *see also supra* pp. 7–8, 15, 19–20.  Any fair reading of Mr. Lanier's Complaints

reveals the truth: it is the alleged breach of Regulation NMS and the NMS Plans—rather than a

breach of contract governed by state law—that forms the basis for Mr. Lanier's claims.

Mr. Lanier concedes this very fact.  He acknowledges that the Subscriber Agreements on

which he purports to base his claims are not separate, independent documents existing outside of

the NMS Plans and Regulation NMS: "[T]he market data [that] Subscribers contracted to

receive . . . is disseminated under" the relevant plans.  3745 Compl. ¶ 47; 3865 Compl. ¶ 48;

3866 Compl. ¶ 45; *see also*, *e.g.*, 3745 Compl. ¶ 1 n.2 ("The electronic market data . . . includes

all electronic data disseminated pursuant to the written plan at issue in this case . . . ."); *id.* ¶ 10

("The market data is distributed according to market data reporting plans in which Exchange

Defendants are participants").  As Mr. Lanier also admits, "[t]he dissemination of market data to

Subscribers pursuant to their Subscriber Contracts is subject to, and may not deviate from or be

inconsistent with, the Plans."  3745 Compl. ¶ 66; 3865 Compl. ¶ 63; 3866 Compl. ¶ 59.

Mr. Lanier maintains that the "core question" in this case is "whether the Exchange

Defendant[s] breached the Subscriber Contracts" by "disseminating the data to Preferred Data

Customers first . . . and by providing market data to the Processor that was always invalid

because it was stale."  3745 Compl. ¶¶ 104, 110; 3865 Compl. ¶¶ 100, 102; 3866 Compl. ¶¶ 96,

102.  But because the consolidated market data feed is "disseminated" only "pursuant to the . . .

Plan[s]," 3745 Compl. ¶ 109; 3865 Compl. ¶ 105; 3866 Compl. ¶ 101, the gravamen of the

amended Complaints remains the Exchanges' alleged violations of Regulation NMS and their

SEC-approved NMS Plans—with which they have a regulatory duty to comply.  *See* 17 C.F.R.

§ 242.608(c); *see also* 3745 Compl. ¶ 46 n.13; 3865 Compl. ¶ 47 n.16; 3866 Compl. ¶ 44 n.13.

Plaintiffs often try to plead around the Exchange Act, employing a state-law disguise in an attempt to pursue their claims in district court rather than pursuing their remedies before the SEC.  These attempts, however, are "invariably unsuccessful."  *Standard Inv. Chartered, Inc. v. NASD*, No. 07-cv-2014(SWK), 2007 WL 1296712, at *5 (S.D.N.Y. May 2, 2007); *see also*, *e.g.*, *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (dismissing state-law claims that were "common law claims in name only").  The same result is mandated here.

>    **2.      The SEC Has Authority Under Both Regulation NMS And The Exchange Act To Adjudicate Alleged Violations Of Regulation NMS And The NMS Plans.**

For two independent reasons, the SEC has authority to adjudicate Mr. Lanier's allegations that the Exchanges violated Regulation NMS and the NMS Plans.

**a.**      <u>Regulation NMS.</u>  As Mr. Lanier concedes, Regulation NMS provides that "[e]ach self-regulatory organization shall comply with the terms of any effective national market system plan of which it is a sponsor or a participant."  17 C.F.R. § 242.608(c); *see also* 3745 Compl. ¶ 46 n.13; 3865 Compl. ¶ 47 n.16; 3866 Compl. ¶ 44 n.13.  In addition, Regulation NMS provides that "[e]ach self-regulatory organization also shall, absent reasonable justification or excuse, enforce compliance with any such plan by its members and persons associated with its members."  17 C.F.R. § 242.608(c).

If an exchange allegedly fails to comply with these obligations, Regulation NMS creates a review procedure for the SEC to "entertain appeals in connection with the implementation or operation of any effective national market system plan."  17 C.F.R. § 242.608(d).  In particular, "*[a]ny action* taken or failure to act by any person in connection with an effective national market system plan . . . *shall be subject to review by the [SEC]*, on its own motion or upon application by any person aggrieved thereby."  17 C.F.R. § 242.608(d)(1) (emphases added).

24

Mr. Lanier's Complaints plainly challenge an "action taken" by the Exchanges "in connection with an effective national market system plan," *id.*, and thus he had the opportunity to complain to the SEC about those actions.  If the SEC ruled against him, Mr. Lanier could have appealed the SEC's ruling to a federal court of appeals.  *See* 15 U.S.C. § 78y(a)(1).

   **b.** <u>Exchange Act.</u> The Exchange Act independently provides for review of Mr. Lanier's allegations.  Like Regulation NMS, the Exchange Act provides that "[e]very self-regulatory organization shall comply with the provisions of [the Exchange Act], the rules and regulations thereunder, and its own rules, and . . . absent reasonable justification or excuse enforce compliance" by its members.  15 U.S.C. § 78s(g)(1).  Thus, Mr. Lanier's allegation that the Exchanges have breached their obligations under Regulation NMS is also an allegation that they have breached their duties under the Exchange Act.

   The SEC retains "plenary" authority under the Exchange Act to "remedy the acts and omissions of self-regulatory organizations."  *Cook*, 31 F. Supp. 2d at 1248; *see also*, *e.g.*, *Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*, No. 13-cv-5833, slip op. at 3 (N.D. Ill. Aug. 4, 2014).  Congress has given "formidable oversight power" to the SEC to "supervise, investigate, and discipline" SROs for "*any* possible wrongdoing."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007) (emphasis added); *Standard Inv. Chartered*, 2007 WL 1296712, at *7 (noting the SEC's "numerous powers" to remedy complaints by those claiming to be aggrieved by SRO action).  Among other things:

- The SEC may censure SROs for violating the Exchange Act or SEC regulations. *See* 15 U.S.C. § 78s(h)(1); *see also Standard Inv. Chartered*, 2007 WL 1296712, at *7.

- The SEC can suspend the registration, or otherwise limit the activities, of an SRO that has failed to comply with the Exchange Act or SEC regulations.  *See* 15 U.S.C. § 78s(h)(1); *see also Standard Inv. Chartered*, 2007 WL 1296712, at *7.

- The SEC can bring administrative proceedings or sue in federal court to obtain injunctive relief, disgorgement, civil monetary penalties, and/or the appointment of a receiver to remedy SRO violations of the Exchange Act or SEC regulations. *See, e.g.*, 15 U.S.C. § 78u(d); 15 U.S.C. § 78u-3; *Standard Inv. Chartered*, 2007 WL 1296712, at *6; *SEC v. Tourre*, -- F. Supp. 2d --, 2014 WL 969442, at *6 (S.D.N.Y. Mar. 12, 2014); *SEC v. Wang*, 944 F.2d 80, 81–82 (2d Cir. 1991); Exchange Act Release No. 34-64553 (May 26, 2011), *available at* 2011 WL 2098098.

Mr. Lanier complains that the Exchanges have provided preferential access to market data to certain market participants, *see, e.g.*, 3745 Compl. ¶ 2; 3865 Compl. ¶ 2; 3866 Compl. ¶ 2, in violation of their NMS Plans—and therefore in violation of both Regulation NMS and the Exchange Act.  The SEC is vested with authority to resolve these claims under the Exchange Act, and to provide appropriate remedies in the event that it finds there has been a violation. Indeed, the SEC has proven itself ready, willing, and able to pursue enforcement proceedings against an exchange for violation of the "fair and reasonable" and "not unreasonably discriminatory" standards found in Rule 603 of Regulation NMS.  *See In re NYSE*, Exchange Act Release No. 34-67857.

## B.  Mr. Lanier Cannot Bypass The Exchange Act's Review Process By Suing In Federal District Court.

Congress created a two-tiered process under the Exchange Act that did not include *any* role for the district courts.  "[R]ather than allowing plaintiffs to sue under common law theories," Congress has created a "self-contained process" to "review and remedy . . . complaints" about SRO actions such as those challenged here.  *Series 7*, 548 F.3d at 114.  As a result, district courts lack subject matter jurisdiction over claims against SROs raising issues that "Congress intended to subject to the comprehensive enforcement structure created by the Exchange Act."  *Hayden v. NYSE, Inc.*, 4 F. Supp. 2d 335, 340 (S.D.N.Y. 1998).  This remains true "[w]hether or not Plaintiff chooses to avail [himself] of this process."  *Cleantech Innovations, Inc. v. NASDAQ*

*Stock Mkt., LLC*, No. 11-cv-9358(RJS), 2011 WL 7138696, at *4 (S.D.N.Y. Dec. 30, 2011)

("*Cleantech I*") (dismissing challenge to SRO action for lack of jurisdiction).

The Second Circuit has recognized that the Exchange Act's provision allowing review of

SEC decisions by the federal courts of appeals under 15 U.S.C. § 78y "generally preclude[s] *de*

*novo* review in the district courts, requiring litigants to bring challenges 'in the Court of Appeals

or not at all.'"  *Altman*, 687 F.3d at 45–46 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357

U.S. 320, 336 (1958)).  This Court has similarly recognized, in *Cleantech II*, that litigants cannot

pursue claims in district court that could be raised through the Exchange Act's review process,

because that statute "sets forth a specific and comprehensive scheme" for reviewing challenged

SRO actions, "including review by the SEC and the United States Courts of Appeals."  2012 WL

345902, at *1 (citations omitted).[30]  This same rule applies to allegations raised under Regulation

NMS.

The Second Circuit's decision in *Feins v. American Stock Exchange, Inc.*, 81 F.3d 1215

(2d. Cir. 1996), is illustrative.  Feins was denied membership by the American Stock Exchange

(AMEX) but obtained partial relief from the SEC, which set aside the denial for procedural

improprieties and ordered AMEX to reexamine Feins's application.  (AMEX did so, and

_____

[30] This exclusivity rule holds true not only under the Exchange Act with respect to SROs, but
also under many similar two-step systems in which a federal statute gives jurisdiction first to a
federal agency and then to a federal court of appeals.  "By lodging review of agency action in the
Court of Appeals, Congress manifested an intent that the appellate court exercise *sole*
jurisdiction over the class of claims covered by the statutory grant of review power."
*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (emphasis added).
Under those circumstances, a federal statute channeling review to the agency and then to a court
of appeals creates the exclusive procedure for a judicial challenge, even if there is no "express
statutory command of exclusiveness."  *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*,
379 U.S. 411, 422 (1965).  Indeed, "[o]nce a court concludes that an agency action is subject to
circuit court review, it almost invariably holds that circuit court jurisdiction is exclusive in order
to avoid potential confusion, conflict, and duplication of effort."  3 Richard J. Pierce, Jr.,
*Administrative Law Treatise* § 18.2, at 1684 (5th ed. 2010); *see also*, *e.g.*, *CETA Workers' Org.
Comm. v. City of New York*, 617 F.2d 926, 935–36 (2d Cir. 1980).

admitted Feins to membership.)  Feins asked the SEC for money damages for delay and inconvenience, but the SEC responded that it could not grant such relief.  *Id.* at 1217.  Feins sued in district court for those damages, arguing that plaintiffs must be permitted to proceed separately from the Exchange Act's tiered review structure in order "to protect membership applicants against quasi-governmental abuse by erroneous decisions of" an SRO.  *Id.* at 1222.  The Second Circuit refused to accept such a cause of action:  "[T]he statute *does* give Feins a cause of action," *i.e.*, "Feins might well have appealed to a federal court of appeals the SEC's refusal to require AMEX to admit her to membership under the terms of the original transaction."  *Id.* at 1223 (emphasis added).  That appeal is the sole avenue of judicial review because "the procedure and the remedy that Congress expressly provided accomplishes the goal of the statute."  *Id.* at 1222.  And, as the Second Circuit subsequently held in *Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999), *Feins*'s reasoning extends more broadly to foreclose purported state-law claims like those at issue here, *see id.* at 207–08 (dismissing state-law tort claims challenging whether NASD properly applied its rules).

Similarly, the D.C. Circuit emphasized in *Series 7* that the Exchange Act's "multiple layers of review evince Congress's intent to direct challenges" into "avenues Congress created," "rather than allowing plaintiffs to sue under common law theories."  548 F.3d at 114.  The comprehensiveness of the Exchange Act's review process demonstrates Congress's intent to "displace[] claims for relief based on state common law," and courts have "consistently found Congress's intent under the Exchange Act precludes common law causes of action."  *Id.*

28

Because Mr. Lanier's state-law claims impermissibly seek to challenge SRO actions outside of the "avenues Congress created," *Series 7*, 548 F.3d at 114, this Court lacks jurisdiction to entertain those claims.[31]

## II.   Mr. Lanier's Claims Are Preempted By The Exchange Act And Regulation NMS.

Mr. Lanier asserts state-law claims in a transparent attempt to plead around the Exchange Act and Regulation NMS. *See* 3745 Compl. ¶ 5; 3865 Compl. ¶ 5; 3866 Compl. ¶ 5. Federal law does not permit that result. As the Second Circuit has recognized, courts have ruled that state-law claims like Mr. Lanier's are foreclosed under the doctrine of conflict preemption. *See, e.g.*, *Barbara v. NYSE, Inc.*, 99 F.3d 49, 59 (2d Cir. 1996) (citing decisions holding state-law claims preempted); *see also Series 7*, 548 F.3d at 111 (noting the "seemingly impenetrable wall of contrary precedent" barring such claims). That doctrine applies where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (internal quotation marks omitted).

Despite Mr. Lanier's assertion that he is pursuing only "'genuine' common law claims, [that] contention is beside the point, because it is those claims which Congress intended to

---

[31] Despite possessing at least two routes to bring his claims before the SEC, Mr. Lanier has not attempted to invoke the Exchange Act's review process. He has not initiated any proceeding before the SEC, nor pursued any adverse decision by the SEC to the federal courts of appeals. Thus, even if it were argued—incorrectly—that Mr. Lanier could have been permitted to pursue his claims in district court after exhausting his remedies under the Exchange Act, dismissal would be warranted here because he has not exhausted those remedies. *See Swirsky v. NASD*, 124 F.3d 59, 62 (1st Cir. 1997) (applying "'the doctrine of exhaustion of administrative remedies . . . to prevent circumvention of established procedures'" in the SRO context (quoting *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695 (3d Cir. 1979))); *Citadel*, No. 13-cv-5833, slip op. 3 (dismissing complaint because "plaintiffs have not availed themselves of the administrative process"); *Am. Benefits Grp., Inc. v. NASD*, No. 99-cv-4733(JGK), 1999 WL 605246, at *8 (S.D.N.Y. Aug. 10, 1999) (dismissing complaint because the plaintiff "could have challenged the rules at least before the SEC and sought review in an appropriate court of appeals" but failed to do so); *Cook*, 31 F. Supp. 2d at 1249 (dismissing complaint for failure to exhaust because the SEC must "determine whether [SROs are] discharging properly [their] duties and responsibilities").

preempt in the Exchange Act, and which would 'stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Series 7*, 548 F.3d at 114 (quoting *Barbara*, 99 F.3d at 59); *see also*, *e.g.*, *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1136 (9th Cir. 2005) (holding that SRO arbitration rules preempted state law to avoid a "patchwork of inconsistent state arbitration regulations that would interfere with Congress's intent"); *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1215 (9th Cir. 1998) ("[A]llow[ing] states to define by common law the regulatory duties of a self-regulatory organization [is] a result which cannot co-exist with the Congressional scheme of delegated regulatory authority under the Exchange Act").[32]

Mr. Lanier's Complaints directly challenge the Exchanges' performance of their delegated functions under the Exchange Act.  *See supra* pp. 5–8, 15–17, 19–20.  That is sufficient, without more, to demonstrate that his lawsuit "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and therefore is preempted.  *Arizona*, 132 S. Ct. at 2501.  Regulation NMS, which expressly governs the conduct challenged here, has equal preemptive effect.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").  By seeking to apply state law to conduct that is regulated by detailed federal statutes

---

[32] Indeed, the preemptive force of the Exchange Act and SEC regulations is so great that they displace even *federal* antitrust laws in areas in which the SEC actively regulates.  *See Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275–76 (2007); *Gordon v. NYSE, Inc.*, 422 U.S. 659, 682 (1975); *United States v. NASD*, 422 U.S. 694, 719–20 (1975).  In these cases, several of which involved SROs as defendants, the Supreme Court held that, so long as the subject is one over which the SEC has exercised regulatory authority and there is a "risk" that application of both laws would "produce conflicting guidance, requirements, duties, privileges, or standards of conduct," the securities laws govern, *see*, *e.g.*, *Billing*, 551 U.S. at 275–76—even when the SEC had disapproved of the practices on which the antitrust claims were based, *see id.* at 278–79.

and regulations, Mr. Lanier's claims pose an obstacle to the fulfillment of the congressional and administrative purposes and are therefore preempted.

Section 11A of the Exchange Act and Regulation NMS create a *federal* standard for the SEC to apply in evaluating whether any action or failure to act constitutes a violation of Regulation NMS or the NMS Plans.  Under the regulation, proceedings before the SEC "shall" be dismissed if the SEC determines that the underlying action or failure to act was "consistent with the public interest, the protection of investors, the maintenance of fair and orderly markets, and the removal of impediments to, and the perfection of the mechanisms of a national market system."  17 C.F.R. § 242.608(d)(3).  Even if the SEC concludes that an exchange has violated Regulation NMS or an NMS Plan, the regulation grants broad authority to the SEC to determine an appropriate remedy, providing that the SEC "shall" set aside the challenged action or omission "and/or require such action" as "the [SEC] deems necessary or appropriate."  *Id.*

It would undermine Congress's goal in creating the *national* market system, and the SEC's goals in promulgating Regulation NMS, if an exchange's actions under the NMS Plans would be subject to the varying decisions of different courts applying state-specific standards, such as the liability standard applicable to a state-law breach of contract action.  *See, e.g.*, 3745 Compl. ¶¶ 131–46 (asserting breach of contract claims); 3865 Compl. ¶¶ 127–41 (same); 3866 Compl. ¶¶ 123–35 (same).  Mr. Lanier's claims therefore would stand as an obstacle to Congress's and the SEC's purposes if the determination of what standard of liability to apply or what remedy was "necessary or appropriate" for a given breach were decided by courts or juries under state law, which could vary among the 50 states, rather than by the SEC under the authority granted to it by Congress.  *See, e.g.*, 3745 Compl. ¶ 170 (seeking declaratory and injunctive relief, among other remedies); 3865 Compl. ¶ 165 (same); 3866 Compl. ¶ 159 (same).

The preemption barrier to Mr. Lanier's suit is especially clear here because the SEC has considered—and *rejected*—the central assertion on which the Complaints are based.  Mr. Lanier complains that the recipients of proprietary feeds receive market data earlier than he receives the consolidated data feed, which goes through an intermediary Processor.  *See, e.g.*, 3745 Compl. ¶ 82; 3865 Compl. ¶ 78; 3866 Compl. ¶ 74.  As described above, however, in adopting Regulation NMS, the SEC made clear that it was prohibiting an SRO or broker-dealer only from *sending* data to a vendor or user any sooner than it *sends* the data to a Processor, but that exchanges are not required to "synchronize the delivery of [their] data to end-users with delivery of [consolidated] data by a Network processor to end-users."  NMS Adopting Release, 70 Fed. Reg. 37,496, 37,567.  In other words, the SEC has rejected the notion—essential to Mr. Lanier's Complaints—that exchanges must police the order in which data *arrives* at end users from the proprietary versus the consolidated feeds.  The SEC recently reiterated its acceptance of the fact that "information from a Network Processor generally reaches market participants later than information from exchanges' proprietary feeds."  *In re NYSE*, Exchange Act Release No. 34-67857, at 9; *see also* EMS Concept Release, 75 Fed. Reg. 3601 (recognizing that it takes up to 5 milliseconds for quotes and up to 10 milliseconds for trade information for the Processors to consolidate the data they receive from the various exchanges before the data can be sent to subscribers such as Mr. Lanier).  Mr. Lanier's Complaints, therefore, ask this Court and a jury to impose liability for conduct the SEC has decided does not offend the standards he invokes.[33]

---

[33] In the 3866 Complaint—unlike in the 3745 and 3865 Complaints—Mr. Lanier alleges that the OPRA Plan participants "[p]rovided[ed] market data on a more timely basis to Preferred Data Customers than the same data was transmitted to the Processor for dissemination to the Subscriber Class."  3866 Compl. ¶¶ 63–64, 128(D).  To the extent this can be construed as an allegation that data was *sent* to the Exchanges' customers before the data was sent to the OPRA Processor, that claim also falls squarely within the scope of the SEC's regulatory authority.  As noted above, the SEC has exercised its review authority over precisely these types of claims, *see*

**III.    Mr. Lanier's Claims Are Barred By Absolute Immunity.**

The Second Circuit has repeatedly held that SROs are absolutely immune from private damages lawsuits challenging conduct performed under the aegis of functions delegated to them under the Exchange Act.  Mr. Lanier's claims raise precisely such a challenge, and those claims are therefore barred.

**A.    The Exchanges Are Immune From Private Damages Suits Challenging Their Regulatory Activities.**

An unbroken chain of Second Circuit decisions has left "no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011) (per curiam); *see also*, *e.g.*, *NYSE Specialists*, 503 F.3d at 96; *DL Capital Grp.*, 409 F.3d at 97; *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 105–06 (2d Cir. 2001). Numerous other courts have reached the same conclusion.  *See, e.g.*, *Series 7*, 548 F.3d at 114–15; *Sparta*, 159 F.3d at 1213–15.

Absolute immunity is a "'matter not simply of logic but of intense practicality, since, in the absence of such immunity, [an SRO's] exercise of its quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits.'" *D'Alessio*, 258 F.3d at 105 (quoting *D'Alessio v. NYSE, Inc.*, 125 F. Supp. 2d 656, 658 (S.D.N.Y. 2000)).  The entire "purpose of immunity" is to provide SROs with "breathing room to exercise their powers" without having to worry that regulatory decisions might "engender endless litigation." *NYSE Specialists*, 503 F.3d at 97.  Accordingly, claims against an SRO are barred if they attack conduct that falls within the scope of the SRO's regulatory role, whether the lawsuits are pleaded

---

*In re NYSE*, Exchange Act Release No. 34-67857, at 9–10, and preemption requires dismissal even if the SEC has disapproved of the conduct, *see supra* note 32.

as federal claims, state-law claims, statutory claims, or common-law claims.  *See, e.g.*, *Standard*, 637 F.3d at 116–17 (state-law claims); *DL Capital*, 409 F.3d at 96 (federal statutory and state common-law claims); *D'Alessio*, 258 F.3d at 100 (state common-law claims).[34]

The determinative question in applying SRO immunity is "*whether* [the] specific acts and forbearances [challenged by the plaintiff] were incident to the exercise of regulatory power," and thus the "propriety of those actions or inactions" is irrelevant.  *NYSE Specialists*, 503 F.3d at 98; *see also*, *e.g.*, *id.* at 95–96 (motive and reasonableness are not considerations in immunity determination); *Sparta*, 159 F.3d at 1215 (absolute immunity applies even if the allegations of misconduct are true).  As the Second Circuit explained in *Standard*, if the challenged SRO conduct is "intimately intertwined with the regulatory powers delegated to SROs," then absolute immunity applies.  637 F.3d at 116–17.  Because Mr. Lanier's allegations are "intimately intertwined" with the Exchanges' regulatory functions, his claims are barred by absolute immunity.

**B.      Because Mr. Lanier Seeks Damages Allegedly Caused By The Exchanges' Failure To Properly Exercise Their Delegated Functions, His Claims Are Barred By Absolute Immunity.**

As discussed above, although Mr. Lanier insists that his claims arise solely from contracts between him and each of the Exchanges, the source of the duties at issue here— including the Exchanges' duty to provide non-discriminatory access to market data—is federal law.  Under Section 11A of the Exchange Act and Regulation NMS, Congress and the SEC have charged the Exchanges with the regulatory responsibility of developing, implementing, and

---

[34] The fact that SROs are immune from private damages suits challenging the exercise of their regulatory functions does not mean that those actions are exempt from review.  To the contrary, as noted in Part I.A.2 *supra*, Congress has established a comprehensive review system involving oversight by the SEC and, on appeal, the federal courts of appeals.  *See*, *e.g.*, *NYSE Specialists*, 503 F.3d at 101–02 (discussing the "manifold" alternatives to private civil suits for reviewing SRO conduct).

enforcing SEC-approved data dissemination plans to facilitate the national market system.  *See supra* pp. 5–8.  Mr. Lanier acknowledges that "[t]he dissemination of market data to Subscribers pursuant to their Subscriber Contracts is subject to, and may not deviate from or be inconsistent with, the Plan[s]" adopted by the Exchanges under Regulation NMS.  3745 Compl. ¶ 66; 3865 Compl. ¶ 63; 3866 Compl. ¶ 59.  Mr. Lanier's allegation that the Exchanges have "violated their obligations under [the Plans]," 3745 Compl. ¶ 104; 3865 Compl. ¶ 100; 3866 Compl. ¶ 96, is an allegation that they have failed to implement the national market system consistent with their regulatory responsibilities, and his claims accordingly are barred by absolute immunity.

### 1.      The Exchanges' Implementation Of The National Market System Is A Core Regulatory Function Under The Exchange Act.

The Exchanges' dissemination of market data is a core regulatory function that falls within their statutorily delegated responsibilities under Section 11A of the Exchange Act and Regulation NMS.  *See* 15 U.S.C. § 78k-1(a)(1)(D) (noting that national market system will "foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to the best execution of such orders").  In particular, the regulatory responsibility for disseminating consolidated market data—the type of data to which Mr. Lanier subscribed—is delegated specifically to the Exchanges under Section 11A and Regulation NMS.  *See* H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975) (stating that the systems for collecting and distributing consolidated market data would "form the heart of the national market system"); *see also* Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126, 11,177 (Mar. 9, 2004) ("public availability of market information . . . is [a] fundamental objective[] of the Exchange Act").

Regulation NMS—which is subtitled "*Regulation* of the National Market System," *see* 17 C.F.R. Part 242 (emphasis added)—delegates to the Exchanges the regulatory responsibility of

organizing themselves (and others) through NMS Plans to produce consolidated reports of

market data.  *See, e.g.*, 15 U.S.C. § 78k-1(a)(3)(B) (directing SEC to "authorize or require

[SROs] to act jointly with respect to matters as to which they *share authority under this chapter*

in planning, developing, operating, or regulating a national market system" (emphasis added));

*see also* 17 C.F.R. § 242.603(b) (requiring the Exchanges and national securities associations

that trade NMS stocks to act jointly pursuant to NMS Plans to disseminate consolidated

quotation and transaction information); *id.* § 242.608(a)–(b) (setting forth the procedures for

filing NMS Plans and amendments with the SEC and the standards governing SEC approval of

those plans).  All participating exchanges take part in this regulation of the national market

system through their representation on the governing bodies of the respective plans.  The NMS

Plans themselves spell out (in slightly varying language) these regulatory responsibilities,

including:

- overseeing the consolidation process;

- periodically evaluating the Processors;

- setting the fees to be paid by recipients of consolidated data feeds;

- determining matters involving the interpretation of the plans; and

- making policy determinations pertaining to contracts with recipients of consolidated market data and prescribing the forms of contracts for providing consolidated data.

*See, e.g.*, NASDAQ UTP Plan § IV.B; OPRA Plan § 4.1; CTA Plan §§ IV, V.[35]

Thus, in planning and operating the national market system, the Exchanges actively are

engaged in a regulatory function required by Congress and the SEC, and governed by the SEC's

---

[35] *See supra* note 7.

Regulation NMS.  Because Mr. Lanier's claims seek damages arising from the Exchanges' alleged failure to properly exercise this regulatory authority, his claims are barred.

The Second Circuit's decision in *NYSE Specialists* is illustrative.  The Second Circuit considered a suit that alleged "wide-ranging manipulative, self-dealing, deceptive, and misleading conduct" against an SRO for allowing certain market traders to have advanced access to trading information.  *NYSE Specialists*, 503 F.3d at 93 (internal quotation marks omitted).  These preferred traders, in turn, allegedly could avail themselves of trading advantages, including by trading ahead of other investors who lacked advanced access.  But the plaintiffs' allegations that the SRO had "permitted and encouraged misconduct and fraud on its trading floor" were tantamount to a claim that the SRO had "abandoned its regulatory role to maintain a fair and orderly market."  *Id*. at 91.  Because the obligation to maintain a fair and orderly market is a core regulatory responsibility for exchanges, the plaintiffs' claims challenged the SRO's failure to properly exercise its regulatory functions, and thus those claims were barred by absolute immunity.  *Id.* at 99–101.

Similarly here, Mr. Lanier alleges that the Exchanges violated their regulatory duty to provide "fair" and "non-discriminatory" access to market data by providing advance access to others, who used it to generate trading profits.  *See, e.g.*, 3745 Compl. ¶ 69 (alleging that the NMS Plans "require . . . the Exchange Defendants . . . to disseminate valid market data . . . on a fair and non-discriminatory basis"); 3865 Compl. ¶ 66 (same); 3866 Compl. ¶ 61 (same).  Because the alleged misconduct in this case arises from obligations imposed on the Exchanges by the Exchange Act and Regulation NMS to plan and implement the national market system,

37

Mr. Lanier's allegations that the Exchanges failed to comply with their responsibilities are barred by absolute immunity.[36]

### 2.   Mr. Lanier Cannot Plead Around Absolute Immunity By Invoking Supposed "Profit" Motivations.

Mr. Lanier attempts to escape the Exchanges' absolute immunity by pleading around it. According to Mr. Lanier, although "[n]ational securities exchanges historically operated as not-for-profit mutual organizations," they have subsequently "demutualized, abandoning their not-for-profit structure for a for-profit model and shedding their responsibilities as self-regulatory organizations." *E.g.*, 3745 Compl. ¶¶ 37–38; 3865 Compl. ¶¶ 38–39; 3866 Compl. ¶¶ 35–36; *see also, e.g.*, 3745 Compl. ¶ 41 (citing *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2013 WL 6621024 (S.D.N.Y. Dec. 12, 2013)); 3865 Compl. ¶ 42 (same); 3866 Compl. ¶ 39 (same).  Mr. Lanier then alleges that the Exchanges' "sale and distribution of advance access to market data through their own separate distribution channels has nothing to do with their function as self-regulatory organizations . . . and everything to do with serving their profit-based motives." *E.g.*, 3745 Compl. ¶ 43; 3865 Compl. ¶ 44; 3866 Compl. ¶ 41.  Mr. Lanier's invocation of supposed profit motivations does not abrogate immunity.  Under settled Second Circuit precedent, such motivations are *categorically* irrelevant to the immunity analysis.

**a.**     Second Circuit Precedent.  The Second Circuit has repeatedly and expressly held that allegations of profit motive *cannot* defeat absolute immunity.  *See NYSE Specialists*, 503 F.3d at 98 (granting immunity to SRO even though the plaintiff had alleged that the challenged decisions were made to increase the SRO's profits); *D'Alessio*, 258 F.3d at 98 (same); *see also*

---

[36] As the Second Circuit recognized in *DL Capital*, "safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place."  409 F.3d at 98.  Because Mr. Lanier's Complaints allege that the Exchanges failed in their responsibilities to "safeguar[d] the integrity of market information," *id.*, his claims would be barred by absolute immunity even apart from Section 11A and Regulation NMS.

*Dexter v. Depository Trust & Clearing Corp.*, 406 F. Supp. 2d 260, 263–64 (S.D.N.Y. 2005) (allegations of a profit motive are irrelevant to the immunity analysis), *aff'd*, 219 F. App'x 91 (2d Cir. 2007).  It does not matter *how* or *why* an SRO is alleged to have acted wrongfully.  As noted above, all that matters is "*whether* [the challenged] acts and forbearances were incident to the exercise of regulatory power."  *NYSE Specialists*, 503 F.3d at 98.[37]

In *NYSE Specialists*, the plaintiffs alleged—as here—that the SRO defendant had "abandoned its regulatory duties and oversight" because it "had a direct financial interest in the successful continuation of th[e] [challenged] scheme."  503 F.3d at 93, 98 n.3 (internal quotation marks omitted).  The Second Circuit held that these allegations were irrelevant, however, because the "focus" of the immunity inquiry must remain on the "specific function at issue in the allegations of misconduct."  *Id.* at 99.  "If such conduct was within the ambit of the SRO's delegated power," the Second Circuit held, "immunity presumptively attaches, even where the SRO wrongly exercises that power."  *Id.*

Judge Lynch considered a similar issue in *Dexter*.  In that case, the company at issue had been subject to a bankruptcy reorganization plan in which shares of the company had been cancelled and former shareholders had received in exchange interests in a litigation trust.  The SRO nonetheless continued to allow purchase of the cancelled shares and announced that holders of those shares would, in conflict with the bankruptcy plan, receive interests in the trust.  406 F. Supp. 2d at 261–62.  When the trustee distributed funds to these later purchasers, a shareholder

---

[37] Indeed, "absolute immunity applies even where the challenged conduct was motivated by a wrongful motive[,] as such intent is irrelevant."  *NYSE Specialists*, 503 F.3d at 98 n.3.  The doctrine "'accords protection from . . . any judicial scrutiny of the motive for and reasonableness of official action,' . . . even where the challenged conduct was motivated by a wrongful motive or even malice."  *Id.* at 95–96 (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005)).  Courts have thus "declined to craft exceptions [to the immunity doctrine] for bad faith (*Desiderio* [*v. NASD*], 191 F.3d [198,] 208 [(2d Cir. 1999)]), fraud (*DL Capital Grp.*, 409 F.3d at 98), negligence, or even gross negligence (*Sparta*, 159 F.3d at 1215)."  *Series 7*, 548 F.3d at 115.

at the time of reorganization filed suit, alleging that the SRO had diluted his value in the trust—and, he maintained, had done so because of the SRO's desire to protect its members and to increase its own profits.  *Id.*  Judge Lynch noted, however, that SROs do not "lose their immunity because, in addition to their regulatory functions, they also are profit-making and profit-seeking enterprises," and accordingly an SRO's "'motivation in performing [its regulatory] functions is irrelevant to the applicability of absolute immunity.'"  *Id.* at 263 (quoting *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004)).  "[H]owever badly motivated, inept, or even unlawful the [SRO's] actions may have been," the court concluded, the SRO is "absolutely immune from suit on both federal and state claims" because it was performing a regulatory function in permitting trading to proceed.  *Id.* at 264.  The Second Circuit summarily affirmed the decision in *Dexter*.  219 F. App'x at 92.

In this case, Mr. Lanier's claims directly implicate the Exchanges' implementation of SEC-approved plans for regulating the national market system.  Just as the plaintiffs did in *NYSE Specialists*, Mr. Lanier alleges that the Exchanges have abandoned their regulatory role and acted based on supposed profit motivations.  *See* 3745 Compl. ¶¶ 37–43; 3865 Compl. ¶¶ 38–44; 3866 Compl. ¶¶ 35–41.  But just as in *NYSE Specialists*, *Dexter*, and other cases, the motivations behind the Exchanges' alleged misconduct are "irrelevant."  *Dexter*, 406 F. Supp. 2d at 263.  Absolute immunity applies with full force to Mr. Lanier's claims *because* those claims seek damages from the Exchange's failure to properly perform their regulatory functions.

**b.**     The *Facebook* Decision.  Mr. Lanier's Complaints cite Judge Sweet's decision in *Facebook*, which partially granted a motion to dismiss on immunity grounds but also partially denied SRO immunity with respect to claims arising from technical problems in an exchange's electronic trading systems during the course of an initial public offering ("IPO").  *See, e.g.*, 3745

40

Compl. ¶ 41 n.12; 3865 Compl. ¶ 42 n.15; 3866 Compl. ¶ 39 n.12.  Judge Sweet concluded that

the SRO was immune with respect to its refusal to halt trading or cancel trades following the

malfunction, but he determined that absolute immunity did not shield the SRO for claims relating

to the pre-IPO design and promotion of its trading platform.  *See Facebook*, 986 F. Supp. 2d 428,

453 (S.D.N.Y. 2013) (discussing challenges to "software design before an IPO" and "promotion

of that software before trading commence[d]").  Those claims, he believed, related to the SRO's

"own interest as a private entity to increase trading on its Exchange," *id.* at 453, rather than its

regulatory functions.

Even if Judge Sweet's decision had been correct on the facts in *Facebook*—and it was

not[38]—the reasoning in *Facebook* would not apply here.  The facts of this case arise in a different

context from those in *Facebook*, which dealt with technical errors during the course of an IPO.

What matters in this case is whether the Exchanges' dissemination of market data pursuant to

Regulation NMS and their NMS Plans falls within their delegated duties under the Exchange

Act.  The answer to that is unquestionably yes.

## IV.   Mr. Lanier's Claims Are Barred By SLUSA.

Not only does Mr. Lanier attempt to circumvent the authority of the SEC, but his

Complaints also attempt to make an end-run around SLUSA.  SLUSA preempts, and therefore

---

[38] The Exchanges respectfully submit that the portion of Judge Sweet's decision in *Facebook*
denying SRO immunity is wrongly decided; the decision is currently on appeal to the Second
Circuit.  Although the court in *Facebook* correctly recognized that "[t]he immunity inquiry turns
on the nature of the challenged conduct, not its profitability," and that "the SRO's motive [is] not
considered," it incorrectly relied on the SRO's alleged motive to increase revenue in denying
immunity.  986 F. Supp. 2d at 448–52 & n.13.  The court also erred in concluding that the design
of a trading platform is not a regulatory act.  *Id.* at 452–55.  The conduct at issue in *Facebook*
was immune because it involved the regulation of trading on the exchange, a function within the
SRO's delegated duty to operate and maintain a fair and orderly market.

requires dismissal of, any claim in which (1) the underlying suit is a "covered class action"[39]; (2) the action is based on state or local law; (3) the action concerns a "covered security"[40]; and (4) the defendant is alleged to have misrepresented or omitted a material fact (or employed a manipulative or deceptive device or contrivance) "in connection with the purchase or sale of" that security. *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 395 F.3d 25, 33 (2d Cir. 2005), *vacated on other grounds by* 547 U.S. 71 (2006). SLUSA applies here and is yet another, independent ground requiring dismissal of the Complaints.

The causes of action pleaded in each of the Complaints satisfy the four requirements of that statute. First, as a class action seeking damages on behalf of "millions" and "hundreds of thousands" of proposed class members, they are "covered class actions." 3745 Compl. ¶¶ 122, 124, 146; 3864 Compl. ¶¶ 118, 120, 141; 3866 Compl. ¶¶ 114, 116, 135; 15 U.S.C. § 78bb(f)(5)(B). Second, each of the four claims for relief asserted in the Complaints is based on state law. *See* 3745 Comp. ¶¶ 131–69; 3865 Compl. ¶¶ 127–64; 3866 Compl. ¶¶ 123–58. Third, the Complaints concern securities traded nationally and listed on regulated national exchanges and thus deal with "covered securities." *See* 3745 Compl. ¶ 9 (describing the "market data" at the heart of the complaint as the "best bid and offer and trade data for the securities traded on each Defendant's exchange"); 3865 Compl. ¶ 9 (same); 3866 Compl. ¶ 9 (same); 15 U.S.C. § 78bb(f)(5)(E).

Fourth, and finally, the allegations of the Complaints make clear that Mr. Lanier is accusing the Exchanges of making misrepresentations or omissions of material facts or engaging in deceptive conduct in connection with the purchase or sale of the various covered securities.

---

[39] A "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 83 (2006).

[40] A "covered security" is one traded nationally and listed on a regulated national exchange. *Id.*

Although Mr. Lanier studiously attempts to plead around this requirement, the substance of his allegations belies his disclaimers.  Mr. Lanier alleges that the Exchanges provided him and the other putative class members with "inaccurate" data regarding the price of securities bought and sold on the Exchanges, and "placed[] inaccurate times on the market data received by Subscribers." *E.g.*, 3745 Compl. ¶¶ 105, 139(D); 3865 Compl. ¶¶ 75, 100, 101, 134(D); 3866 Compl. ¶¶ 72, 96, 97, 128(E), 149.  He further alleges that the Exchanges did so "intentional[ly]" and "willful[ly]" "in order to enable Preferred Data Customers to exploit the time advantage gained by their advance access to the valid market data." *E.g.*, 3745 Compl. ¶¶ 4, 139(I), 141, 142; 3865 Compl. ¶¶ 4, 97, 134(I), 136, 137; 3866 Compl. ¶¶ 4, 93, 128(J), 130, 131.  He also alleges that this information was "material[]."  3745 Compl. 6 n.8 & ¶¶ 16, 140; 3865 Compl. 6 n.9 & ¶¶ 16, 135; 3866 Compl. 6 n.8 & ¶¶ 16, 129.  Under any construction, these allegations are of material misrepresentations and omissions sufficient to satisfy SLUSA's requirements.  *See, e.g.*, *Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010) (finding SLUSA's final prong was satisfied and dismissing various state-law claims—including breach of contract—where the plaintiff alleged that the defendant "fail[ed] to disclose material information which, under the circumstances, should have been disclosed to the plaintiffs" and otherwise communicated "inaccurate, incomplete or erroneous information to Plaintiffs" (alteration and internal quotation marks omitted)); *Felton v. Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684, 693 (S.D.N.Y. 2006) ("conclud[ing] without difficulty that [the plaintiffs' breach of contract] claim is a securities fraud wolf dressed up in a breach of contract sheep's clothing" where the claim alleged that the plaintiffs "believed that they were paying for and receiving informed and

objective investment advice, [but] actually received recommendations based on" allegedly biased information (internal quotation marks omitted)).[41]

Moreover, these alleged misrepresentations and omissions and deceptive conduct occurred "in connection with the purchase or sale" of covered securities. The Supreme Court has held that the "in connection with" standard is satisfied when the alleged fraud "coincide[s]" with the purchase or sale of securities. *Dabit*, 547 U.S. at 85 (internal quotation marks omitted). And the Second Circuit has explained, in turn, that the "'coincide' requirement is broad in scope" and can be met when the claims "necessarily allege," "necessarily involve," or "rest on" the purchase or sale of securities. *Romano*, 609 F.3d at 521–22 (internal quotation marks omitted); *see also Cinicolo v. Morgan Stanley Dean Witter & Co.*, No. 01-cv-6940(GBD), 2004 WL 2848542, at *5 (S.D.N.Y. Dec. 9, 2004) (holding that the "in connection with" requirement was met based on allegations that "although [the plaintiffs] believed that they were receiving objective [investment] advice, . . . they were in fact receiving advice that was compromised by an internal company policy" put in place to favor large investment clients); *McCullagh v. Merrill Lynch & Co.*, No. 01-cv-7322(DAB), 2002 WL 362774, at *1, *4 (S.D.N.Y. Mar. 6, 2002) (same).

Indeed, the "purchase or sale" standard is met when the claims coincide with the purchase or sale of securities "whether by the plaintiff *or by someone else*." *Dabit*, 547 U.S. at 85 (emphasis added); *accord Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1066 (2014).

---

[41] It is of no moment that Mr. Lanier does not plead any cause of action that expressly includes fraud as an element. In evaluating SLUSA preemption, the Court is "free to look beyond the face of the . . . complaints to determine whether they allege securities fraud in connection with the purchase or sale of covered securities" and whether the plaintiff has "cloth[ed] a federal law claim in state garb." *Romano*, 609 F.3d at 519, 520 (internal quotation marks omitted) (dismissing various state-law claims, including breach of contract); *see also In re Herald, Prime & Thema*, 730 F.3d 112 (2d Cir. 2013) ("Since SLUSA requires our attention to both the pleadings and the realities underlying the claims, plaintiffs cannot avoid SLUSA merely by consciously omitting references . . . to the federal securities law." (internal quotation marks omitted)), *reh'g denied*, 753 F.3d 110 (2d Cir. 2014) (per curiam).

In *Dabit*, for example, the Supreme Court held that the "in connection with" requirement was satisfied by allegations that Merrill Lynch had disseminated "misleading research" and "overly optimistic appraisals of the stocks' value" that the plaintiff brokers had relied upon in advising their clients whether or not to sell their holdings, even though the plaintiffs themselves did not buy or sell any covered securities as a result of that research.  547 U.S. at 75, 88–89.

In this case, there can be no serious dispute that the dissemination of the market data coincided with the purchase or sale of securities.  In the Subscriber Agreements signed by Mr. Lanier and attached to the Complaints, Mr. Lanier described himself as being in the business of "buy[ing] & sell[ing] stocks & options."  3745 Compl. Exs. A & B.  Although Mr. Lanier avoids pleading that he or members of the putative class purchased or sold any securities, courts look beyond such artful pleading to the substance of a plaintiff's allegations.  *See Romano*, 609 F.3d at 523–24 ("Though appellants contend that they seek only 'employment damages,' the amended complaints are inconsistent with this characterization.").  Here, the only reason subscribers would be concerned with the accuracy or timing of the market data—which was the "best bid and offer and trade data for the securities traded," 3745 Compl. ¶ 9; 3865 Compl. ¶ 9; 3866 Compl. ¶ 9—is because they intended to and did, in fact, rely on that data in deciding to purchase or sell securities.  Any suggestion to the contrary is simply implausible.

If Mr. Lanier is not complaining about being disadvantaged "in connection with" trading activity, he would have no reason to complain about the difference of *microseconds* between the time consolidated data arrives at the Processors and the time that the subscribers to the proprietary feeds receive the unconsolidated market data.  *See* 3866 Compl. ¶ 82.  As Mr. Lanier alleges, a delay in the dissemination of data is important "in today's financial markets" only because it may provide a trader with time "to transact their trading business and generate

45

tremendous profits" before other traders receive the data.  *Id.* ¶ 14; *see also id.* ¶ 79 ("This

timing discrepancy allows Preferred Data Customers to exploit the Subscribers' lack of valid

market data and generate profits for themselves."); *id.* ¶ 99 ("Without the existence of someone

(here, the Subscribers) who receives data later, there could be no earlier receipt of data by the

Preferred Data Customers, and their speedy receipt of the data would not be of value.").

Of course, under the Supreme Court's decision in *Dabit*, it is irrelevant whether Mr.

Lanier or members of the classes purchased or sold securities so long as someone else did.  This

standard mandates dismissal of the Complaints under SLUSA because the Complaints clearly

allege that the Preferred Data Customers traded securities.  Specifically, Mr. Lanier alleges, the

Exchanges' actions allowed Preferred Data Customers to "cancel orders and *execute trades*" and

generate "tremendous profits from the advance receipt of the market data."  3745 Compl. ¶ 14

(emphasis added); 3865 Compl. ¶ 14 (same); 3866 Compl. ¶ 14 (same); *see also, e.g.*, 3745

Compl. ¶¶ 2, 8, 12, 85, 141 (contending that the Exchanges engaged in the alleged conduct to

"increase . . . the volume of market activity on their exchanges"); 3865 Compl. ¶¶ 2, 8, 12, 43,

81, 103 (same); 3866 Compl. ¶¶ 2, 8, 12, 40, 77 (same).  Indeed, Mr. Lanier's claims are all

premised on the argument that it was "unfair" and "discriminatory" to provide Preferred Data

Customers with advance access to the unconsolidated data precisely because it gave Preferred

Data Customers a temporal market advantage—namely, allowing Preferred Data Customers to

earn profits *by purchasing and selling securities* in reliance on the data before the subscribers

have access to the consolidated data.  *See, e.g.*, 3745 Compl. ¶ 14; *id.* ¶ 15 ("[T]he data

contracted for Subscribers is still *en route* from the Exchange Defendants to the Processor after

Preferred Data Customers have received data *and acted on it* to their advantage." (emphasis

added)); *id.* ¶ 13 ("Preferred Data Customers are willing to pay the Exchange Defendants'

premium fees . . . for this head start because it guarantees profits for Preferred Data

Customers."); *see also, e.g.*, 3865 Compl. ¶¶ 3, 13–15; 3866 Compl. ¶¶ 3, 13–15.

"To regard [Mr. Lanier's Complaints] as alleging nothing more than common law

breaches of contract would reward artful pleading in a manner that the law does not permit."

*Felton*, 429 F. Supp. 2d at 693.  Instead, because the substance of Mr. Lanier's allegations makes

clear that his claims satisfy each of the elements necessary for SLUSA preemption, this Court

should conclude that those claims are barred.

**V.     The Complaints Fail To State A Claim.**

**A.     The Complaints Fail To State A Claim For Breach Of Contract.**

**1.     The Subscriber Agreements Do Not Contain The Promises Mr. Lanier Alleges.**

Mr. Lanier's breach of contract claim fails to state a claim for the most obvious possible

reason: the contracts on which he is suing do not make the promises that he alleges.  This failure

requires dismissal.  *See, e.g.*, *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y.

2001) (holding that "[i]n pleading [a breach of contract claim], a plaintiff must identify what

provisions of the contract were breached" and dismissing the claim because the plaintiffs had

"not identified any language" in the agreement that obligated the defendants to take the actions

plaintiffs contended they were required to take).

Mr. Lanier does not cite a single provision of the Subscriber Agreements attached to the

Complaints that makes any promise that Mr. Lanier will receive consolidated data as early as

other customers receive unconsolidated data through proprietary feeds or co-location.  And with

good reason: the Subscriber Agreements do not contain any such provision.  To the contrary, the

Subscriber Agreements contain express provisions disclaiming the promises Mr. Lanier alleges

were made regarding the timeliness of data dissemination.  The OPRA Agreement states:

> DISCLAIMER OF LIABILITY.  NEITHER OPRA NOR ANY OPRA PARTICIPANT GUARANTEES THE *TIMELINESS*, SEQUENCE, ACCURACY OR COMPLETENESS OF THE OPTIONS LAST SALE PRICES, QUOTATION INFORMATION, OR OTHER MARKET INFORMATION SUPPLIED TO APPLICANT HEREUNDER AND NEITHER OPRA NOR ANY OPRA PARTICIPANT SHALL BE LIABLE IN ANY WAY TO APPLICANT OR TO ANY OTHER PERSON FOR ANY DELAYS, INACCURACIES, ERRORS IN OR OMISSIONS OF ANY OF THE INFORMATION OR THE TRANSMISSION THEREOF, OR FOR ANY DAMAGES ARISING THEREFROM OR OCCASIONED THEREBY OR BY REASON OF NONPERFORMANCE OR INTERRUPTION OF ANY OF THE OPTIONS LAST SALE PRICES, QUOTATION INFORMATION OR OTHER MARKET INFORMATION SUPPLIED TO APPLICANT FOR ANY CAUSE WHATEVER.

3866 Compl. Ex. A, ¶ 8 (emphasis added).  Similarly, the NYSE Agreements provide:

> DATA NOT GUARANTEED—Neither NYSE, any other Authorizing SRO nor the Processor (the "disseminating parties") guarantees the *timeliness*, sequence, accuracy or completeness of Market Data or of other market information or messages disseminated by any disseminating party.

3745 Compl. Ex. A, ¶ 6; Ex. B, ¶ 6 (emphasis added).  And the NASDAQ UTP Agreement also disclaims warranties and liability relating to timeliness, stating:

> NASDAQ'S THIRD PARTY INFORMATION PROVIDERS MAKE NO WARRANTIES OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY (INCLUDING, WITHOUT LIMITATION, *TIMELINESS*. . . ) . . . . AND THEY SHALL HAVE NO LIABILITY FOR THE ACCURACY OF, OR FOR DELAYS OR OMISSIONS IN, ANY OF THE INFORMATION PROVIDED BY THEM.

3865 Compl. Ex. A, ¶ 11 (emphasis added).[42]

As for Mr. Lanier's contention that the data must be "valid" and "not stale," those phrases appear nowhere in the Subscriber Agreements.  And contrary to the suggestion in the Complaints, there is no language in the Subscriber Agreements requiring the Exchanges to

---

[42] The "Third Party Information Providers" include the exchanges participating with NASDAQ.

disseminate the market data in a "fair and non-discriminatory manner."  *See, e.g.*, 3745 Compl.

¶ 139(B); *see also* 3865 Compl. ¶ 134(C); 3866 Compl. ¶ 128(B).  As noted above, those

standards arise under Regulation NMS and the NMS Plans, not the Subscriber Agreements.

Although Mr. Lanier tries to allege that the NMS Plans are incorporated into the

contracts, none of the Subscriber Agreements incorporates the terms of the plans.  The NASDAQ

Agreement does not even mention any NMS Plan.  The OPRA Agreement says only that the

subscriber is to receive information "published by [OPRA] pursuant to a Plan," 3866 Compl. Ex.

A, not that any provision of the OPRA Plan is incorporated in the Agreement.  And the NYSE

Agreements provide only that they are "subject to" the CTA and CQ Plans.  3745 Compl. Ex. A,

¶ 12; Ex. B, ¶ 12.  The fact that the NYSE Agreements state that they are "subject to" the

Exchange Act, Regulation NMS, and the NMS Plans does not mean they are incorporated into

the contract such that Mr. Lanier might have a right to sue under a breach of contract theory for

violation of the NMS Plans or Regulation NMS.  *See Gurfein v. Ameritrade, Inc*., 312 F. App'x

410, 413 (2d Cir. 2009) (summary order) (holding that a contract stating that it is "subject to"

exchange rules and regulations "does not incorporate into the contract the rules and regulations"

and does not "contractually obligate [the defendant] to its customers to follow these rules and

regulations so as to create a separate cause of action for any alleged violation of them").  In other

words, the fact that the agreements refer to the NMS Plans does not convert the Exchanges'

regulatory duties under those plans into contractual duties that are enforceable in litigation.

Nor can Mr. Lanier rely on the invocation of the implied duty of good faith and fair

dealing to impose non-existent contractual obligations on the Exchanges.  "[T]he implied

covenant of good faith and fair dealing . . . cannot be used to create terms that do not exist in the

writing."  *Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*, 66 A.D.3d 580, 581 (1st Dep't 2009).

Nor can it be used to impose any obligation that is inconsistent with the express terms of the contract. *See, e.g.*, *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983). Here, the Subscriber Agreements do not make any promises that subscribers like Mr. Lanier will receive data before customers who subscribe to the propriety feeds, and indeed the contracts expressly disclaim any guarantee of the sort that Mr. Lanier attempts to imply.

> **2.** **There Has Been No Breach Of The Promises Mr. Lanier Alleges.**

Apart from the fact that the "fair" and "not discriminatory" standards in Regulation NMS and the NMS Plans are not incorporated into the Subscriber Agreements, the Complaints still fail to establish breach of those standards. As the SEC has recognized, data that must go through a two-step process—to the Processors for consolidation and then on to the subscriber—will invariably experience latencies not present in a feed that goes directly to a customer. *See In re NYSE*, Exchange Act Release No. 34-67857, at 9; EMS Concept Release, 75 Fed. Reg. 3594, 3601, 3611. This unavoidable—and SEC-sanctioned—circumstance does not make the dissemination of the consolidated data unfair or discriminatory. The SEC already has ruled that Regulation NMS is not offended by the fact that some customers might receive information before other customers. *See supra* pp. 15–16.

In a final effort to identify any contractual language to support his breach of contract claim, Mr. Lanier points to a provision found in only one of the Subscriber Agreements, the NASDAQ UTP Agreement in the 3865 Complaint, which provides only that "NASDAQ shall endeavor to offer the information as promptly and accurately as is reasonably practicable." 3865 Compl. ¶ 71 & Ex. A ¶ 9.[43] But Mr. Lanier alleges no facts that would establish a breach of any

---

[43] Similar language is found in the various NMS Plans, *see, e.g.*, 3745 Compl. ¶ 68 & n.28; 3866 Compl. ¶ 62 & n.15, but for the reasons set forth above, this language is not incorporated into the Subscriber Agreements. *See supra* p. 49; *see also Gurfein*, 312 F. App'x at 413.

such requirement.  For the same reasons that offering data through two separate channels is not

unfair or discriminatory, it is not "reasonably practicable" to ensure that the data from these

separate feeds arrives at the end users at the same time when one feed includes the added step of

consolidation and the other does not.

> ### 3.   The Breach Of Contract Claims Are Barred By Waiver, Estoppel, And Ratification.

In any event, Mr. Lanier's continued subscription to the feeds for many years, despite

knowledge that proprietary-feed recipients could receive market data more quickly, prevents him

from maintaining a breach of contract claim.

The differences in speed between proprietary feeds and the consolidated feeds have been

public knowledge for many years.  The SEC has acknowledged and accepted that difference

since at least 2005, and the Exchange Defendants have filed numerous public documents with

the SEC relating to their proprietary feed and co-location offerings.  *See supra* pp. 12–15.

Indeed, the Complaints allege that it was public knowledge that proprietary feeds were "the only

way to know where the market really is because the [Processors]/Subscriber Feeds are slow and

not useful."  3745 Compl. ¶ 91; 3865 Compl. ¶ 87; 3866 Compl. ¶ 83.

Mr. Lanier himself was aware of the latency issues relating to proprietary feeds and co-

location.  Four years ago he told the SEC that the NYSE proprietary feed "is by design always

equal to or faster than the [consolidated feed]" and that it was "common lingo to refer to the

[consolidated feed] as the 'slow feed' and [the proprietary feed] as the 'fast feed.'"  Harold R.

Lanier, *Comments on File No. S7-02-10, Concept Release on Equity Market Structure* (Sept. 13,

2010), *available at* http://www.sec.gov/comments/s7-02-10/s70210-283.pdf.  Despite full

awareness of these issues by at least 2010, Mr. Lanier has continued to subscribe to the consolidated feeds for years.[44]

"It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991), *aff'd sub nom, Yaeger v. Nat'l Westminster,* 962 F.2d 1 (2d Cir.1992); *see also, e.g., El Reda v. Love Taxi, Inc.*, 202 A.D.2d 275, 276 (1st Dep't 1994) ("[P]laintiffs are estopped from asserting that the deductions in question were unauthorized, where, as here, if plaintiffs wished to protest the deductions, they should have objected when the deductions were first imposed some fifteen years earlier, or within a reasonable period thereafter, rather than merely consenting to, adopting and acquiescing in the deductions while accepting the full benefits which flowed therefrom."). This principle is so firmly established that courts reject even claims of economic duress when a party continued under the contract with full knowledge of the facts, holding that the continued performance constitutes a ratification of the contract. *See, e.g., King v. Fox*, 418 F.3d 121, 132–33 (2d Cir. 2005) ("King's eight years of acquiescence in the agreement with full knowledge of its terms between 1978 and 1986 would be enough under New York law to show that he ratified the agreement [despite King's claim of economic duress]."); *Benjamin Goldstein Prods., Ltd. v. Fish*, 198 A.D.2d 137, 138 (1st Dep't 1993) ("[P]laintiffs, by their knowing acceptance of payments from Peter Fish for more than one year

---

[44] It is of no moment that the Complaints allege that "the significance of the side deals providing advance access to market data . . . was not known to the investing community and the Subscribers, including Plaintiff Harold Lanier." 3745 Compl. ¶ 88; 3865 Compl. ¶ 84; 3866 Compl. ¶ 80. That allegation is contradicted by the Complaints' other allegations and Mr. Lanier's SEC filings and therefore cannot be credited. *See, e.g., Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (summary order); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

after the agreement was executed before commencing the underlying action, ratified the

Settlement Agreement, and are therefore barred from alleging economic duress in its

execution.").

Mr. Lanier cannot continue to pay his subscription fees and accept the market data from

the consolidated feed with full knowledge of the speed differences between the proprietary feeds

and the consolidated feeds, only to suddenly sue the data providers years after acquiring that

knowledge.  Mr. Lanier's claims for breach of contract therefore must be dismissed on this

additional ground.

> **B.      The Complaints Fail To State A Claim For Unjust Enrichment.**
>
> > **1.      Unjust Enrichment Is Not Available Because There Is A Contract Between The Parties.**

Mr. Lanier pleads his unjust enrichment claims "in the alternative" to his breach of

contract claim, but it nevertheless fails as a matter of law because "[t]he theory of unjust

enrichment lies as a quasi-contract claim" and is "an obligation the law creates *in the absence of

any agreement*."  *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d

573, 586 (2d Cir. 2006) (internal quotation marks omitted); *accord, e.g.*, *Clark-Fitzpatrick, Inc.

v. Long Is. R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).  An unjust enrichment claim is precluded if

"there is a valid and enforceable contract governing a particular subject matter."  *Beth Isr.*, 448

F.3d at 587.  Because Mr. Lanier does not and cannot dispute that he has valid and enforceable

contracts concerning his receipt of market data, he cannot maintain an unjust enrichment claim.

*See, e.g.*, *E. Cont'l Mining & Dev. Ltd. v. Signet Grp., LLC*, No. 13-cv-1930(KBF), 2013 WL

6503526, at *7–9 (S.D.N.Y. Dec. 9, 2013); *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500, 506

(S.D.N.Y. 2006).

## 2.     Equity And Good Conscience Do Not Require Restitution.

In any event, Mr. Lanier is unable to state a valid unjust enrichment claim.  To state a claim for unjust enrichment, the plaintiff must establish "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Isr.*, 448 F.3d at 587.  Here, equity and good conscience do not require restitution under the circumstances alleged in the Complaints.  When that is the case, courts do not hesitate to grant Rule 12(b)(6) motions to dismiss unjust enrichment claims on those grounds.  *See, e.g.*, *Tasini v. AOL, Inc.*, 505 F. App'x 45, 47 (2d Cir. 2012) (summary order) (affirming Rule 12(b)(6) dismissal); *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333 (2d Cir. 2011) (same); *Marcus v. AT&T Corp.*, 138 F.3d 46, 64 (2d Cir. 1998) (same).

The most obvious reason the Exchanges have done nothing unjust in collecting fees is that those fees have been permitted by the SEC and the SEC has approved the very result that Mr. Lanier decries—the earlier receipt of market data by proprietary feed customers than by subscribers like Mr. Lanier.  The situation is analogous to that presented in *Marcus*.  In that case, the plaintiffs based their unjust enrichment claim on AT&T's alleged failure to disclose certain billing practices.  The Second Circuit noted that AT&T did disclose the billing practices in tariffs filed with the Federal Communications Commission ("FCC"), and that the FCC had approved of the practice.  The Second Circuit therefore held that the district court properly dismissed the unjust enrichment claim because "AT&T . . . charged only the filed rates that it is required by law to charge" and therefore equity and good conscience did not require restitution.  138 F.3d at 51, 61, 64.  The same analysis applies here.  Consequently, the Court should dismiss the unjust enrichment claims.

54

### C.    The Complaints Fail To State A Claim For Constructive Trust.

Mr. Lanier also purports to state a cause of action for a constructive trust.  Under New

York law, however, "the imposition of a constructive trust is less a cause of action than it is an

equitable remedy."  *Davis v. CornerStone Tel. Co., LLC*, 867 N.Y.S.2d 16, 2008 WL 2329176, at

*5 (Sup. Ct. 2008), *aff'd as modified*, 61 A.D.3d 1315 (3d App. Div. 2009).  This remedy is

available only when the plaintiff establishes that there is "clear and convincing evidence of (1) a

confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance

on such a promise; and (4) unjust enrichment."  *Bice v. Robb*, No. 07-cv-2214(PAC), 2012 WL

762168, at *7 (S.D.N.Y. Mar. 9, 2012) (internal quotation marks omitted), *aff'd*, 511 F. App'x

108 (2d Cir. 2013).  Here, Mr. Lanier fails to plead facts sufficient to establish any of these

factors.  For that reason, and for the separate and independent reason that a constructive trust is

an inappropriate vehicle to seek return of subscription fees paid pursuant to a contract, the claim

for a constructive trust must be dismissed.

### 1.    Mr. Lanier Fails To Plead Facts Sufficient To Establish Any Of The Elements Of A Constructive Trust.

For the same reasons that Mr. Lanier has failed to state a claim for breach of contract and

unjust enrichment, *see* Parts V.A–B *supra*, he fails to plead the existence of at least three

essential elements of a constructive trust: an express or implied promise, any transfer based on

such a promise, and unjust enrichment.  Those failures standing alone suffice to require dismissal

of the constructive trust claims.

In addition, a constructive trust is inappropriate because there is no confidential

relationship or fiduciary duty between the Exchanges and Mr. Lanier.  *See, e.g.*, *Piemonte v. Chi.

Bd. Options Exch., Inc.*, 405 F. Supp. 711, 718 n.4 (S.D.N.Y. 1975) ("Securities exchanges are

not in a fiduciary relationship with individuals who buy and sell shares through their facilities.").

The dealings between them—to the extent there were any direct dealings at all—were nothing more than arm's-length commercial transactions, which are insufficient to establish a confidential or fiduciary duty. *See, e.g.*, *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (internal quotation marks omitted)); *Bice*, 2012 WL 762168, at *7 (granting motion to dismiss for failure to identify a confidential or fiduciary relationship); *Atateks Foreign Trade Ltd. v. Dente*, 798 F. Supp. 2d 506, 507 (S.D.N.Y. 2011) (same); *First Keystone Consultants, Inc. v. DDR Constr. Servs.*, 74 A.D.3d 1135, 1138 (2d Dep't 2010) (same).

## 2.    A Constructive Trust Cannot Be Used To Recover Subscription Fees.

This Court should also dismiss Mr. Lanier's constructive trust claim because a constructive trust cannot be used to recover the contractual payments at issue in the Complaints.

To impose a constructive trust, the plaintiff must establish that "the defendant holds specific property that is traceable to the proceeds of his wrongdoing." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 371 (2d Cir. 2011). "Tracing is necessary where a private plaintiff seeks to impose a constructive trust[] because liability is premised on the fiction that the victim at all times retained title to the property in question . . . ." *Id.* at 373*; see also Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005); *In re 650 Fifth Ave. & Related Props.*, No. 08-cv-10934(KBF), 2013 WL 4572527, at *4 (S.D.N.Y. Aug. 27, 2013). In applying this rule, the Second Circuit has declined to impose a constructive trust when the plaintiff essentially sought to recover payments made under a contract. *Nechis*, 421 F.3d at 103–04. As the Second Circuit held, "the monies upon which [the plaintiff] seeks to impose a trust are premiums paid for health care coverage, which [the defendant] is under no obligation to segregate and which [the plaintiff]

does not allege to be segregated in a separate account.  Moreover, the language of [the plaintiff's] request for relief involves words of contract rather than those of equity . . . ."  *Id.*

Here, Mr. Lanier pleads his constructive trust claim "in the alternative" to his breach of contract action, but he essentially seeks to use a constructive trust to recover contractual payments made by him and the prospective class members pursuant to contracts for subscription services.  *See* 3745 Compl. ¶¶ 151–55; 3865 Compl. ¶¶ 146–50; 3866 Compl. ¶¶ 140–44.  There are no allegations that these payments were placed into segregated accounts or that the Exchanges were under any obligation to segregate these fees.  Thus, just as in *Nechis*, a constructive trust is inappropriate, and this Court should "decline th[e] invitation to perceive equitable clothing where the requested relief is nakedly contractual."  421 F.3d at 104.

## CONCLUSION

For the numerous reasons stated above, this Court should dismiss the Complaints under Rule 12(b)(1) for lack of subject matter jurisdiction.  In the event that this Court reaches the additional arguments raised by the Exchanges, this Court should dismiss the Complaints under Rule 12(b)(6).  Mr. Lanier already had the opportunity to amend his Complaints and did so after the Exchanges provided him with notice of the arguments they intended to raise in their motion to dismiss, pursuant to this Court's order on August 4, 2014.  The dismissal should therefore be with prejudice.  *See, e.g., Baiul v. Williams Morris Agency, LLC*, No. 13-cv-8683(KBF), 2014 WL 1804526, at *13 (S.D.N.Y. May 6, 2014) (denying leave to amend where plaintiff previously had amended and was on notice of the arguments the defendants raised in the motion to dismiss).

September 29, 2014                              Respectfully submitted,

                                               By: */s/ Jessica L. Pahl*
                                               George A. Borden
                                               Steve M. Farina (admitted *pro hac vice*)

57

Thomas G. Hentoff (admitted *pro hac vice*)
Jessica L. Pahl (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
gborden@wc.com
sfarina@wc.com
thentoff@wc.com
jlpahl@wc.com

*Counsel for Defendants New York Stock Exchange,*
*LLC (only in Case Nos. 14-cv-3745 and 14-cv-*
*3865) and NYSE Arca, Inc. and NYSE MKT, LLC*

By: /s/ *Douglas R. Cox* (with permission)
Douglas R. Cox
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9539
dcox@gibsondunn.com

*Counsel for NASDAQ OMX Group, Inc. (only in*
*Case No. 14-cv-3865) and NASDAQ OMX BX, Inc.,*
*NASDAQ OMX PHLX LLC, The NASDAQ Stock*
*Market, LLC*

By: /s/ *Paul E. Greenwalt* (with permission)
Paul E. Greenwalt (admitted *pro hac vice*)
Elyse K. Yang (admitted *pro hac vice*)
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5541
Facsimile: (312) 258-5600
pgreenwalt@schiffhardin.com
eyang@schiffhardin.com

*Counsel for C2 Options Exchange, Incorporated*
*(only in Case No. 14-cv-3866) and Chicago Board*
*Options Exchange, Incorporated*

By: /s/ *James A. Murphy* (with permission)

58

James A. Murphy
Joseph C. Lombard (admitted *pro hac vice*)
Theodore R. Snyder
MURPHY & McGONIGLE, PC
1185 Avenue of the Americas, 21st Floor
New York, NY 10036
Telephone: (212) 880-3968
Facsimile: (212) 880-3998
jmurphy@mmlawus.com
jlombard@mmlawus.com
theodore.snyder@mmlawus.com

*Counsel for BATS-Y Exchange, Inc., EDGA*
*Exchange, Inc., EDGX Exchange, Inc. (collectively*
*only in Case Nos. 14-cv-3745 and 14-cv-3865), ISE*
*Gemini, LLC (only in Case No. 14-cv-3866) and*
*BATS Exchange, Inc. and International Securities*
*Exchange, LLC*

By: /s/ *Seth L. Levine* (with permission)
Seth L. Levine
Christos Papapetrou
LEVINE LEE LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
slevine@levinelee.com
cpapapetrou@levinelee.com

*Counsel for Chicago Stock Exchange, Inc. (only in*
*Case Nos. 14-cv-3745 and 14-cv-3865)*

By: /s/ *George Kostolampros* (with permission)
George Kostolampros
Treazure R. Johnson (admitted *pro hac vice*)
McKENNA LONG & ALDRIDGE, LLC
1900 K Street NW
Washington, DC 20006
Telephone: (202) 496-7526
Facsimile: (202) 496-7756
gkostolampros@mckennalong.com
trjohnson@mckennalong.com

Charles E. Dorkey, III
McKENNA LONG & ALDRIDGE, LLC

59

230 Park Avenue
New York, NY 10169
Telephone: (212) 905-8330
Facsimile: (212) 922-1819
cdorkey@mckennalong.com

*Counsel for National Stock Exchange, Inc. (only in Case Nos. 14-cv-3745 and 14-cv-3865)*

By: /s/ *Michael D. Blanchard* (with permission)
Michael D. Blanchard
Colleen J. O'Loughlin
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
michael.blanchard@bingham.com
colleen.oloughlin@bingham.com

*Counsel for BOX Options Exchange, LLC (only in Case No. 14-cv-3866)*

By: /s/ *Mark N. Mutterperl* (with permission)
Mark N. Mutterperl
Michael C. Hefter
David J. Ball
Jessica S. Parise
BRACEWELL & GIULIANI, LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020
Telephone: (212) 508-6100
Facsimile: (212) 508-6101
mark.mutterperl@bgllp.com
michael.hefter@bgllp.com
david.ball@bgllp.com
jessica.parise@bgllp.com

*Counsel for Miami International Securities Exchange, LLC (only in Case No. 14-cv-3866)*