UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

```
                                       USDC SDNY
                                       DOCUMENT
                                       ELECTRONICALLY FILED
                                       DOC #: _____
                                       DATE FILED: April 28, 2015
```

HAROLD R. LANIER, on behalf of himself       :
individually and on behalf of others similarly  :
situated,                                     :
                                              :
                        Plaintiff,            :
                                              :
            -v-                               :            14-cv-3745 (KBF)
                                              :
BATS EXCHANGE, INC., BATS Y-EXCHANGE,         :
INC., CHICAGO BOARD                           :
OPTIONS EXCHANGE, INC., CHICAGO               :
STOCK EXCHANGE, INC., EDGA                    :
EXCHANGE, INC., EDGX EXCHANGE,                :
INC., INTERNATIONAL SECURITIES                :
EXCHANGE, LLC, NASDAQ OMX BX,                 :
INC., NASDAQ OMX PHLX LLC, THE                :
NASDAQ STOCK MARKET, LLC,                     :
NATIONAL STOCK EXCHANGE, LLC,                 :
NEW YORK STOCK EXCHANGE, LLC,                 :
NYSE ARCA, INC., and NYSE MKT, LLC,           :
                                              :
                        Defendants.           :

------------------------------------------------------------------ X
                                              :
HAROLD R. LANIER, on behalf of himself       :
individually and on behalf of others similarly  :
situated,                                     :
                                              :
                        Plaintiff,            :
                                              :
            -v-                               :            14-cv-3865 (KBF
                                              :
BATS EXCHANGE, INC., BATS Y-EXCHANGE,         :
INC., CHICAGO BOARD                           :
OPTIONS EXCHANGE, INC., CHICAGO               :
STOCK EXCHANGE, INC., EDGA                    :
EXCHANGE, INC., EDGX EXCHANGE,                :
INC., INTERNATIONAL SECURITIES                :
EXCHANGE, LLC, NASDAQ OMX BX,                 :
INC., NASDAQ OMX PHLX LLC, THE                :
NASDAQ STOCK MARKET, LLC, NASDAQ              :
OMX GROUP, INC., NATIONAL STOCK               :

EXCHANGE, INC., NEW YORK STOCK          :
EXCHANGE, LLC, NYSE ARCA, INC., and     :
NYSE MKT, LLC,                          :
                                        :
              Defendants.               :
------------------------------------------------------------ X

                                        :
HAROLD R. LANIER, on behalf of himself  :
individually and on behalf of others similarly :
situated,                               :
                                        :
              Plaintiff,                :
                                        :
       -v-                              :        14-cv-3866 (KBF)
                                        :
BATS EXCHANGE, INC., BOX OPTIONS        :        <u>OPINION & ORDER</u>
EXCHANGE, LLC, C2 OPTIONS               :
EXCHANGE, INCORPORATED, CHICAGO         :
BOARD OPTIONS EXCHANGE, INC.,           :
INTERNATIONAL SECURITIES                :
EXCHANGE, LLC, ISE GEMINI, LLC,         :
MIAMI INTERNATIONAL SECURITIES          :
EXCHANGE, LLC, NASDAQ OMX BX,           :
INC., NASDAQ OMX PHLX LLC, THE          :
NASDAQ STOCK MARKET, LLC, NYSE          :
ARCA, INC., and NYSE MKT, LLC,          :
                                        :
              Defendants.               :
------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

In 2014, author Michael Lewis published his bestselling book <u>Flash Boys</u>,

which argued that so-called "high-frequency traders" have been able to gain an

unfair advantage in the U.S. equities market because equities exchanges have

permitted them to pay premium prices in order to obtain the ability to obtain and

trade on market data faster than other investors.  <u>See generally</u> Michael Lewis,

<u>Flash Boys</u> (2014).  Since that time, several lawsuits against these exchanges have

been filed in this District and in the Northern District of Illinois, alleging that by

2

offering such advantages to high-frequency traders, the exchanges have violated various federal statutes and regulations, particularly the Commodities Exchange Act and the Securities Exchange Act of 1934 (the "Exchange Act").  See, e.g., Flynn v. Bank of Am. Corp., No. 14-cv-4321 (S.D.N.Y. June 13, 2014); Harel Ins. Co. v. BATS Global Mkts. Inc., No. 14-cv-3608 (S.D.N.Y. May 20, 2014); Am. Eur. Ins. Co. v. BATS Global Mkts. Inc., No. 14-cv-3133 (S.D.N.Y. May 2, 2014); City of Providence, R.I. v. BATS Global Mkts., Inc., No. 14-cv-2811 (S.D.N.Y. Apr. 18, 2014); Braman v. CME Grp. Inc., No. 14-cv-2646 (N.D. Ill. Apr. 11, 2014).

The three materially identical lawsuits currently before this Court (nos. 14-cv-3745, 14-cv-3865, and 14-cv-3866), which have been brought by plaintiff Harold Lanier on behalf of himself and others similarly situated against a number of defendant exchanges,[1] are similar to these other actions, but they differ in two key respects.  First, Lanier makes the novel factual allegation that certain preferred data customers have been able to receive unconsolidated market data before that data arrives at the processor responsible for consolidating it and distributing it to other customers.  Second, Lanier does not assert any claims under federal law. Rather, he argues that the exchange defendants are liable for breach of contract under state law.  This claim is based on Lanier's assertion that when defendants

---

1 The following entities are named as defendants in all three actions: BATS Exchange, Inc.; Chicago Board Options Exchange, Inc.; International Securities Exchange, LLC; NASDAQ OMX BX, Inc.; NASDAQ OMX PHLX LLC; NYSE ARCA, Inc.; NYSE MKT, LLC; and the NASDAQ Stock Market, LLC.  Named as defendants in no. 14-cv-3745 and no. 14-cv-3865, but not no. 14-cv-3866, are: BATS Y-Exchange, Inc.; Chicago Stock Exchange, Inc.; EDGA Exchange, Inc.; EDGX Exchange, Inc.; National Stock Exchange, Inc.; and New York Stock Exchange, LLC.  Named as defendants only in no. 14-cv-3866 are: BOX Options Exchange, LLC; C2 Options Exchange, Inc.; ISE Gemini, LLC; and Miami International Securities Exchange, LLC.  (See 14-cv-3745 ECF No. 89 ("3745 Am. Compl.") ¶¶ 22-35; 14-cv-3865 ECF No. 81 ("3865 Am. Compl.") ¶¶ 22-36; 14-cv-3866 ECF No. 76 ("3866 Am. Compl.") ¶¶ 22-33.)

make market data available to preferred data customers more quickly than other customers, they violate Regulation NMS, which is incorporated by reference into contracts between plaintiff Lanier and defendants.

Defendants have filed consolidated motions to dismiss all claims. Because Lanier's claims are preempted by a comprehensive federal regulatory scheme, and because his factual allegations are nevertheless insufficient to state a claim under Rule 12(b)(6), these motions are GRANTED. Under the regulatory framework established by Congress, Lanier's claims must be adjudicated in the first instance by the Securities Exchange Commission (the "SEC"), and not this Court.

I.     FACTUAL ALLEGATIONS

Plaintiff Lanier has entered into contracts to receive electronic market data services from defendants, all of which operate securities exchanges (the "Exchange Defendants"). (3745 Am. Compl. ¶ 1 & n.1; 3865 Am. Compl. ¶ 1 & n.1; 3866 Am. Compl ¶ 1 & n.1.) The Exchange Defendants receive hundreds of millions of dollars in subscription fees in exchange for providing these data services. (See 3745 Am. Comp. ¶ 7; 3865 Am. Compl. ¶ 7; 3866 Am. Compl. ¶ 7.) All of the electronic market data services contracts that Lanier has entered into with the Exchange Defendants are similar in all respects material to all of Lanier's claims. (3745 Am. Compl. ¶ 6; 3865 Am. Compl. ¶ 6; 3866 Am. Compl. ¶ 6.) Each contract obligates an Exchange Defendant "to provide valid market data" to Lanier. (3745 Am. Compl. ¶ 6; 3865 Am. Compl. ¶ 6; 3866 Am. Compl. ¶ 6.)

Lanier alleges that in an effort to increase profits through subscription fees and/or the volume of market activity on their exchanges, the Exchange Defendants

enabled certain "Preferred Data Customers" to have advance access to the market data that the Exchange Defendants were contractually obligated to provide to him and other subscribers.  (3745 Am. Compl. ¶ 2; 3865 Am. Compl. ¶ 2; 3866 Am. Compl. ¶ 2.)  This breached their promise "to provide Subscribers with the market data in a non-discriminatory manner."  (3745 Am. Compl. ¶ 2; 3865 Am. Compl. ¶ 2; 3866 Am. Compl. ¶ 2.)  Lanier asserts that the "gravamen" of his claims in each action is that "by providing earlier access to the data to Preferred Data Customers through the use of the separate data distribution channels, the Exchange Defendants breached the Contracts, including the duty of good faith and fair dealing, because they deprived Subscribers of the value for which they contracted, thereby causing them harm."  (3745 Am. Compl. ¶ 8; 3865 Am. Compl. ¶ 8; 3866 Am. Compl. ¶ 8.)

Lanier asserts that he is alleging state law contract claims based on the sale of stale data to him and other similarly situated subscribers.  (3745 Am. Compl. ¶ 5; 3865 Am. Compl. ¶ 5; 3866 Am. Compl. ¶ 5.)  Lanier asserts that he is not complaining about the existence of separate distribution channels per se, but rather that he is seeking redress for a violation of a contractual commitment prohibiting defendants from providing earlier access to market data to Preferred Data Customers.  (3745 Am. Compl. ¶ 5; 3865 Am. Compl. ¶ 5; 3866 Am. Compl. ¶ 5.)

A.    The Data

The market data disseminated by the Exchange Defendants to subscribers is required to be the best bid and offer and trade data for the securities traded on each defendant's exchange.  (3745 Am. Compl. ¶ 9; 3865 Am. Compl. ¶ 9; 3866 Am.

Compl. ¶ 9.)  The market data is distributed according to market data reporting plans pursuant to which a defendant submits market data to a processor.  (3745 Am. Compl. ¶ 10; 3865 Am. Compl. ¶ 10; 3866 Am. Compl. ¶ 10.)  The Processor consolidates the data from all the exchanges, determines the overall "consolidated" best bid and offer, and then distributes that data (as well as trade data) via the Securities Information Processor ("SIP") or "Subscriber Feed" to customers such as Lanier.  (3745 Am. Compl. ¶ 10 & n.6; 3865 Am. Compl. ¶ 10 & n.6; 3866 Am. Compl. ¶ 10 & n.6.)  "The consolidated or aggregated market data is intended to be a single source of information across all markets, rather than requiring the public to obtain data from many different exchanges and different markets."  (3745 Am. Compl. ¶ 10; 3865 Am. Compl. ¶ 10; 3866 Am. Compl. ¶ 10.)  Lanier alleges that the "Subscriber Contracts obligated defendants to provide to Subscribers valid market data on a non-discriminatory basis"  but that what they in fact received had already been sent to the Preferred Data Customers and was therefore stale.  (3745 Am. Compl. ¶ 11; 3865 Am. Compl. ¶ 11; 3866 Am. Compl. ¶ 11.)

According to Lanier, most if not all of defendants charge a substantial premium to Preferred Data Customers in return for receiving the data before it is received by Subscribers. (3745 Am. Compl. ¶ 13; 3865 Am. Compl. ¶ 13; 3866 Am. Compl. ¶ 13.)  This is done by "mak[ing] the data available" to the processor "such that the data arrives at the Processor well over one thousand microseconds later than the same data distributed over faster channels reaches Preferred Data Customers."  (3745 Am. Compl. ¶ 14; 3865 Am. Compl. ¶ 14; 3866 Am. Compl. ¶ 14.)

The Preferred Data Customers are then able to cancel orders and execute trades before Subscribers even receive the market data. (3745 Am. Compl. ¶ 14; 3865 Am. Compl. ¶ 14; 3866 Am. Compl. ¶ 14.)

Lanier includes the following illustration of the alleged issue:



(3745 Am. Compl. ¶ 15; 3865 Am. Compl. ¶ 15; 3866 Am. Compl. ¶ 15.)

B.     Data Distribution

The Exchange Defendants distribute market data to subscribers through four consolidated information collection and dissemination systems: the Consolidated Quotation System ("CQS"), the Consolidated Tape System ("CTS"), the Nasdaq UTP System, and the Options Price Reporting Authority ("OPRA") System.  (3745 Am. Compl. ¶ 44; 3865 Am. Compl. ¶ 45; 3866 Am. Compl. ¶ 42.)  Lanier alleges that each system operates pursuant to a "market data reporting plan."  (3745 Am. Compl. ¶ 45; 3865 Am. Compl. ¶ 46; 3866 Am. Compl. ¶ 43.)  Each plan has a Processor which collects, processes, and disseminates the applicable market data it receives from each of defendants that are participants in a plan.  (3745 Am. Compl. ¶ 46; 3865 Am. Compl. ¶ 47; 3866 Am. Compl. ¶ 44.)  On behalf of the participants in a plan, the processor disseminates market data to subscribers through the SIPs

or Subscriber Feeds.  (3745 Am. Compl. ¶ 46; 3865 Am. Compl. ¶ 47; 3866 Am. Compl. ¶ 44.)

     C.    <u>The Plans</u>

The plan for the Nasdaq UTP System is called the Joint Self-Regulatory Organization Plan Governing the Collection, Consolidation and Dissemination of Quotation and Transaction Information for Nasdaq-listed Securities Traded on Exchanges on an Unlisted Trading Privilege Basis (the "Nasdaq UTP Plan.")  (3865 Am. Compl. ¶ 46.)  Nasdaq is the processor for this plan. (3865 Am. Compl. ¶ 52.) For the OPRA System the plan is called the OPRA Plan.  (3866 Am. Compl. ¶ 43.) OPRA is the processor for the OPRA Plan.  (3866 Am. Compl. ¶ 46.)  The CQS operates pursuant to the CQ Plan, and the CTS operates pursuant to the CTA Plan. (3745 Am. Compl. ¶ 45.)  The CQS and CTS market data are processed and disseminated through two networks, one for securities listed on the New York Stock Exchange ("NYSE") (referred to as "Network A"), and the second for a number of other exchanges (including several named as defendants in this action) (referred to as "Network B").  (3745 Am. Compl. ¶ 49.)  The Securities Industry Automation Corporation ("SIAC") acts as the Processor for the CQ Plan and the CTA Plan. (3745 Am. Compl. ¶ 53.)  It receives the market data for both Network A and Network B from defendants and aggregates that data into consolidated data that is then sent out to subscribers.  (3745 Am. Compl. ¶ 53.)

The CQ Plan and the CTA Plan state that data must be provided on "fair and reasonable terms" that are "not discriminatory."  (3745 Am. Compl. ¶ 56 & n.25.) The OPRA Plan provides that the Exchange Defendants must disseminate "valid

market data" to the Processor on a "uniform, nondiscriminatory" basis and on "fair and reasonable terms." (3866 Am. Compl. ¶ 61 & n.14.) The Nasdaq UTP Plan provides that defendants must "promptly" transmit "accurate" market data for securities covered by the Plan to the processor for dissemination to subscribers. (3865 Am. Compl. ¶ 65 & n.22.) The Nasdaq UTP Plan also provides that such data be distributed on a "fair and non-discriminatory manner." (3865 Am. Compl. ¶ 66 & n.23.)

To receive the market data pursuant to any one of these plans, a subscriber must enter into a subscriber contract with the relevant processor. (3745 Am. Compl. ¶ 54; 3865 Am. Compl. ¶ 68; 3866 Am. Compl. ¶ 73.)

D.   The Subscriber Contract

Plaintiff Lanier alleges that he entered into subscriber contracts for the receipt of valid market data disseminated by the Exchange Defendants pursuant to each of the plans. (3745 Am. Compl. ¶ 20; 3865 Am. Compl. ¶ 20; 3866 Am. Compl. ¶ 20.) Lanier alleges that he and other subscribers paid periodic fees in exchange for the receipt of valid market data on a "non-discriminatory basis." (3745 Am. Compl. ¶ 78; 3865 Am. Compl. ¶ 74; 3866 Am. Compl. ¶ 71.)

The CQ and CTA subscriber contracts are materially the same. (Compare 3745 Am. Compl. ex. A, with 3745 Am. Compl. ex B.) Both contracts are entitled "Agreement for Receipt of Consolidated Network [A/B] Data and [NYSE/AMEX] Market Data." (3745 Am. Compl. exs. A-B.) Each agreement's preamble provides for the receipt of "Market Data." (3745 Am. Compl. exs. A-B.) The definition of "Market Data" in each agreement provides, inter alia, that "last sales prices and

information deriving from those prices cease to be 'Market Date' [sic] 15 minutes after the Authorizing SRO(s) make the prices available over their low speed data transmission facilities," and that NYSE or AMEX "may alter such period from time to time on 60 days' written notice to Subscriber." (3745 Am. Compl. ex. A ¶ 1(c), ex. B ¶ 1(c).)

Paragraph 6 provides "DATA NOT GUARANTEED." (3745 Am. Compl. ex. A ¶ 6, ex. B ¶ 6.) It states in pertinent part:

> Neither NYSE, any Authorizing SRO nor the Processor (the "disseminating parties") guarantees the timeliness, sequence, accuracy, or completeness of Market Data or other market information or messages disseminated by any disseminating party. No disseminating party shall be liable in any way to Subscriber or to any other person for (a) any inaccuracy, error or <u>delay</u> in, or omission of, (i) any such data, information, or message, or (ii) the transmission or delivery of any such data, information or message, or (b) any loss or damage arising from or occasioned by (i) any such inaccuracy, error, <u>delay</u> or omission, [or] (ii) non-performance . . . .

(3745 Am. Compl. ex. A ¶ 6, ex. B ¶ 6 (emphasis added).) Paragraph 7 provides:

> DISSEMINATION DISCONTINUANCE OR MODIFICATION -- The Authorizing SROs may discontinue disseminating any Type of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages to Subscriber.

(3745 Am. Compl. ex. A ¶ 7, ex. B ¶ 7.) Paragraph 9 contains a standard integration provision. (<u>See</u> 3745 Am. Compl. ex. A ¶ 9, ex. B ¶ 9.) Paragraph 12 provides:

> APPLICABILITY OF THE 1934 ACT AND PLANS -- This Agreement is subject to the Securities and Exchange Act of 1934, the rules under that act, the CTA Plan . . . and the CQ Plan . . . .

(3745 Am. Compl. ex. A ¶ 12, ex. B ¶ 12.)

The Nasdaq Subscriber Agreement provides:

> DISCLOSURE – PLEASE READ
> ...
> MOST TYPES OF DAMAGES ARE EXCLUDED AND REMAINING DAMAGES ARE LIMITED: Nasdaq is not liable for trading losses, lost profits, or incidental, consequential or other indirect damages, even if the information is untimely or incorrect. . . .
>
> NO IMPLIED OR STATUTORY WARRANTIES OR DUTIES: . . . There are no express warranties except for a Limited Warranty regarding efforts only.   STOCK QUOTES MIGHT NOT BE CURRENT OR ACCURATE.

(3865 Am. Compl. ex. A at 1.)  Paragraph 9 of this agreement provides, in pertinent part:

> NASDAQ'S       WARRANTIES/DISCLAIMER       OF WARRANTIES.   NASDAQ shall endeavor to offer the Information as promptly and accurately as is reasonably practicable. . . .  In the event that the information is not available, is delayed, is interrupted, is incomplete, or is not accurate or is otherwise materially affected . . . [Subscriber's exclusive remedies are limited to a credit or refund of fees].

(3865 Am. Compl. ex A. ¶ 9.)  Paragraph 10 provides for a limitation of liability as to Nasdaq.  (See 3865 Am. Compl. ex A. ¶ 10.)  Paragraph 21 provides for modifications only in writing.  (See 3865 Am. Compl. ex A. ¶ 21.)

The preamble to the OPRA Subscriber Agreement states that the Subscriber (referred to in the agreement as the "Applicant") is seeking approval to obtain

information published by OPRA "pursuant to a Plan declared effective by the

Securities and Exchange Commission."  (3866 Am. Compl. ex. A.)  Paragraph 8 of

the agreement provides, in pertinent part:

> DISCLAIMER OF LIABILITY – NEITHER OPRA NOR
> ANY OPRA PARTICIPANT GUARANTEES THE
> TIMELINESS, SEQUENCE, ACCURACY OR
> COMPLETENESS OF ANY OF THE OPTIONS LAST
> SALE PRICES, QUOTATION INFORMATION OR
> OTHER MARKET INFORMATION SUPPLIED TO
> APPLICANT HEREUNDER AND NEITHER OPRA NOR
> ANY OPRA PARTICIPANT SHALL BE LIABLE IN ANY
> WAY TO APPLICANT OR TO ANY OTHER PERSON,
> FOR ANY DELAYS, INACCURACIES, ERRORS IN OR
> OMISSIONS OF, ANY OF THE INFORMATION OR
> THE TRANSMISSION THEREOF, OR FOR ANY
> DAMAGES ARISING THEREFROM . . . .

(3866 Am. Compl. ex. A ¶ 8.)

      E.   <u>Alleged Advance Access</u>

Lanier alleges that defendants "provide" market data to Preferred Data

Customers via private feeds that "make the data available to Preferred Data

Customers before the data is made available to the Processor."  (3745 Am. Compl.

¶89; 3865 Am. Compl. ¶ 85; 3866 Am. Compl. ¶ 81.)  This is accomplished through

the use of "transmission lines for the Private Feeds that carry the data to Preferred

Data Customers in a fraction of the time it takes for the slower transmission lines

to make the same market data available to the Processor."  (3745 Am. Compl. ¶ 89;

3865 Am. Compl. ¶ 85; 3866 Am. Compl. ¶ 81.)  Thus, while it takes—on average—

about 1500 microseconds for the market data to arrive at the Processor, Preferred

Data Customers receive the data in as fast as one microsecond.  (3745 Am. Compl.

¶ 90; 3865 Am. Compl. ¶ 86; 3866 Am. Compl. ¶ 82.)  In addition, Lanier alleges

that defendants market and sell advance access by permitting Preferred Data Customers to "co-locate" their services in close proximity to the servers that transmit the market data.  (3745 Am. Compl. ¶ 95; 3865 Am. Compl. ¶ 91; 3866 Am. Compl. ¶ 87.)  Co-location provides additional microseconds as the data is required to travel a shorter distance.  (3745 Am. Compl. ¶ 96; 3865 Am. Compl. ¶ 92; 3866 Am. Compl. ¶ 88.)

## II.   PLAINTIFF'S CLAIMS

In each of the three actions, Lanier has asserted claims for breach of contract, constructive trust and unjust enrichment.  In support of his contract claim, Lanier alleges that defendants were obligated to provide "valid market data" on a "non-discriminatory basis" in exchange for subscription fees.  (3745 Am. Compl. ¶¶ 136, 139(B); 3865 Am. Compl. ¶¶ 131, 134(B); 3866 Am. Compl. ¶¶ 125, 128(B).)  The constructive trust claim is plead as an alternative to the breach of contract.  (3745 Am. Compl. ¶ 148; 3865 Am. Compl. ¶ 143; 3866 Am. Compl. ¶ 137.)  Lanier's unjust enrichment claims are based on defendants' failure to provide him with "valid market data" in a uniform, fair, and non-discriminatory manner.  (3745 Am. Compl. ¶ 160; 3865 Am. Compl. ¶ 155; 3866 Am. Compl. ¶ 149.)  Lanier alleges that defendants were able to charge premium fees to Preferred Data Customers based on their provision of data on a less timely basis to plaintiff (and others in the proposed class); this timing difference enable the Preferred Data Customers to obtain trading advantages.  (3745 Am. Comp. ¶¶ 13, 16, 87; 3865 Am. Compl. ¶¶ 13, 16, 83; 3866 Am. Compl. ¶¶ 13, 16, 79.)

III.   STANDARD OF REVIEW

Defendants argue for dismissal based both on a lack of subject matter jurisdiction as well as failure to state a claim.

A.   Rule 12(b)(1)

A district court is a court of limited jurisdiction.  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Before deciding any case, a district court must assure itself that the case is properly within its subject matter jurisdiction.  Wynn v. AC Rochester, 273 F.3d 153, 157 (2d Cir. 2001).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).  The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.  Id. (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)).  In resolving a motion to dismiss under Rule 12(b)(1), the Court must construe all ambiguities and draw all inferences in plaintiff's favor. See id.

In reviewing a motion to dismiss for a lack of subject matter jurisdiction pursuant to Rule 12(b)(1), this Court must accept as true the uncontroverted and well plead factual allegations in the complaints and draw all reasonable inferences in favor of plaintiff.  Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

B.     Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949.

In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  Id.  If the court can infer no more than "the mere possibility of misconduct" from the factual averments—in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate.  Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 129 S. Ct. at 1950).

IV.   THE EXCLUSIVE FEDERAL REGULATORY SCHEME

The threshold question of whether this Court has subject matter jurisdiction over Lanier's claims depends on whether those claims have been preempted by the

Exchange Act and various regulations promulgated thereunder.  For the reasons that follow, the Court concludes that Lanier's claims are preempted.

A.     Preemption

Congress has the power to preempt state law.  <u>Arizona v. United States</u>, 132 S. Ct. 2492, 2500-01 (2012).  As a result, the States may not regulate conduct in a field "that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  <u>Id.</u>  An intent to displace state law may be "inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  <u>Id.</u> at 2501 (quoting <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947)).  State laws may also be preempted when they conflict with federal law.  <u>Id.</u>

"The purpose of Congress is the ultimate touchstone" in any preemption analysis.  <u>In re Series 7 Broker Qualification Exam Scoring Litig.</u>, 548 F.3d 110, 113 (2d Cir. 2008) (alteration in original) (quoting <u>Retail Clerks Int'l Assn v. Schermerhorn</u>, 375 U.S. 96, 103 (1963)).  In preemption analysis, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  <u>Id.</u> (quoting <u>Rice</u>, 331 U.S. at 230).

Whether a state law cause of action has been preempted by a federal statute may be apparent on the face of the statute itself or by necessary implication based on the depth and breadth of the scheme.  <u>In re Series 7</u>, 548 F.3d at 113.  The

determination as to whether a breach of contract claim has been preempted turns on both the nature of the violation and relief.  See id. at 113-15.  If the alleged conduct is within the ambit of what Congress has reserved to itself, the claim is very likely preempted; similarly, if the remedy sought would necessarily tread on an area Congress has reserved to itself, the claim is very likely preempted.  See id. at 114 (determining that a breach of contract claim relating to the determination of competency standards for brokers was preempted by a comprehensive federal regulatory scheme).  Even a "genuine" breach of contract suit may be preempted if it "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. (quoting Barbara, 99 F.3d at 59).  "[C]ourts have consistently found Congress's intent under the Exchange Act precludes common law causes of action."  Id.

     B.    Regulatory Scheme

         1.    Overarching structure.

Section 6(a) of the Exchange Act requires national securities exchanges to register with the SEC.  15 U.S.C. § 78f(a).  The Exchange Act designates national securities exchanges to be "self-regulatory organizations" ("SROs").  Id. § 78c(a)(26).  Under the Exchange Act, SROs are both subject to an extensive regulatory scheme and delegated regulatory powers and responsibilities, including "planning, developing, operating or regulating" a "national market system."  See id. §§ 78f(b)(5), 78k-1(a)(3)(B); see also DL Capital Group, LLC v. NASDAQ Stock Mkt., Inc., 409 F.3d 93, 95 (2d Cir. 2005) (explaining authority of SROs).  The concept of a national market system was created in 1975 through an amendment to the

Exchange Act that provided for a "linking of all markets for qualified securities through communication and data processing facilities," which would "foster efficiency, enhance competition, increase the information available to brokers, dealers and investors, facilitate the offsetting of investors' orders, and contribute to best execution of such orders." 15 U.S.C. § 78k-1(a)(1)(D). Congress provided that the SROs could act jointly to carry out this mandate, subject to oversight by the SEC. Id. §§ 78k-1(a)(3)(B).

Section 11A of the Exchange Act gives the SEC "pervasive rulemaking power to regulate securities communications systems," H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975), and requires SROs the comply with rules promulgated by the SEC governing the "distribution" of information "with respect to quotations for and transactions in . . . securities," 15 U.S.C. 78k-1(c)(1). Under Section 11A, the SEC must promulgate rules to ensure that investors "may obtain on terms which are not unreasonably discriminatory . . . information with respect to quotations for and transactions in such securities as is published or distributed by any [SRO] . . . ." Id. § 78k-1(c)(1)(D).

To carry out this assignment, the SEC promulgated a number of rules and regulations, including Regulation NMS. See Regulation NMS, 70 Fed. Reg. 37,496 (June 29, 2005) [hereinafter "NMS Adopting Release"] (codified at 17 C.F.R. §§ 242.600-.613). Rule 603 of Regulation NMS requires SROs to "act jointly pursuant to one or more effective national market system plans to disseminate consolidated information, including a national best bid and national best offer, on

quotations for and transactions in NMS stocks."  17 C.F.R. § 242.603(b).  This Rule

further provides that SROs are to distribute quotation and transaction information

on "terms that are fair and reasonable" and that are "not unreasonably

discriminatory."[2]  Id. § 242.603(a).  Under Rule 608(c) of Regulation NMS, each SRO

"shall, absent reasonable justification or excuse, enforce compliance with any such

plan."  17 C.F.R. § 242.608(c).

The plans cited by Lanier's complaint have been approved by the SEC

pursuant to these regulations.[3]  Forms of certain of the Subscriber Agreements have

also been approved by the SEC.  See Exchange Act Release No. 34-47230, 68 Fed.

Reg. 4259, 4259-60 (Jan. 28, 2003) (approving OPRA's revised form of vendor

agreement and a revised consolidated form of "Subscriber Agreement"); Exchange

---

[2] Rule 603 does not apply to exchanges that trade options because that rule applies only to "quotations for or transactions in an NMS stock," 17 C.F.R. § 242.603(a), and an "NMS stock" is defined in Regulation NMS as "any NMS security other than an option," id. § 242.600(47).  However, the national securities exchanges that trade options also submitted a plan related to the dissemination of quotations and transactions in options to the SEC pursuant to Rule 608, and that plan has been approved by the SEC.  Like Rule 603, § 5.2(c)(i) of the OPRA Plan requires the dissemination of data to be "uniform" and "nondiscriminatory," and to be on "on fair and reasonable terms."  Options Price Reporting Auth., LLC, Limited Liability Company Agreement of Options Price Reporting Authority, LLC § 5.2(c)(i) (2010), available at http://www.opradata.com/pdf/opra_plan.pdf.

[3] The SEC first approved the CTA Plan in 1974, finding it to be "an appropriate vehicle for the consolidated reporting of transactions in listed securities" and that its approval was consistent with "the maintenance of fair and orderly markets, the public interest and the protection of investors." Consolidated Tape Plan, Exchange Act Release No. 34-10787, 1974 WL 163426 (May 10, 1974).  The SEC first approved the CQ Plan in 1978, finding it would "provide an appropriate basis for the creation of a composite quotation system—an essential element of a national market system." American Stock Exchange, Inc. and New York Stock Exchange, Inc., Exchange Act Release No. 34-15009, 1978 WL 195902 (July 31, 1978).  The SEC first approved the NASDAQ UTP Plan in 1990, finding that it would "enhance market efficiency and fair competition, avoid investor confusion, and facilitate regulatory surveillance of concurrent exchange and OTC trading."  Approving Proposed Reporting Plan for NASDAQ/NMS Securities, Exchange Act Release No. 34-28146, 1990 WL 312325 (June 26, 1990).  The SEC first approved the OPRA Plan in 1981.  Matter of American Stock Exchange, Inc., Exchange Act Release No. 34-17638, 1981 WL 36678 (Mar. 18, 1981).

Act Release No. 20386, 48 Fed. Reg. 53,616, 53,616-17 (Nov. 28, 1983) (approving the CTA non-professional subscriber agreement).

Compliance with Rule 603 of Regulation NMS is overseen by the SEC.  See, e.g., In re New York Stock Exchange LLC, Exchange Act Release No. 34-67857, 2012 WL 4044880, at *3 (Sept. 14, 2012).  The SEC has broad authority to supervise, investigate, and discipline SROs for wrongdoing.  In re NYSE Specialists Sec. Litig., 503 F.3d 89, 101 (2d Cir. 2007).  When a party believes he has been aggrieved by another's failure to comply with Regulation NMS, he may apply to the SEC for review.  17 C.F.R. § 242.608(d)(1). SEC administrative decisions can be appealed to a federal court of appeals.  15 U.S.C. § 78y(a)(1).

2.   <u>Regulation of data dissemination and timing issues.</u>

The SEC has also approved the SROs' use of proprietary feeds, and has recognized that exchanges developed proprietary feeds to address the needs of traders who are "latency sensitive" and who desire the data "to power certain trading algorithms or smart order routers."  Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293, 13,294 (Mar. 26, 2009) (order approving sale of proprietary feed of last sale data by NYSE); NMS Adopting Release at 37,566-67; see also, e.g., Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,770, 74,780 (Dec. 9, 2008) (referring to the SEC's finding in 2005 that allowing the independent dissemination of unconsolidated data by SROs was desirable as "it allows greater flexibility for market forces to determine data products and fees").  The SEC has acknowledged that these feeds offer speed advantages over consolidated data feeds.  Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293, at 13,294 n.7 ("The latency difference

between accessing last sales through the NYSE datafeed or through the CTA datafeed can be measured in tens of milliseconds.").

In addition to regulating proprietary feeds, the SEC regulates co-location services, which it views as a "material aspect of the operation of the facilities of an exchange." Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3610 & n.76 (Jan. 21, 2010). The SEC has recognized that co-location services provide added speed that may save "micro-seconds of latency." Id. at 3610.

The SEC has interpreted Rule 603 to require SROs to transmit data to processors not later than they transmit such data to the proprietary feeds; the SEC has not interpreted Rule 603 to require that subscribers receive data at the same time or earlier than other customers receive the data via proprietary feeds. See NMS Adopting Release at 37,567 ("[A]dopted Rule 603(a) prohibits an SRO or broker-dealer from transmitting data to a vendor or user any sooner than it transmits the data to a Network processor." (emphasis added)). During the notice and comment period for Regulation NMS, the SEC was asked to clarify whether the proposed rules would require an SRO to slow the delivery of its proprietary data so that it would be received no faster than the data disseminated through the consolidated data stream, and the SEC's response was that "Rule 603(a) will not require a market center to synchronize the delivery of its data to end-users with delivery of data by a . . . processor to end-users." Id. at 37,567.

C.    Analysis

The key question the Court must answer in order to determine whether it has subject matter jurisdiction over this action is whether the statutory scheme

described above preempts Lanier's state law breach of contract claims.  That is, do Regulation NMS and the rules promulgated under it (in particular, Rules 603 and 608) demonstrate Congress's intent to reserve for itself and the SEC total oversight of the conduct at issue here?  The answer to this question turns principally on the characterization of Lanier's claims.

How, according to Lanier, have the Exchange Defendants violated their contractual obligations to him?  Lanier alleges that the Exchange Defendants have done so by providing unconsolidated data to Preferred Data Customers via proprietary feeds, which enables them to receive it as much as 1,499 microseconds earlier than subscribers receive consolidated data through SIPs and Subscriber Feeds.  According to Lanier, the fact that the Exchange Defendants transmit market data in such a manner that Preferred Data Customers receive it more quickly violates the nondiscrimination and fairness provisions of the CQ Plan, CTA Plan, OPRA Plan, and Nasdaq UTP Plan, as well as the prompt transmittal provision of the NASDAQ UTP Plan, each of which is incorporated into the Subscriber Agreements by reference.  Thus, the Subscriber Agreements' references to the plans work feats of legal alchemy: they convert claims that are ultimately based on a violation of federal regulations into state law breach of contract claims.

The problem with this argument is that the SEC has acknowledged that SROs' use of proprietary feeds and co-location may allow certain traders to gain speed advantages—and in a number of Exchange Act Releases, it has approved their use nonetheless.  <u>See, e.g.</u>, Exchange Act Release No. 34-61358, 75 Fed. Reg.

3594 at 3610 & n.76; Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293 at 13,294; NMS Adopting Release at 37,567.  Awarding Lanier relief on his breach of contract claim would require this Court to in essence determine that the Exchange Defendants are violating the plans, even though the SEC's Exchange Act Releases indicate that the SEC is not of the view that this conduct violates the plans.  While one might question the wisdom of the SEC's stance on this issue and its fairness to ordinary investors, it is nevertheless clear that success for Lanier on his breach of contract claims would create a conflict between federal law (as interpreted by the SEC) and state law (as interpreted by this Court).  Thus, were Lanier to succeed on his contract claims, there would be a conflict between state law and federal law.  Lanier's claims are therefore preempted for this reason alone.

But that is not the only reason why Lanier's claims are preempted.  Indeed, it is clear that Congress intended to create a comprehensive federal regulatory scheme governing the dissemination of data in a national market system.  The breadth and depth of this scheme—which encompasses rules and regulations developed by both the SEC and SROs, SEC oversight, and an SEC adjudication process subject to appeal to in federal court—is evident from the description above.

For these reasons, Lanier's claims are preempted both under the doctrine of conflict preemption and under the doctrine of field preemption, and must accordingly be dismissed.  In short, the SEC and not this Court must determine whether the defendant SROs have provided information in a manner that violates their obligations under Regulation NMS.  Rule 608 provides plaintiff with a means

of seeking redress for his concerns, and relief consistent with that authorized by Congress.  As this Court has determined that it lacks subject matter jurisdiction over this action, it need not reach the more difficult question of whether the Exchange Defendants are entitled to absolute immunity.[4]

## V.   DISCUSSION OF THE CONTRACTS

Even if this court were to find that it has jurisdiction over Lanier's claims, it would nonetheless dismiss them pursuant to rule 12(b)(6).  Lanier has failed to allege facts sufficient for this Court to conclude that the Exchange Defendants have breached a contractual obligation to him under the Subscriber Agreements.  Lanier sources the promises that he claims were breached by defendants to the fairness, nondiscrimination, and prompt-transmittal provisions of the plans, which are based on Rule 603 and which are, according to his allegations, incorporated into the Subscriber Agreements by reference to those plans.

---

[4] SROs are immune from actions challenging their performance of delegated governmental powers. DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc., 409 F.3d 93, 97-100 (2d Cir. 2005).  Immunity attaches when an SRO is performing a delegated regulatory function and when its conduct is consistent with the quasi-governmental powers delegated to them.  Id. at 97 (citing D'Alessio v. N.Y. Stock Exchange Inc., 258 F.3d 93, 106 (2d Cir. 2001); Barbara v. N.Y. Stock Exchange, Inc., 99 F.3d 49, 58 (2d Cir. 1996)).  Courts in this Circuit "apply a functional test to determine whether an SRO is entitled to immunity," under which SROs are absolutely immune from suit where the alleged misconduct concerns, inter alia, "the enforcement of security rules and regulations," or "the interpretation of the securities laws and regulations as applied to the exchange or its members."  Id. (citations omitted).

Defendants argue that Lanier's suits concern their regulatory activities, and that for this reason they are entitled to absolute immunity from the suits.  However, in the Court's view, it is a rather difficult question whether the conduct at issue here is truly regulatory (for example, involving the interpretation of the securities laws or the enforcement of security rules), as opposed to merely being regulated conduct.  The fact that an SRO has authority to regulate an activity does not imply that the SRO is acting as a regulator when it itself engages in that same activity.  That is, it is not clear that the SROs' transmission of data to paying clients is a regulatory act.  Because the Court has determined that Lanier's claims are preempted, it need not reach the question of whether defendants enjoy absolute immunity from suit for the conduct alleged in Lanier's complaints.

24

However, as explained above, under the SEC's interpretation of Rule 603, SROs are not required to ensure that subscribers receive consolidated data at the same time or earlier than other customers receive unconsolidated data from proprietary feeds.  See NMS Adopting Release at 37,567 ("Rule 603(a) will not require a market center to synchronize the delivery of its data to end-users with delivery of data by . . . processor to end-users.").  Further, the Subscriber Agreements make no promise regarding when subscribers shall receive consolidated data relative to when unconsolidated data is received by proprietary feed customers.[5]  Although the Nasdaq Subscriber Agreement provides that Nasdaq "shall endeavor to offer the Information as promptly and accurately as is reasonably practicable," (3865 Am. Compl. ex A. ¶ 9), Lanier alleges that consolidated data must go through the additional step of consolidation at a processor—which implies that its delivery in a slightly delayed manner relatively to unconsolidated data is inevitable absent the introduction of a timed delay for unconsolidated data feeds.  Thus, even taking all of Lanier's factual allegations are true, defendants are not in breach of any contractual obligation to him or others similarly situated to him.[6]

---

[5] Lanier's brief in opposition to the instant motions argues that defendants breached the Subscriber Agreements by "provid[ing] data to [Preferred Data Customers] before they provided that same data to the SIP."  (14-cv-3745 ECF No. 101 at 10-12 (emphasis in original).)  This allegation, which concerns the timing of processors' receipt of unconsolidated data, is different from the allegations in the complaints, which concern the timing of subscribers' receipt of consolidated data (though of course, those two concepts are related).  In any event, Lanier does not allege in his complaints that the Subscriber Agreements make any promises as to the timing of processors' receipt of unconsolidated data per se.  For this reason, Lanier's newfound allegations are irrelevant.

[6] The Court has assumed arguendo that the Subscriber Agreements incorporate the plans, but whether they do is a matter of debate among the parties.  The Nasdaq Subscriber Agreement does not reference a plan; the OPRA Agreement states that the subscriber shall receive information "published by [OPRA] pursuant to a Plan"; and the NYSE Subscriber Agreements provide only that they are "subject to" the CTA and CQ Plans.  (3865 Am. Compl. ex. A; 3866 Compl. ex. A; 3745 Am.

What is more, each of the Subscriber Agreements expressly disclaims any warranty as to timeliness or accuracy.  Lanier argues that public policy prevents SROs from disclaiming or Lanier from effectively waiving of the covenant of good faith and fair dealing.  This, according to Lanier, prevents the same contract from both promising to provide timely and accurate information and simultaneously disclaiming any obligation to do just that.  This argument misreads the Subscriber Agreements, which promise one thing: the provision of consolidated market data to Lanier and other subscribers like him.  The contracts do not prohibit provision of the same data in different forms to different kinds of customers, whether in consolidated or unconsolidated form.  And in general the duty of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim, as "breach of that duty is merely a breach of the underlying contract." Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002) (quoting Fasolino Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)).  Accordingly, Lanier has failed to state a claim for breach of contract.[7]

---

Compl. exs. A-B.)  The fact that an agreement states that it is "subject to" particular rules and regulations does not necessarily incorporate all of those rules and regulations into the contract, such that it would "contractually obligate [the defendant] to its customers to follow these rules and regulations so as to create a separate cause of action for any alleged violation of them." Gurfein v. Ameritrade, Inc., 312 Fed. App'x 410, 413 (2d Cir. 2009) (summary order).

[7] Lanier's unjust enrichment and constructive trust claims must also be dismissed.  Lanier's unjust enrichment claim must be dismissed because there is no dispute that Lanier was a party to contracts with defendants, and unjust enrichment applies only if there is no valid and enforceable contract at issue. Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586-87 (2d Cir. 2006) (quoting Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572 (N.Y. 2005)).

Additionally, Lanier's constructive trust claim fails because Lanier has alleged that he and the Exchange Defendants were engaged only in arms-length commercial transactions—he has not alleged a confidential or fiduciary relationship between him and any of the Exchange Defendants. See, e.g., In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002).  It also fails because Lanier has not alleged that any of the funds from the payments he made under his contracts with the

VI.    CONCLUSION

For the reasons set forth above, defendants' motions are GRANTED.

Dismissal is with prejudice as any amendment could not avoid the preemption issue

or avoid the dispositive contract language.

The Clerk of Court is directed to close the motions at 14-cv-3745 ECF No. 97,

14-cv-3865 ECF No. 92, and 14-cv-38666 ECF No. 83, and to terminate these

actions.

SO ORDERED.

Dated:      New York, New York
            April 28, 2015

_____
KATHERINE B. FORREST
United States District Judge

---

Exchange Defendants were placed (or should have been placed) into segregated accounts.  See
Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 103-04 (2d Cir. 2005) (noting that equitable
restitution in the form of a constructive trust or equitable lien is not applicable in situations where
the monies at issue were not required to be and are not placed in a segregated account); see also FTC
v. Bronson Partners, LLC, 654 F.3d 359, 373 (2d Cir. 2011) ("Tracing is necessary where a private
plaintiff seeks to impose a constructive trust . . . .").